## BEFORE THE UNITED STATES JUDICIAL PANEL
## ON MULTIDISTRICT LITIGATION

MDL NO. 2599

IN RE:

**TAKATA AIRBAG PRODUCTS
LIABILITY LITIGATION**

_____/

### <u>EXHIBIT</u>

*Alimanovic, et al. v. Mercedes-Benz USA, LLC, et al.* **Complaint**

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

NERMINA ALIMANOVIC
and ELVIR ISLAMOVIC,

      Plaintiffs,

                                    Case No.:

v.

MERCEDES-BENZ USA, LLC,
a foreign limited liability
company; MERCEDES-BENZ
RESEARCH AND
DEVELOPMENT NORTH
AMERICA, INC., a foreign
corporation; DAIMLER
NORTH AMERICA
CORPORATION, a foreign
corporation; DAIMLER AG, a
foreign corporation,

      Defendants.

---

# COMPLAINT

---

      Plaintiffs, Nermina Alimanovic and Elvir Islamovic, through their undersigned counsel, hereby sue Defendants, Mercedes-Benz USA, LLC, a foreign limited liability company, Mercedes-Benz Research and Development North America, Inc., a foreign corporation, Daimler North America Corporation, a foreign corporation, and Daimler AG, a foreign corporation

(collectively, the "Mercedes-Benz Defendants"), for the claims for relief stated herein.

## SUMMARY OF THE ACTION

1.      Plaintiffs, Nermina Alimanovic ("Nermina") and Elvir Islamovic ("Elvir"), bring this action to recover for the severe, permanent, and life-altering injuries they suffered when the defective Takata airbag inflator installed in their 2012 Mercedes-Benz C-250 (VIN # WDDGF4HB0CA626808) (the "Mercedes Vehicle") unexpectedly ruptured, exploded, and shot metal shrapnel into their faces and bodies during a vehicular collision that occurred in the Middle District of Florida on November 7, 2020.

### Nermina Alimanovic's Airbag Shrapnel Injuries



2.     Following an investigation of the incident, it was discovered that the Mercedes-Benz Defendants are responsible for designing, manufacturing, procuring, and installing the exploding Takata airbag inflator that caused Plaintiffs' injuries and that the Takata airbag inflator is defective and unreasonably dangerous under Florida law.

3.     Specifically, the Mercedes Vehicle's airbag inflator[1] and airbag module[2] that injured Plaintiffs were Original Equipment Manufacturer ("OEM") component parts—manufactured at plants in Freiberg and Aschaffenburg (Nikkheim), Germany, respectively, and placed inside the Mercedes Vehicle by Defendant, Daimler AG.

**Metal Shrapnel from the Ruptured Airbag Inflator**



___

[1]     The subject inflator's serial number is XBFB23800071, produced on August 26, 2011, in lot 11237F01.
[2]     The subject airbag module's serial number is MEZZZ12510197, produced on August 8, 2011, with propellant lots V4Y00348 and 8YB03342.

4.     Astonishingly, it was further discovered that the Mercedes-Benz Defendants knew about the Takata airbag inflator's defectively dangerous condition for several years prior to the incident that forms the basis of this lawsuit, but for self-serving economic reasons, the Mercedes-Benz Defendants procured and installed the Takata airbag inflator in the Mercedes Vehicle anyway, in blatant disregard of Plaintiffs' health and safety.

5.     Before they began equipping their vehicles with defective Takata airbags, the Mercedes-Benz Defendants expressed concern over clear signs of overpressurization, module cover tearing, cushion tearing, output variability, and module integrity during post-deployment—all signs of potentially serious inflator and propellant defects.

6.     Despite these concerns, and despite its knowledge that Takata's airbags could not meet a key set of industry standards, the Mercedes-Benz Defendants approved multiple models of ammonium-nitrate inflators, including the model used in the Mercedes Vehicle. Indeed, the Mercedes-Benz Defendants went so far as to waive key performance variables and accept deviations in order to push the airbags through the approval process.

7.     Beyond the notice and warnings they received through their internal review and testing, as well as interactions with Takata, the Mercedes-Benz Defendants also belong to a German car consortium (Volkswagen, Porsche, and BMW) that—no later than 2007—was discussing

the risks of ammonium-nitrate inflators with Takata. That consortium, often referred to as Arbeitskreis or the Group of Five Working Committee (the "Group of Five"), among other things, adopts and maintains technical standards for airbags and inflators.

8. The Group of Five's standards have, at minimum, contributed to Defendants' airbag and inflator testing standards during the relevant time period implicated by this lawsuit. The Group of Five met with Takata on at least one occasion, in or about February 2007, to discuss the ammonium-nitrate airbag inflators.

9. Because of their membership in the Group of Five, the Mercedes-Benz Defendants were, or should have been, aware of ruptures and/or abnormal deployments in their vehicles. See infra ¶¶ 64, 105, 111–12, 133, 138.

10. The Mercedes-Benz Defendants not only had knowledge of the Takata inflator defect through their own interactions with Takata and work in the Group of Five, they also tracked Takata's interactions with other major automakers.

11. The Mercedes-Benz Defendants knew or should have known that other major automakers' field ruptures involved one of the Mercedes-Benz Defendants' key suppliers.

12.     And, as explained in greater detail below, despite repeated recalls by others in the auto industry—such as Honda's recalls of airbags with the Takata inflator defect in 2008 (in which the recall notice expressly noted the risk that Takata airbags "could produce excessive internal pressure," causing "the inflator to rupture," spraying metal fragments through the airbag cushion), 2009, 2010, 2011, and 2013—Defendants utterly failed to take reasonable measures to investigate the issue or protect purchasers, lessees, and the general public.

13.     The Mercedes-Benz Defendants are directly responsible for Plaintiffs' injuries that were caused by the explosion of the inflator incorporated into the airbag safety system (herein referred to as the "Takata airbag," "Defective Airbag(s)," "airbag safety system," "Airbag Safety System," "airbag system," "safety system," or "airbag").

## THE PARTIES, JURISDICTION & VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because neither Plaintiff is a citizen of a state of which any Defendant is a citizen and the amount in controversy exceeds $75,000.

15.     This is an action for damages in excess of Seventy-Five Thousand Dollars and no cents ($75,000.00), exclusive of fees and costs.

16.     At all times material hereto, Plaintiffs are, and were, Florida citizens.

17.    At all times material hereto, Defendant Mercedes-Benz USA ("MBUSA") is a Delaware limited liability corporation whose principal place of business is located in Georgia and is authorized to do and doing business throughout the state of Florida, for which it receives substantial revenue. MBUSA's only member is Daimler North America Corporation, a Delaware corporation with its principal place of business in Michigan. MBUSA is a wholly-owned subsidiary of Daimler AG and engages in business, including the advertising, marketing, and sale of Mercedes-Benz vehicles, including the Mercedes Vehicle, in Florida, in furtherance of the interests of Daimler AG. MBUSA is Daimler AG's principal North American subsidiary. MBUSA renders services on behalf of Daimler AG that are sufficiently important to Daimler AG and its sale of vehicles in the United States that Daimler AG would perform those services itself if MBUSA did not exist. Daimler AG controls the public name and brand of MBUSA.

18.    At all times material hereto, Defendant, Daimler North America Corporation ("DNAC") is the parent company of MBUSA. DNAC is a Delaware corporation with its principal place of business located in Michigan. DNAC is a holding company for all of Daimler AG's United States business units, including MBUSA and Mercedes-Benz Research and Development North America, Inc. ("MBRDNA"), and DNAC is responsible for all aspects of Daimler AG's business in the United States.

19.     At all times material hereto, Defendant, MBRDNA is a Delaware corporation with its principal place of business in California. MBRDNA is engaged in research and development technologies incorporated into Mercedes-Benz vehicles sold in the State of Florida.

20.     At all times material hereto, Defendant, Daimler AG is the parent corporation of MBUSA, MBRDNA, and DNAC. Daimler AG is a German corporation with its principal place of business located in Germany. Daimler AG is responsible for all aspects of Mercedes-Benz business worldwide, including but not limited to design, manufacturing, testing, inspection, assembly, distribution, marketing, sales, finance, leasing, and customer service of Mercedes-Benz vehicles, including MBUSA vehicles such as the Mercedes Vehicle.

21.     Daimler AG announced on February 26, 2018, that "Mercedes-Benz employs thousands of Americans, supports communities, and is investing in the U.S.," and touted that "Mercedes-Benz invests $1 billion in Tuscaloosa, creates 600 new jobs." Daimler AG also advertises its connection to Florida on its website, representing that its Jacksonville, Florida parts distribution center "supports dealers in the region with parts supply and houses parts inventory."

22.     Daimler AG and MBUSA are further connected by a General Distributor Agreement that gives Daimler AG the right to control nearly

every aspect of MBUSA's operations—including sales, marketing, management policies, information governance policies, pricing, and warranty terms. Daimler AG has, and at all relevant times had, the contractual right to exercise, and in practice has exercised, control over MBUSA's work, including but not limited to the manner of Mercedes-Benz vehicles' marketing, the scope of written warranties, and representations made and facts withheld from consumers and the public about the defect in the Mercedes Vehicle.

23.     Daimler AG has held MBUSA out as its agent for all purposes in the United States and Florida, but especially for sales and marketing of Mercedes-Benz vehicles and for ongoing management of relationships with purchasers and lessees of Mercedes-Benz vehicles in Florida. Daimler AG established MBUSA as its wholly-owned subsidiary company. It named MBUSA with its official "Mercedes-Benz" title. Daimler AG provided MBUSA with marketing and technical materials avoiding any distinction between Daimler AG and MBUSA, and instead representing MBUSA as nothing less than Daimler AG's presence in Florida for purposes of selling and leasing Mercedes-branded vehicles and providing related services.

24.     Daimler AG exerts a close degree of control over the actions of its subsidiaries, including MBUSA. For example, Daimler AG regularly submitted to MBUSA the paperwork necessary to complete required

applications needed to obtain certificates of conformity for a significant number of vehicles sold by Daimler AG in the United States. As another example, Daimler AG and MBUSA have together submitted requests to NHTSA to delay implementation of the Takata inflator recalls. MBUSA communicates with NHTSA on behalf of Daimler AG.

25. Daimler AG exerts control over the daily affairs of its American affiliates, including MBUSA, through inter alia: daily production plans directing worker activities and labor productivity set and sent by German management; requiring weekly reports to be sent from the United States to Germany so that German supervisors can oversee U.S. work; regular meetings held at U.S. facilities to direct activities and establish policies; and directing the method of promotions for workers at U.S. affiliates. Daimler AG also regularly implements common policies across U.S. affiliates by installing Daimler AG executives at U.S. affiliates.

26. Daimler AG exercises control over the work of MBUSA with respect to the manner of the vehicles' marketing, representations concerning the defective inflators equipped in its vehicles, and worldwide monitoring and analysis of claims that the defective inflators have ruptured or over-aggressively deployed. In a press release in February 2016, Daimler AG acknowledged that it made the decision to recall certain Mercedes-Benz

vehicles. MBUSA, as Daimler AG's agent, carried out the recall that Daimler AG initiated in the United States.

27. Daimler AG operates MBUSA with a unity of interest and ownership such that MBUSA is a mere instrumentality of its parent, Daimler AG. MBUSA and Daimler AG engage in the same business enterprise and share common board members and employees.

28. Daimler AG worked together with MBUSA to develop the owner's manuals, warranty booklets, product brochures, advertisements, and other promotional materials relating to Mercedes-Benz vehicles sold in Florida, with the intent that these documents would be distributed in Florida, and caused those materials to be disseminated throughout Florida.

29. Daimler AG controls MBUSA through, inter alia, Daimler AG's Board of Management, which is the ultimate body responsible for managing the Daimler Group, an operating unit identified by Daimler AG that includes MBUSA. As Daimler AG acknowledges in its annual report, Daimler AG's Board of Management establishes targets and requirements with which each subsidiary in the Daimler Group, including MBUSA, must comply. Daimler AG also exerts control over MBUSA through "Committees of the Daimler Group," which address key strategic issues, including those relating to product planning, investments, and management issues, for members of the Daimler Group, including MBUSA.

30.     Daimler AG acknowledged in a recent annual report that the United States is a key sales market for it. Daimler AG's sales to the United States and Florida in particular, are voluntary, intentional, and regular.

31.     Daimler AG supervisors certified to U.S. government officials that its vehicles met U.S. federal requirements and standards so that the vehicles could be sold in the United States. Daimler AG employees also affixed labels to the engines of Mercedes-Benz vehicles to disclose to U.S. Customs and Border Protection agents that the vehicles were covered by valid certificates for the United States.

32.     Daimler AG established channels for marketing its vehicles and providing regular advice to owners and lessees of its vehicles, including Plaintiffs, in Florida by licensing its trademarks to dealerships and authorizing dealerships to sell its vehicles.

33.     Daimler AG, through its affiliate MBUSA, created or controlled the distribution network, including dealerships that sell Mercedes-Benz branded vehicles in Florida.

34.     Daimler AG employees, managers, and supervisors have travelled to the United States and Florida and communicated with people in the United States and Florida to discuss, investigate, and evaluate Takata Phase Stabilized Ammonium Nitrate (PSAN) inflators and their defects.

35.     Several 2018 letters from Daimler AG's counsel to NHTSA disclose that both Daimler AG and MBUSA are involved in and responsible for the Takata inflator recall. In a submission to NHTSA, an MBUSA manager also certifies under penalty that he is "authorized by MBUSA and its parent company [Daimler AG] to execute documents on their behalf," confirming that MBUSA acts and is authorized to act as Daimler AG's agent.

36.     Daimler AG participated in the proceedings in Delaware federal court relating to Takata's bankruptcy, and two senior executives of Daimler AG, including an Executive Vice President, signed the Takata Chapter 11 plan to confirm that Daimler AG would be a "Consenting OEM," which provided for compensation to Daimler AG as a creditor of Takata.

37.     At all times material hereto, MBUSA acts as the sole distributor for Mercedes-Benz vehicles in the United States, purchasing those vehicles from Daimler AG in Germany for sale in the United States.

38.     Daimler AG has brought litigation in U.S. courts to protect its trademarks from infringement and counterfeiting. The protection afforded its trademarks and patents under U.S. law enabled Daimler AG to sell vehicles in the United States and Florida.

39.     In a recent complaint to enforce its trademark rights, Daimler AG conceded its direct role in controlling advertisements and marketing of its vehicles in the United States, stating: "Daimler has expended millions of

dollars in advertising across the country in connection with MERCEDES-BENZ mark. . . . Daimler has established the MERCEDES-BENZ mark as famous and/or well-known among U.S. purchasers of motor vehicles and wheels, as well as among the general members of the U.S. Public." And confirming its exercise of control over its U.S. subsidiaries, Daimler AG states: "To create and maintain goodwill among its customers, Daimler and its subsidiaries and/or licensees have taken substantial steps to assure that all authorized dealers and service providers using the MERCEDES-BENZ Mark are of the highest quality."

40.    Daimler AG licenses the use of the Mercedes trademarks to MBUSA to promote the sale of Mercedes-Benz vehicles in the United States and Florida.

41.    This Court has personal jurisdiction over the Mercedes-Benz Defendants pursuant to the Florida Long-Arm Statute, Fla. Stat. § 48.193(1)(a)(1), (2), and (6), because they conduct substantial business in Florida; Plaintiffs' claims arise out of the Mercedes-Benz Defendants' operating, conducting, engaging in or carrying on a business or business venture in Florida or having an office, agents, or representatives in Florida, arising out of the Mercedes-Benz Defendants' acts and omissions outside this state.

42.     The Mercedes-Benz Defendants are engaged in the business of designing, manufacturing, testing, and selling vehicles which are distributed and sold in retail stores throughout the United States and Florida specifically.

43.     Through their wholly-owned subsidiaries and/or agents, the Mercedes-Benz Defendants market their products in a continuous manner in the United States, including the State of Florida.

44.     By seeking distribution of their products in Florida, the Mercedes-Benz Defendants have purposefully availed themselves of doing business in the state of Florida in a meaningful way, and have sufficient minimum contacts to justify being subject to the jurisdiction of a Florida Court.

45.     Indeed, the Mercedes-Benz Defendants specifically target and serve the Florida market, through establishing distribution channels—including multiple authorized dealerships, and advertising the C-class vehicle in Florida—to build demand for their product.

46.     The first sale of the Mercedes Vehicle occurred in Florida. In 2011, the Mercedes-Benz Defendants sold the Mercedes Vehicle in Florida, where the Mercedes Vehicle was titled or registered as a rental vehicle by the Florida Motor Vehicle Department.

47. On June 21, 2012, the Mercedes Vehicle was serviced by the Mercedes-Benz Defendants' authorized dealership Mercedes-Benz of Palm Beach as a result of the Mercedes Defendants' efforts to specifically target and serve the Florida market.

48. The Mercedes-Benz Defendants submitted themselves to the jurisdiction of this Honorable Court by doing, personally or through their agents, at all times material to this cause of action, the following acts:

    a. Committing a tortious act within this state by selling and delivering defective vehicles, including Mercedes-Benz C250 vehicles, to persons, firms, or corporations in this state via distributors, dealers, wholesalers, and brokers. Such Mercedes-Benz vehicles were used by consumers in Florida in the ordinary course of commerce and trade;

    b. Conducting and engaging in substantial business and other activities in Florida by selling and servicing Mercedes-Benz vehicles and component parts to persons, firms, or corporations in this state via distributors, wholesalers, dealers, and brokers. Such Mercedes-Benz vehicles were used by consumers in Florida in the ordinary course of commerce and trade;

    c. The acts or omissions of the Mercedes-Benz Defendants caused injuries to persons, including Plaintiffs. At or about the time of said injuries, the Mercedes-Benz Defendants engaged in solicitation activities in Florida to purposefully promote the sale, consumption, and use of Mercedes-Benz vehicles, including the C250 which is the subject of this Complaint;

    d. Selling Mercedes-Benz vehicles and component parts, including the C250 which is the subject of this

Complaint, with knowledge or reason to foresee that their Mercedes-Benz vehicles would be shipped in interstate commerce and would reach the market of Florida users or consumers;

e. The Mercedes-Benz Defendants are subject to the Florida long-arm statute by doing business in Florida and by committing torts where one or more elements of the tort or one or more of the tortious acts occurred in Florida and by recruiting Florida residents for employment;

f. The claims against the Mercedes-Benz Defendants are linked, related, and/or arise out of the Mercedes-Benz Defendants' conduct;

g. Key elements of the tort occurred in Florida. Specifically, on November 7, 2020, Nermina was a front seat passenger in the Mercedes Vehicle that was driven by Elvir when the Mercedes Vehicle was involved in a collision (the "Incident") in the Middle District of Florida;

h. The Mercedes-Benz Defendants have purposefully availed themselves of Florida;

i. The Mercedes-Benz Defendants' contacts with Florida principally relate to the sale of vehicles and all of the conduct associated with such vehicle sales and this civil action is related to and connected with the sale of their vehicles;

j. Due process and fair play and substantial justice are honored by this civil action going forward in this Florida Court;

k. There is little or no burden on the Mercedes-Benz Defendants litigating this case in this Florida Court;

l. It would be a tremendous burden and great inefficiency and unnecessary delay imposed on

Plaintiffs to litigate this case in another forum;

m. Florida has an interest in overseeing this litigation which involves injuries to Florida residents and tortious transactions which occurred in Florida and defective products sold in Florida;

n. Public policy favors resolution of this dispute in this Florida Court;

o. The Mercedes-Benz Defendants' conduct and connection with Florida are such that the Mercedes-Benz Defendants should reasonably anticipate being haled into court[3] in Florida—Florida is the State of first sale of the Mercedes Vehicle.

50. The Mercedes-Benz Defendants cannot deny personal jurisdiction in this Court for the following reasons:

a. The Mercedes-Benz Defendants placed the Mercedes Vehicle into the stream of commerce under circumstances—Florida is the State of first sale—such that the Mercedes-Benz Defendants should reasonably anticipate being haled into court in Florida;

b. The Mercedes-Benz Defendants have a regular plan for the distribution of their new and used products within Florida with the goal of achieving a commercial benefit from the sale of those products in Florida;

---

[3] Daimler AG, as the parent of MBUSA, controls and communicates with MBUSA concerning virtually all aspects of vehicles containing defects in the United States. For example, in communications to investors about emissions investigations in the United States, Daimler AG has stated that it will defend itself against US class action lawsuits "with all available legal means." Press Release, Daimler Conducts Internal Investigation Regarding its Certification Process Related to Exhaust Emissions in the United States (April 22, 2016), *available at* https://www.daimler.com/documents/investors/nachricten/kapitalmarktmeldungen/daimler-ir-release-en-20160422-2.pdf.

c.   The Mercedes-Benz Defendants place their products into the stream of commerce by targeting Florida—under circumstances that they could or should reasonably anticipate being haled into courts in Florida—through at least thirty-one approved Mercedes-Benz dealerships in cities and towns in Florida. The Mercedes-Benz Defendants have directed sales of C250 vehicles to Florida and sold tens of thousands of C250 automobiles through those approved Mercedes-Benz dealerships in Florida. In doing so, the Mercedes-Benz Defendants developed a market in Florida for their C250 vehicles.

d.   The Mercedes-Benz Defendants have contracts with their Mercedes-Benz dealerships in Florida where the Mercedes-Benz Defendants contractually promise to come into courts in Florida to defend claims concerning the failure of the Mercedes-Benz Defendants' products that injure Florida residents, like Plaintiffs;

e.   The Mercedes-Benz Defendants require their Florida dealerships to advertise within Florida, and the Mercedes-Benz Defendants share in the cost of these Florida advertisements for Mercedes-Benz Defendants' products;

f.   The Mercedes-Benz Defendants jointly participate in the interactive websites of Mercedes-Benz dealerships located within Florida;

g.   The Mercedes-Benz Defendants certify mechanics who work at Mercedes-Benz dealerships in Florida;

h.   The Mercedes-Benz Defendants provide certification training for mechanics who work at Mercedes-Benz dealerships at multiple locations in Florida;

i.   The Mercedes-Benz Defendants oversee aspects of their product warranty process from within Florida;

j.    The Mercedes-Benz Defendants send technical service bulletins regarding work procedures related to Mercedes-Benz vehicles, like the Mercedes-Benz Vehicle, into Florida;

k.    The Mercedes-Benz Defendants send recall notices related to safety defects in Mercedes-Benz vehicles, including the Mercedes Vehicle, into Florida;

l.    The Mercedes-Benz Defendants direct Florida customers to approved Mercedes-Benz service centers to have recall work performed on Mercedes-Benz vehicles initially sold into separate states but located in Florida at the time of the necessary recall repair and replacement work;

m.    The Mercedes-Benz Defendants gather data about their vehicle performance in Florida and use that data in the redesign of their products;

n.    The Mercedes-Benz Defendants have been parties in numerous cases where they have come into courts in Florida to answer claims about the failure of Mercedes-Benz products in Florida;

o.    The Mercedes-Benz Defendants have at least hundreds of thousands of clients in Florida;

p.    The Mercedes-Benz Defendants spend at least hundreds of thousands of dollars per year marketing products in Florida. In doing so, the Mercedes-Benz Defendants developed a market in Florida for their C250 vehicles;

q.    The Mercedes-Benz Defendants have purposefully availed themselves of the privilege and benefits of conducting activities within Florida;

r.    The Mercedes-Benz Defendants hold patents and trademarks which they demand must be honored in Florida;

s. The Mercedes-Benz Defendants engage in national marketing of their products that pervades into Florida;

t. The Mercedes-Benz Defendants target marketing specific to Florida;

u. The Mercedes-Benz Defendants have active websites accessible in Florida where they engage in the direct sale of Mercedes-Benz products from their websites;

v. The Mercedes-Benz Defendants' active websites also have numerous interactive features; and

w. Plaintiffs' claims are connected with or relate to the Mercedes-Benz Defendants' contacts with Florida.

51. Therefore, this Court is authorized to exercise personal jurisdiction over the Mercedes-Benz Defendants.

52. Venue is proper in this Court pursuant to 28 U.S. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the Middle District of Florida.

## FACTUAL ALLEGATIONS

### A. The Subject Incident

53. The Mercedes-Benz Defendants are in the business of and derive substantial profit from designing, engineering, manufacturing, assembling, producing, inspecting, testing, distributing, and selling a wide range of motor vehicles for consumer use and from procuring and installing the many component parts that go into manufacturing these motor vehicles.

54. Mercedes-Benz vehicles sold in the United States, including the Mercedes Vehicle, contain defective Takata airbags. The Mercedes-Benz Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Florida.

55. The Mercedes-Benz Defendants designed, engineered, manufactured, assembled, produced, inspected, tested, distributed, and sold the Mercedes Vehicle and procured and installed many component parts used to produce the Mercedes Vehicle, including the Mercedes Vehicle's airbags, airbag inflators, and airbag systems.

56. On November 7, 2020, Nermina was a front seat passenger in the Mercedes Vehicle that was driven by her partner, Elvir in the Middle District of Florida when a collision resulted in the unexpected rupture and explosion of the passenger-side Takata Airbag Inflator installed in the Mercedes Vehicle (the "Incident"). The Incident, which forms the basis of this Complaint, arose out of ordinary use of the Mercedes Vehicle.

57. At the time of the Incident, the Mercedes Vehicle and its component sub-assemblies at issue in this action were in the same essential condition as they were at the time that they left the Mercedes-Benz Defendants' control.

58. The Incident triggered the deployment of the Mercedes Vehicle's

airbag safety system that was designed and manufactured to provide protection from injuries in such foreseeable crashes. However, instead of providing protection as intended, the airbag system catastrophically _failed_. The inflator of the Airbag Safety System ruptured and exploded upon deployment in this crash—shooting multiple metal fragments of the airbag safety system through the Mercedes Vehicle and into Nermina's face and head.

59.     The injuries sustained by Plaintiffs, as described more fully herein, would not have occurred but for the defects present in the Mercedes Vehicle and its component parts. These defects prevented a normal, safe, and expected airbag deployment in the Mercedes Vehicle at the time of the accident and instead caused shrapnel to expel from the frontal passenger airbag, resulting in a subsequent fire inside the Mercedes Vehicle—seriously injuring Plaintiffs.

## B.     Background of Takata

60.     Takata Corporation, Takata, Inc., and TK Holdings, Inc. (referred to herein collectively as "Takata") participated in the design, manufacture, supply, and distribution of airbags, airbag systems, and airbag component parts, including airbag inflators.

61.     At the time of the Incident, Takata was the world's second largest manufacturer of automotive safety devices, including airbags. Airbags made

up 38.2 percent of Takata's business. Takata had a fully integrated development, design, and manufacturing system for its airbags. Takata made the entire airbag system, including the collision sensing devices, airbag control units, airbag modules, airbag inflators, and airbag cushion materials.

62. Takata supplied airbags, airbag systems, and airbag component parts to automakers for U.S. vehicles and to state and local government purchasers since at least 1983. Airbags manufactured by Takata have been installed in millions of vehicles in the United States manufactured by at least ten different automakers, including Mercedes-Benz, Honda, Toyota, Mazda, Mitsubishi, Nissan, Subaru, Chrysler, Ford, General Motors and BMW. By 2014, Takata captured 22 percent of the global automotive airbag market.

## C. How Takata's Airbags Work

63. The driver-side airbag is located in the center part of a vehicle's steering wheel and is stored inside the steering wheel cover. The passenger-side airbag is typically located above the glove compartment and beneath the dashboard. When a collision occurs, the airbag breaks through a "tear-seam" on the back side of the steering wheel cover or back side of the dashboard as it inflates to protect the front seat occupants.

64. When collision sensors in the vehicle detect a collision, a signal is sent to the airbag control unit. The signal sent from the sensors to the airbag control unit is processed, and the airbag control unit determines

the severity of the impact based on the inputted data. If the airbag control unit determines that an airbag deployment is necessary, it sends a signal to initiate the airbag inflator.

65. The airbag inflator consists of two components encased in a metal canister: (1) a propellant, and (2) an ignitor. The propellant is pressed into wafers or pellets and is encased in a metal canister. The ignition of the propellant causes an explosive chemical reaction that emits gas, resulting in the rapid inflation and deployment of the airbag cushion. The following basic illustration depicts Takata's airbag module:



66. As the force of the collision reaches the driver or passenger, they begin to move forward. By this time, the airbags should be fully inflated and ready to receive and restrain the forward movement of the passengers. The airbag is meant to inflate in a timely fashion in a collision, but only with the force necessary to cushion the occupant from the vehicle's interior

### D.    The Takata Airbag Defect

67.    When it began manufacturing airbags in the 1980s, Takata used a compound called sodium azide as the propellant within its inflators.

68.    Takata redesigned its airbags in the late 1990s for the ostensible purpose of making them more compact and reducing toxic fumes earlier models emitted when deployed.

69.    In the mid-1990s, Takata began using a different propellant called 5-aminotetrazole, in part due to toxicity issues associated with sodium azide.

70.    In the late-1990s, Takata's managers pressured its engineers in Michigan to devise a lower cost propellant based upon ammonium nitrate, a compound commonly used in fertilizer and explosives.

71.    Ammonium nitrate is a dangerous material that should not be used in airbags. It is an inherently volatile and unstable chemical. Temperature changes as minimal as daily temperature swings are large enough for the ammonium nitrate to cycle through three of its five crystalline states, adding to its volatility. It also readily absorbs moisture from the atmosphere. The chemical's sensitivity to temperature fluctuations and moisture cause it to break down over time, which in turn results in violent detonation or the chemical becoming effectively inert. As one explosives expert bluntly stated in *The New York Times*, ammonium nitrate "shouldn't

be used in airbags," and is better suited to large demolitions in mining and construction.

72.     From the time it began investigating ammonium nitrate in the late 1990s, Takata understood these risks. Indeed, Takata expressed concern in a patent document in 1995 that an ammonium nitrate propellant would be vulnerable to temperature changes and that its casing "might even blow up." Takata further recognized that "[o]ne of the major problems with the use of ammonium nitrate is that it undergoes several crystalline phase changes," one of which occurs at approximately 90 degrees Fahrenheit. If ammonium nitrate undergoes this type of temperature change, the compound may "expand and contract and change shape resulting in growth and cracking" of the propellant, which might cause an airbag inflator to "not operate properly or might even blow up because of the excess pressure generated."

73.     Additionally, Takata admitted in a patent document from 1999 that pure ammonium nitrate is "**problematic**" because many gas generating compositions made with it are "**thermally unstable**."

74.     In 1999, as the ammonium nitrate design was being considered, Takata's engineering team in Moses Lake, Michigan, raised objections and pointed to explosives manuals that warned of the risk of disintegration and irregular, overly-energetic combustion. As one former Takata engineer told a reporter, "ammonium nitrate stuck out like a sore thumb," and yet his team

was given only "a couple days" to perform its review.

75.    Not surprisingly, other major airbag manufacturers, including Autoliv, Key Safety Systems, and TRW Automotive, have reportedly avoided using ammonium nitrate as a propellant.

76.    The only conceivable advantage to the compound for an airbag manufacturer, according to the expert quoted in *The New York Times*, is that it is "cheap, unbelievably cheap." Indeed, Takata had originally planned to use tetrazole as its propellant, which was not only more stable than ammonium nitrate, but also yields other desired benefits, such as being more environmentally friendly. But tetrazole was too expensive for Takata, as executives ultimately pressured engineers in Michigan to develop a cheaper alternative.

77.    As discussed more fully herein, Takata's initial analyses and commentary warning against the use of ammonium nitrate in its airbags ultimately came true; it was soon discovered that Takata's airbags suffered from a defect that caused them to explode violently during the course of a vehicular collision and shoot metal shrapnel toward drivers and occupants of the vehicles in which Takata's airbags were installed (hereinafter referred to as the "Inflator Defect").

### E.    Knowledge of the Airbag Defects by Takata and the Automotive Industry

78.    Takata began receiving complaints regarding the Inflator Defect shortly after introducing the redesigned airbag to the market, and those complaints continued to multiply over the years. Nevertheless, rather than switch to a compound it knew would be safer, even if more expensive, Takata recklessly opted to try, over the course of many years, to stabilize a compound that chemically resists stabilization.

79.    For example, in a 2006 patent application, Takata discussed the need to test the performance of ammonium nitrate at various extreme temperatures because it is an **unstable chemical**, and these tests could reveal many problems, including "**over-pressurization of the inflator leading to rupture**." The 2006 patent document purportedly contained a fix for that sort of rupturing.

80.    Notably, the alleged fix in 2006 came *after* a rupture incident in 2004 that caused an injury, and incidents continued to mount after that time as well. Takata submitted a patent application with purported fixes as recently as 2013. These ongoing, albeit unsuccessful, efforts show that Takata knew its design was problematic.

81.    Takata's airbag manufacturing operations were acutely aware of the defects plaguing Takata airbags. Takata experienced persistent and glaring quality control problems in its manufacturing operations. The Takata plants that manufactured the airbags at issue include plants located in

Moses Lake, Washington, LaGrange, Georgia, and Monclova, Mexico. These plants also manufacture airbag inflators.

82.    At a House hearing in December 2014, Hiroshi Shimizu, Takata's Senior Vice President for Global Quality Assurance, admitted: "We considered it a main contribution to the problem is [sic] the high temperature and absolute humidity, together with age of the products and probably maybe a combination with manufacturing issues." Nonetheless, Mr. Shimizu claimed that Takata still had not determined the root cause of the defect: "At this moment, we don't have the root cause. We know the factors may contribute to this problems [sic], so that is why we are still researching these inflators collected from regions." Executive Vice President of Honda North America, Rick Schostek, echoed that point at the House hearing: "we have theories, but we don't know the cause . . . ."

83.    Mr. Shimizu grossly understated the problem. Starting in 2001, engineers at the Monclova, Mexico plant identified a range of problems, including faulty welding and rust, which they said could have caused inflators to fail. Between 2001 and 2003, Takata struggled with at least 45 different inflator problems, according to dozens of internal reports titled "potential failures" and reviewed by *Reuters*.

84.    On at least three occasions between 2005 and 2006, Takata engineers struggled to eliminate leaks found in inflators, according to

engineering presentations. In 2005, Shainin, a U.S. consulting firm, found a pattern of additional problems. Underscoring Takata's reckless use of ammonium nitrate, on March 31, 2006, the Monclova, Mexico plant was rocked by violent explosions in containers loaded with propellant, leaving at least a dozen workers injured.

85. Apparently, not even that terrible incident could prompt serious and lasting improvements. In a February 2007 email to multiple colleagues, one manager stated that "[t]he whole situation makes me sick," referring to Takata's failure to implement checks it had introduced to try to keep the airbags from failing.

86. Takata engineers also scrambled as late as 2009 to address propellant issues after "inflators tested from multiple propellant lots showed aggressive ballistics," according to an internal presentation in June 2009.

87. Based on internal Takata documents, Takata was struggling to meet a surge in demand for its airbags. Putting profits ahead of safety, Takata exhibited shoddy and reckless behavior in the handling of its ammonium nitrate propellant. In March 2011, a Takata supervisor at the Monclova plant sent an e-mail to other employees stating: "A part that is not welded = one life less, which shows we are not fulfilling the mission." The title of the e-mail was *"Defectos y defectos y defectos!!!!"* This shoddy and reckless attitude permeated all of Takata's operations and facilities.

88. Yet, handling problems at Takata facilities persisted: another manager urged employees to examine the propellant visible in a cross section of an airbag inflator, noting that "[t]he propellant arrangement inside is what can be damaged when the airbags are dropped . . . . Here you can see why it is important to handle our product properly." A 2009 presentation of guidelines on handling inflators and airbag units also stressed the dangers of mishandling them. The presentation included a link to a video that appeared to show side-curtain airbags deploying violently, sending the inflator hurtling into the car's cabin. (The inflator itself does not rupture in that video.)

89. Despite knowing it was shipping potentially deadly products, Takata resisted taking back damaged or wet airbag modules, in part because Takata struggled to keep up with a surge in demand for its airbags through the early and mid-2000s as it won big new clients like General Motors and Mazda.

90. Honda was among the first automakers to use Takata's new air bags, and installed them in some models beginning in 1998. Since then, Takata airbags have been installed in vehicles manufactured by at least ten automakers.

91. The Mercedes-Benz Defendants' engineers expressed concerns during the pre-approval process phase of the Takata Airbag inflators.

92. Those concerns were also discussed internally by managers or

engineers at Daimler AG in emails exchanged between its employees and Takata employees on May 6, 2003 and May 7, 2003. Those emails focused on the module having integrity during and post-deployment.

93.     Around the time of April/May 2003, the Mercedes-Benz Defendants recognized that the defective Takata Airbags failed to meet the Mercedes-Benz Defendants' own requirements for approval, as reflected by their ongoing concerns over the variability and performance issues of the Takata inflators during pre-approval testing in which Mercedes-Benz Defendants' employees raised concerns to Takata that the inflator was the cause of module performance issues, including "module cover tearing," and "cushion tearing."

94.     A June 15, 2005 email from a Daimler Chrysler airbag engineer to a Takata program manager, reflects that Mercedes-Benz Defendants' engineers, who had pyrotechnic expertise and worked with Takata on the testing and approval of the airbags, were fully aware of the performance problems plaguing the inflators, and their difficulty meeting USCAR standards before approving the inflators for installation in Mercedes-Benz vehicles, such as the Mercedes Vehicle.

95.     These same Mercedes-Benz Defendants' engineers repeatedly expressed concerns about the PSDI-5 inflator based on the performance of the airbags in pre-approval testing.

96. Despite these concerns, the Mercedes-Benz Defendants ultimately approved Takata's airbags for installation in their vehicles. Internal emails indicate that the Mercedes-Benz Defendants only approved Takata's airbag after the Mercedes-Benz Defendants' engineers agreed to forego key performance variables.

97. On November 1, 2003, Charlene Weaver of Arizona—one of the least humid states in the country—was a passenger in a 2004 Subaru Impreza when she was killed in a Takata airbag-related accident. As summarized in a later section of this Complaint, her car was not recalled until July 2014, more than a decade later.

98. In 2003, an inflator ruptured in a BMW, prompting a January 2004 investigation by Takata and BMW. That investigation took place at Takata's LaGrange, Georgia, facility, and involved an inflator sold to BMW, Honda, and Toyota. The testing was ordered by a senior Takata executive, and the results indicated improper welding and incorrect installation of chemical propellant wafers.

99. In 2004, a Takata airbag violently exploded in a Honda Accord in Alabama, shooting out metal fragments and injuring the car's driver. Honda was notified of the incident, and at least one Takata employee recalls being told that Honda examined the part before turning it over to Takata. Takata reported back to Honda that it was unable to find a cause for the incident.

Ultimately, the companies deemed the incident "an anomaly," and conducted no further investigation or analysis to the public's knowledge. Notably, Honda and Takata did not issue a recall or even involve federal safety regulators beyond completing a reporting form in a cursory and incomplete manner.

100.   Yet, by this time, Takata was aware of the broad problems associated with its choice of unstable and dangerous ammonium nitrate as a propellant. As noted above, between 2001 and 2003, internal Takata reports titled "potential failures" showed that Takata struggled with at least **45 different inflator problems**, and that, in 2002, the Monclova plant recorded 60 to 80 defects for every million inflators shipped to automakers— six to eight times beyond Takata's quality control limit. In light of this accumulated knowledge, Takata's dismissal of the explosion as an anomaly without further study was reckless at best.

101.   Even as it downplayed the incident publicly, engineers at Takata's American headquarters in Auburn Hills, Michigan, began conducting secret tests on 50 airbags it had retrieved from scrapyards. The tests were conducted by Al Bernat, Takata's then-vice president of engineering, and took place over weekends and holidays during the summer of 2004. Steel inflators in at least two of the airbags cracked during the tests, a condition which can lead to rupture. Takata engineers theorized that

welding problems made the inflator vulnerable to splitting and rupturing. The result was so startling that engineers began designing possible fixes in anticipation of a recall.

102.   But Takata executives discounted the 2004 test results and shockingly, ordered the lab technicians to delete the test data from company computers and to dispose of the airbag inflators. Prototypes of design alternatives were also trashed. One former Takata employee stated that "[a]ll the testing was hush-hush . . . . Then one day, it was, 'Pack it all up, shut the whole thing down.' It was not standard procedure."

103.   Takata did not disclose these tests and continues to deny they occurred. In regulatory filings, Takata has stated instead that it began testing Defective Airbags in 2008. Because Honda and Takata agreed to describe the 2004 incident in Alabama as an "anomaly," and because Honda and Takata were communicating about the defective inflators by 2004, upon information and belief, Honda was aware of Takata's secret testing that occurred shortly after the Honda airbag explosion.

104.   In June and August of 2007, Honda notified Takata of three additional airbag explosion incidents. All three accidents involved metal fragments propelling into the faces and bodies of car passengers upon deployment of the airbags. As with the 2004 incident, Honda did not initiate a recall or provide information about the ruptures to federal investigators.

Rather, it callously risked vehicle occupants' safety as it awaited a failure mode analysis being conducted by Takata.

105. After the 2007 incidents, Honda and Takata began another internal investigation, including a survey of inflators. Starting in late 2007 or early 2008, Honda began collecting inflators returned to dealers for reasons unrelated to the exploding-airbag defect, and sent them to Takata for investigation, all without informing vehicle owners or regulators. Honda also collected inflators from scrap yards for the same purpose.

106. Takata began what became a year-long study of the Inflator Defect. Takata's engineers ultimately concluded that workers at a Takata factory in Monclova, Mexico, had left out moisture-sensitive explosives on the plant floor, making them prone to overly energetic combustion. Takata advised Honda that by November 2002, it had corrected any such handling deficiencies.

107. The victims of the four Honda incidents—one in 2004 and three in 2007—brought legal claims against Honda, which the automaker settled on a strictly confidential basis. While Honda filed a standard report with U.S. safety regulators for each of these four incidents, its reports tellingly omitted the most critical detail of these incidents: the Defective Airbags posed a substantial risk of serious injury or death when deployed. In later submissions to NHTSA, Honda admitted that it had received still other

complaints in this timeframe:

> a. On July 25, 2008, Honda received an unidentified complaint related to Takata driver airbag ruptures.
>
> b. On September 11, 2008, Honda received notice of a complaint regarding "unusual" driver airbag deployment.

108.   Takata shared the results of the inflator survey analysis with Honda on October 2, 2008. That analysis indicated an airbag inflator problem. Honda and Takata concluded, however, that only a "small number" of inflators were affected.

109.   As a result, Honda issued a recall, but only for 3,940 vehicles in the United States. This November 2008 recall involved certain 2001 Honda Accord and Civic vehicles with airbags that "could produce excessive internal pressure," causing "the inflator to rupture," spraying metal fragments through the airbag cushion ("2008 Recall"). Honda reported that it learned of the problem from a June 2007 claim, and assured regulators that it had identified all "possible vehicles that could potentially experience the problem."

110.   Even as Takata and Honda advocated a minuscule recall focused on older models—less than 0.1 percent of the total Honda recall to date—at about the same time, in April 2009, Takata engineers scrambled to repair a

flaw in a machine at the Monclova, Mexico, factory that made the airbag propellant more volatile, according to materials from a company presentation given that year.

111. Additional incidents took place after the 2008 Recall that underscored its inadequacy:

    a. On April 27, 2009, six months after the limited 2008 recall, a Takata airbag in Jennifer Griffin's 2001 Honda Civic exploded after a minor accident in Orlando, Florida. The explosion sent a two-inch piece of shrapnel from the Defective Airbag flying into Ms. Griffin's neck. Although Ms. Griffin survived, when highway troopers found her, she suffered serious injury to her neck. Ms. Griffin's car was not part of the 2008 Recall. Honda received notice of the incident no later than September 2009, and likely months earlier in July towards the beginning of its correspondence with NHTSA regarding the upcoming 2009 recall.

    b. On May 28, 2009, 18-year-old Ashley Parham of Oklahoma was killed while driving a 2001 Honda Accord when the Takata airbag in her car exploded after her car bumped another car in a parking lot. While she apparently survived the accident itself, the metal shrapnel that shot out of the exploding Defective Airbag sliced open her carotid artery and she bled to death. Ms.

Parham's car was not part of the 2008 Recall.

c.  Another Takata airbag-related incident took place in Virginia on June 9, 2009, and Honda ultimately settled a lawsuit brought by the decedent's family.

d.  According to one of its submissions related to the upcoming 2009 Recall, Honda received three additional Takata airbag unusual deployment complaints on July 27, July 31, and August 31, 2009.

112.  With incidents mounting, Takata and Honda revisited the issue yet again. In June 2009, Takata reported to Honda that the defective airbag components had been made at its factory in Moses Lake, Washington. At the time, Takata engineers explained to Honda that between 2000 and 2002, a flaw in a machine that presses air bag explosives into wafers had made the explosives unstable. The Takata engineers further explained to Honda that with the defective air bags, explosives in the metal inflator, which would normally burn down and produce the nitrogen gas to inflate the air bag, instead burn aggressively and cause the inflator to burst, shooting hot fragments through the air bag's fabric.

113.  After two years of investigation, Honda and Takata found that a machine at Takata's Moses Lake factory in Washington state had failed to compress chemicals firmly enough. That left the inflators vulnerable to moisture, potentially causing the bags to inflate more forcefully than they

were supposed to. At that time, Takata also acknowledged that the defect covered a wider range of vehicles than initially estimated, but claimed that the plant had made numerous upgrades to its machinery in late 2002, which it thought had improved the quality of its explosives.

114.   In June 2009, Takata provided a follow-up report to Honda on its November 2008 analysis, stating that issues related to propellant production appeared to have caused the improper inflator performance.

115.   As a result of Takata's June 2009 follow-up report and the additional claims of "unusual deployments," on June 30, 2009, Honda issued another recall, this one covering 2001 and 2002 Civic, Accord, and Acura vehicles ("2009 Recall"). Thus, it was only two months *after* Ms. Parham's death that Honda expanded its 2008 Recall to include the model she drove.

116.   In August 2009, NHTSA's Recall Management Division sent Honda an information request to explain why it did not include 2009 Recall vehicles in the 2008 Recall, and "to evaluate the timeliness of [Honda's] recent defect decision."

117.   NHTSA also wanted to know "the difference between the driver's airbag inflators in those vehicles from the inflators in the 09V-259 vehicles and explain how this distinction, or any other between the two sets of vehicles, convinced Honda at the time that it did not need to include the latter set in the 08V-593 recall population."

118. NHTSA's Recall Management Division further requested that Honda provide complaints, lawsuits, warranty claims, and field reports, along with an explanation of the "unusual driver airbag deployments" and Honda's investigative efforts.

119. In Honda's September 16, 2009 reply to NHTSA, the automaker said that its information about the "unusual driver airbag deployments" came from Takata: "[w]e understood the causal factors to be related to airbag propellant due to handling of the propellant during airbag inflator module assembly."

120. Honda also reported, based on information from Takata, that the problem with the airbags was isolated to the "production of the airbag propellant prior to assembly of the inflators." Specifically, the cause was "related to the process of pressing the propellant into wafers that were later installed into the inflator modules," and limited to "a specific production process" involving one high-precision compression press that was used to form the propellant into wafers, the automaker told NHTSA.

121. Honda also disclosed to NHTSA that it had fielded nine complaints and one lawsuit related to the 2008 and 2009 Recalls. Honda also finally informed NHTSA about the 2004 incident involving an "unusual deployment" of the vehicle's airbag. Honda claimed that it "only recently [was] reminded of this incident," and that, until recently, Honda "had not

associated it with the [2008 Recall] campaign."

122.  Through a November 20, 2009 request, NHTSA also sought information from Takata. Takata submitted a partial response to NHTSA on December 23, 2009 ("Partial Response"), and then a full response on February 19, 2010 ("Full Response"). Both responses provided vague and misleading information about the seriousness of the problem. Takata asserted that there were no substantive design differences between the inflators in the airbags at issue in the two recalls, but cited differences in the production processes between the lots.

123.  Takata also asserted that the defects only existed in specific lots manufactured between certain dates. It claimed that the inflators involved in the 2008 Recall were manufactured between October 29, 2000 and December 1, 2000, and that inflators involved in the 2009 Recall were manufactured between August 23, 2000 and February 25, 2001. Takata did not provide the dates the inflators were shipped, as NHTSA requested, because, as Takata admitted, its records did not have that information. Instead, it gave just the manufacturing dates. In its Full Response, Takata asserted that the defect identified in the 2009 Recall was the result of a single compression press (the "Stokes press") in a single plant. Takata further asserted that while it did manufacture 2,400 inflators using the same process as the defective inflators, the design was different and "[t]herefore, Takata is convinced that the

inflators sold [redacted] contain no safety-related defect."

124.   Takata wrote in its Full Response that it "believed - [redacted] - that expanding the recall to include all vehicles equipped with inflators manufactured with Stokes propellant produced through and including February 28, 2001 would capture all inflators with tablets that had a risk of producing overly energetic (or aggressive) combustion. This recommendation, as well as the analysis that supported it, was presented to Honda on June 12, 2009."

125.   In both the Partial Response and the Full Response, Takata stated: "Takata has not provided any airbag inflators that are the same or substantially similar to the inflators in vehicles covered by Recalls 08V-593 [in 2008] and 09V-259 [in 2009] to any customers other than Honda. The physical characteristics of the inflator housing used in the Honda vehicles subject to these recalls are unique to Honda." This statement would prove to be false.

126.   On May 6, 2010, NHTSA closed its investigation into the Takata airbags.

127.   In the months following NHTSA's 2009/2010 request for information, Takata engineers came up with yet another explanation for the ruptures; specifically, that in September 2001, machine operators at the Moses Lake plant could have inadvertently switched off an "auto reject"

function that weeded out poorly made explosives that can become unstable. However, Takata assured Honda at the time that, "as part of the upgrades at that plant, in September 2002, the supplier had added a locking mechanism that prevented workers from turning the auto-reject function off.

128. The *Wall Street Journal* further reported that "Honda and Takata discovered more problems. At Moses Lake, employees had switched off a mechanism that automatically checked whether the right amount of propellant was loaded in inflators; at a plant in Monclova, Mexico, a dehumidifier that kept parts dry hadn't been turned on. At times, poor record-keeping meant Honda and Takata couldn't figure out which cars had defective bags. Takata and Honda should have known this statement was false.

129. Honda's and Takata's ongoing cover-up and ineffective recalls continued to cost lives. In December 2009, a 2001 Honda Accord driven by Gurjit Rathore, 33, hit a mail truck in Richmond, Virginia. Her air bag exploded, propelling shrapnel into her neck and chest, and she bled to death in front of her three children, according to a lawsuit filed by her family.

130. In February 2010, only months after its previous recall, Honda announced a third recall for an additional 379,000 vehicles across a number of models ("2010 Recall"). Honda's explanation for the airbag defects changed yet again. Honda explained that of the two different manufacturing processes

used in the preparation of an airbag propellant, one process was within specification and the other was not. Honda's expanded recall supposedly reached those vehicles employing airbags that had utilized manufacturing processes not within specification.

131.   Once again, injuries continued to mount:

    a.   In April 2010, two months after the 2010 Recall, the Takata airbag in Kristy Williams's 2001 Honda Civic exploded while she was stopped at a traffic light in Morrow, Georgia, sending metal shards into her neck and causing profuse bleeding. She survived only because she applied pressure with her fingers to stem the arterial bleeding.

    b.   On November 8, 2010, Suetania Emmanuel of St. Croix, U.S. Virgin Islands, was driving a 2002 Honda Civic when the Takata airbag exploded and sent metal fragments into her face and throat.

132.   In April 2011, Honda filed a Part 573 Defect and Noncompliance report for 2,430 replacement service part airbag modules that might have been installed in vehicles covered by previous recall expansions ("2011 Recall"). Honda was unable to determine which vehicles contained the defective replacement parts, forcing it to recall all 833,277 vehicles that might have had the part installed.

133. According to documents submitted with the 2011 Recall, on August 15, 2011, Honda became aware of an August 1, 2011, "energetic deployment of a driver's airbag inflator that was outside of the prior range of suspect inflators." On September 2, 2011, Honda and Takata began an analysis of these so-called "outside of range" occurrences.

134. Underscoring Takata's ongoing quality control failures, on or about September 14, 2011, Honda and Takata began investigating the possibility that airbag inflator propellant lots were mixed during airbag inflator assembly, prompting further analysis of airbag inflator production records for the period when propellant was processed by the suspect method.

135. Honda reported its death and injury tallies to regulators only in a confidential submission in December 2011, when it issued a fifth limited recall for the rupture defect, according to NHTSA. That recall expanded Recall No. 11V-260 (April 2011), to include an additional 272,779 Honda and Acura vehicles. The expanded recall also included another 640 airbags sold as replacement parts; however, because Honda could not determine on which vehicles the 640 replacement air bags were installed, an additional 603,241 vehicles had to be recalled. Collectively, 1.7 million Honda and Acura vehicles had been recalled by the end of 2011 because they contained Takata-manufactured airbags.

136. In the meantime, Honda and Takata quietly continued their

internal investigation into the Inflator Defect. According to Honda, an exploding airbag in Puerto Rico in October 2011 prompted Honda to ask permission from NHTSA to collect "healthy" airbag modules to see if "abnormal combustion was possible." The collection began on March 14, 2012, and by November 21, 2012, Honda in fact found that even its so-called "healthy" airbags could abnormally combust in certain conditions.

137. Notably, in or about December 2012, NHTSA's Office of Defects Investigation ("ODI") notified Honda that there were numerous injury or death incidents listed on a spreadsheet Honda provided to NHTSA in connection with NHTSA's Takata investigation that were *not* previously provided to NHTSA under the early warning reporting system established by the TREAD Act. In late 2014, Honda ultimately admitted that it failed to report 1,729 serious accidents resulting in injuries or deaths to NHTSA between 2003 and 2014. Eight of these incidents involved Takata airbags. In January 2015, Honda agreed to pay a $70 million fine for this startling failure.

138. Toyota also received additional direct notice of the Inflator Defect in this timeframe. Starting in September 2012, Toyota received field reports of three U.S. vehicles with fractured inflators—two were front passenger side airbags that deployed inadvertently. Toyota recovered 144 in-use inflators from both the Japan and US markets for Takata to evaluate. In February

2013, Takata informed Toyota that some of the propellant wafers found within the recovered inflators were cracked, possibly due to lower material density.

139. Dangerous incidents continued to mount during this period.

a. On April 20, 2011, an unidentified man was hurt in Puerto Rico when the Takata driver airbag ruptured in his 2001 Honda Accord LX. His attorney notified NHTSA on May 26, 2011.

b. On September 20, 2011, Eddie Rodriguez crashed his Honda Civic in Puerto Rico, deploying airbags that launched sharp pieces of metal toward him. Honda reached a confidential settlement with the driver in 2013.

c. On October 20, 2011, there was an alleged rupture of a passenger side airbag in Puerto Rico; Honda obtained the vehicle for analysis on February 3, 2012.

d. On December 4, 2011, Miranda Perez suffered left eye blindness due to a Defective Airbag rupture while driving her 2003 BMW M3 in Buffalo, New York.

e. On March 2, 2012, Angelina Sujata suffered chest injuries due to a Takata airbag rupture while driving her 2001 Honda Civic in Chapin, South Carolina.

f. On March 8, 2012, Sharonda Blowe of Jacksonville, Florida was

severely injured while driving a 2001 Honda Accord when she was struck in the head by pieces of metal exploding out of a Defective Airbag. Ms. Blowe brought suit and reached a confidential settlement.

g. On September 2, 2012, Monique Roig suffered facial injuries due to a Defective Airbag rupture while riding in a 2001 Honda Civic in Miami-Dade County, Florida.

140. By 2013, it became clear that the defective airbag issue was far more widespread than Takata or Honda initially reported to NHTSA.

141. On February 8, 2013, NHTSA and Honda met to discuss the "ongoing investigation" into Honda's defective Takata airbags. By March 6, 2013, Honda had learned that:

> A recreation of propellant production using the same methods as were used during 2001-2002 production periods indicated that it was possible for propellant produced during 2001-2002 to be manufactured out of specification without the manufacturing processes correctly identifying and removing the out of specification propellant. Separately, Honda was informed by the supplier of another potential concern related to airbag inflator production that could affect the performance of these airbag modules.

142. In February and March 2013, Takata notified Nissan and Mazda that it was investigating airbag quality. Separately, Takata advised Honda

"of another potential concern related to airbag inflator production that could affect the performance of these airbag modules."

143. On April 10, 2013, Honda filed a Recall Notification ("2013 Recall") for an additional 561,422 vehicles that could be affected by the following part defect:

> In certain vehicles, the passenger's (frontal) airbag inflator could produce excessive internal pressure. If an affected airbag deploys, the increased internal pressure may cause the inflator to rupture. In the event of an inflator rupture, metal fragments could be propelled upward toward the windshield, or downward toward the front passenger's foot well, potentially causing injury to a vehicle occupant.

144. On April 11, 2013, Takata filed a Defect Information Report titled "Certain Airbag Inflators Used as Original Equipment" ("Takata DIR"). In that report, Takata described the defective airbags as follows:

> Some propellant wafers produced at Takata's plant in Moses Lake, Washington, between April 13, 2000 and September 11, 2002 may have been produced with an inadequate compaction force. . . . In addition some propellant wafers used in inflators produced at Takata's plant in Monclova, Mexico between October 4, 2001 and October 31, 2002, may have been exposed to uncontrolled moisture conditions. Those wafers could have absorbed moisture beyond the allowable limits . . . . In both cases, the propellant could potentially deteriorate over time due to environmental factors, which could lead to over-aggressive combustion in the event of an air bag deployment. This could create excessive internal pressure

within the inflator, and the body of the inflator could rupture.

145. It was not until its April 2013 Report that Takata finally admitted that the defective inflators were installed as original equipment in vehicles manufactured by companies other than Honda, including Toyota, Nissan, Mazda, and BMW. Takata did not know, however, how many inflators were installed as original equipment in vehicles manufactured by companies other than Honda.

146. In April 2013, based on Takata's new admissions, six major automakers, including Nissan, Mazda, BMW, Pontiac, and Honda, issued recalls of 3.6 million vehicles containing Takata airbags.

147. With the increased awareness and scrutiny, news of incidents became more widespread:

   a. On August 5, 2013, Joseph Nasworthy of Jacksonville, Florida, suffered severe lacerations to his eye and nose when the Takata airbag exploded upon deployment in his 2005 Honda Civic.

   b. On September 1, 2013, Stephanie Erdman of Destin, Florida, was driving a 2002 Honda Civic when she was hit in the eye by shards of metal that shot from the Takata airbag. Ms. Erdman filed suit and reached a confidential settlement.

   c. Also in September 2013, when police got to the scene of a minor

car accident in Alhambra, California, they thought the driver, Hai Ming Xu, had been shot in the face. In fact, he was killed by shrapnel exploding from the Takata airbag in his 2002 Acura TL that deployed when it hit the wall of a building. As *The New York Times* reported:

> The authorities have not determined a reason for the injuries, though his coroner's report cited tears in his airbag and facial trauma from a foreign object. And problems persist with Honda's reporting of potential defects.
>
> In at least four more recent suspected ruptures, including the one linked to [the California driver's] death, Honda has not filed a so- called early warning report with safety regulators, as is required in cases where there is a claim of defect that resulted in an injury or death, according to case lawyers and legal filings.

d. On October 12, 2013, Brandi Owens of Forsyth County, Georgia was injured in a low-speed accident when the driver-side Takata airbag of her 2013 Chevy Cruze exploded and detached from the steering wheel. According to a lawsuit, metal from the airbag hit Owens in the face and left her blind in one eye.

148. By 2014, the incident rate picked up even more dramatically. In 2014 and 2015, there have been over a dozen incidents involving injury or fatalities in Nissan, Honda, Toyota, Chevy, and Mazda vehicles, taking place

in a variety of regions in the country, from humid Puerto Rico to far drier Massachusetts and California. For example:

a. On February 19, 2014, a Takata passenger airbag ruptured and sprayed metal fragments at the passenger following a crash in a 2007 Chrysler 300.

b. On February 20, 2014, a Takata airbag ruptured due to ejected metal fragments following an accident in a 2003 Dodge Ram 1500, causing the airbag to collapse and fail in its purpose of cushioning the driver from impact. The driver suffered severe physical injury as a result.

c. On March 14, 2014, Susan Cosgrove of Fremont, California was injured in a low-speed accident while driving a 2013 Chevy Cruze. The Takata-related recall notice on her car arrived at her residence after the incident.

d. On May 29, 2014, Corey Burdick of Eustis, Florida, was driving a 2001 Honda Civic when the airbag deployed and sent shards of metal into his eye.

e. In June 2014, a low-speed accident involving a 2005 Honda Accord in Los Angeles, California, caused the car's driver airbag to "detonate," sending hot metal and plastic shrapnel into the cabin.

     f.   On October 6, 2016, a Takata airbag ruptured and expelled pieces of metal shrapnel that penetrated into the driver's face, slicing his entire face from the left side of his mouth extending to his left eyebrow.

149.   With accidents proliferating, Takata met with NHTSA officials on May 20, 2014 to provide information about inflator ruptures not covered by previous recalls. At that meeting, Takata noted that "all six of the potentially-relevant rupture incidents had occurred in either Florida or Puerto Rico." The referenced incidents include both passenger and driver side airbags. This statement omitted one of the earliest incidents, Ms. Weaver's 2003 accident in Arizona, as well as later incidents in drier locales, as noted above.

150.   On June 11, 2014, NHTSA's ODI published an ODI Resume for a preliminary evaluation of Investigation No. PE 14-016. That document stated that NHTSA was opening an investigation "in order to collect all known facts from [Takata] and the vehicle manufacturers that it believes may have manufactured vehicles equipped with inflators produced during the same period as those that have demonstrated rupture events in the field."

151.   Also on June 11, 2014, Takata informed NHTSA that it "believes that an [sic] number of the inflators identified above were provided to the following vehicle manufacturers for use in vehicles sold in the United States

(the manufacturers are listed in alphabetical order): BMW, Chrysler, Ford, Honda, Mazda, Nissan, and Toyota." Takata's June 11, 2014 letter further stated:

> If we determine that any of those inflators were sold to other vehicle manufacturers, we will let you know promptly. Takata is not certain which models or model years of vehicles are equipped with the subject inflators, and it does not know how many of those vehicles were sold in or are registered in the States to be covered by the requested field actions. That information will need to be obtained from the affected vehicle manufacturers. (Emphasis added).

152.   On June 20, 2014, Honda issued additional recalls for a total of nearly 4.5 million Honda and Acura vehicles that contained defective Takata airbags.

153.   By the end June 2014, the number of vehicles that had been recalled due to defective Takata airbags had increased to over 6 million. Vehicle manufacturers, however, had still not recalled all of the vehicles containing Defective Airbags.

154.   On July 8, 2014, Honda expanded a "two million vehicle air bag recall by as many as one million more vehicles in California." *The New York Times* reported that "[a] defective inflator could explode in a crash, sending shards of its metal casing into the passenger compartment. The inflator was made by Takata Corporation, which has said the propellant inside the

inflator was not properly prepared and was too powerful."

155.    On August 18, 2014, *The New York Times* reported that NHTSA had "deepened" its investigation of Honda's airbags: "Federal regulators have intensified an investigation into the inadvertent deployment of side air bags on 2008 Honda Accords," as they were "concerned that the side air bags along the outer edges of the ceiling and the seats may deploy when a door is slammed."

156.    In August 2014, Honda issued yet another recall of Honda and Acura vehicles, "its ninth for the defect - bringing to six million the total of recalled Honda and Acura vehicles"

157.    The tragic pattern of mounting casualties in the face of manufacturers' sluggish response continued:

    a.    On July 7, 2014, Claribel Nunez of Hialeah, Florida, suffered severe wounds to her forehead from shrapnel that exploded out of a Takata airbag in her 2001 Honda Civic.

    b.    On August 17, 2014, a Takata airbag ruptured after an accident in a 2007 Ford Mustang, deploying with abrupt force and ejecting a metal fragment into the driver's leg. Ford was notified of the incident.

    c.    On October 2, 2014, Florida resident Hien Tran died, four days after her 2001 Honda Accord struck another car in Orlando and

the Takata airbag exploded, sending shrapnel into her neck. The medical examiner stated that the shrapnel tore through the airbag, hitting Ms. Tran and causing "stab-type wounds" and cutting her trachea. Indeed, her death was initially investigated as a homicide by detectives. A week after she died, she received a letter in the mail from Honda urging her to get her car fixed because of faulty airbags that could explode.

158. On October 22, 2014, NHTSA expanded the recall list to cover ten automakers and 7.8 million vehicles, over 5 million of which were Hondas. In a Consumer Advisory dated October 22, 2014, NHTSA sent an urgent warning to the owners of the now "7.8 million Affected Vehicles":

> The National Highway Traffic Safety Administration urges owners of certain Toyota, Honda, Mazda, BMW, Nissan, Mitsubishi, Subaru, Chrysler, Ford and General Motors vehicles to act immediately on recall notices to replace defective Takata airbags. Over seven million vehicles are involved in these recalls, which have occurred as far back as 18 months ago and as recently as Monday. The message comes with urgency, especially for owners of vehicles affected by regional recalls in the following areas: Florida, Puerto Rico, limited areas near the Gulf of Mexico in Texas, Alabama, Mississippi, Georgia, and Louisiana, as well as Guam, Saipan, American Samoa, Virgin Islands and Hawaii.

159. On October 29, 2014, NHTSA sent letters to ten automakers regarding the safety risks posed by the Takata airbags. The letter stated that

"[t]he ongoing cooperation of all manufacturers who have recalled vehicles is essential to address this safety risk," and that the "NHTSA team is engaged with you in critical work to better understand the failures and take action to remedy the safety risk." NHTSA's letter also asked the automakers to provide NHTSA with information as to their recall process, urged a faster response from them, and stated that "more can and should be done as soon as possible to prevent any further tragedies."

160. On October 30, 2014, NHTSA ordered the airbag supplier Takata to turn over documents and answer questions under oath related to defective airbag inflators. The order demanded that Takata turn over records related to the production, testing and subsequent concerns raised internally and by automakers over the airbags, as well as communications between the company and automakers about defect concerns

161. Also on October 30, 2014, NHTSA's ODI published an ODI Resume for Investigation No. AQ 14-004. That document stated that NHTSA had opened an investigation "in order to investigate the extent and scope of Honda's reporting failures, as well as the reason(s) for such failures and the steps being taken by Honda to assure full compliance with TREAD reporting requirements."

162. On November 3, 2014, NHTSA issued another Special Order, this time demanding documents from Honda to determine what and when the

company knew about deaths and injuries caused by Takata's airbags.

163. The U.S. Department of Justice is also investigating whether Takata misled U.S. regulators about the number of defective airbags it sold to automakers, including Toyota and Honda. On November 13, 2014, the United States District Court for the Southern District of New York issued a federal grand jury subpoena to Takata and Honda.

164. By November 18, 2014, it was clear to NHTSA that even the extensive recalls to date were insufficient. NHTSA therefore demanded a national recall of Chrysler, Ford, Honda, Mazda, and BMW vehicles with certain driver airbags made by Takata. It simultaneously issued its second Special Order to Takata compelling it to provide, under oath, documents and detailed information on the propellant used in Takata's inflators. At a hearing of the United States Senate Committee on Commerce on November 20, 2014, Takata Senior Vice President Hiroshi Shimizu refused to support a national recall.

165. The Mercedes-Benz Defendants' disinterest in resolving the issue remained and became increasingly apparent by the next month. When 10 major automakers met in December 2014, to "sort out a way to understand the technical issues involved," the Mercedes-Benz Defendants were shockingly absent.

166. Takata reiterated its refusal at a hearing before the U.S. House

of Representatives Energy and Commerce Subcommittee on December 3, 2014, claiming there was "not enough scientific evidence" to support a national recall. Yet, as NHTSA Administrator David Friedman stated, "when we saw real-world incidents on the driver side, one in California, we pushed Honda to make sure that their recall covered that region. Then very recently, we came aware of a driver side incident in North Carolina. With six total incidents, two of which are outside that region, we can no longer support a regional recall. Our policy is clear: Recalls must be nationwide unless the manufacturers can demonstrate that they are regional. With the new data, it is clear they can no longer demonstrate that the region that was used before was appropriate for driver side airbags."

167. The geographic scope of the incidents undermined Takata's focus on humidity as the defining contributor to the dangerous ruptures. As Mr. Friedman explained, "[o]ne of the most frustrating parts about this is that neither the automakers nor Takata have been able to get to the bottom of the root cause on this. We have been pushing them to do so."

168. As of the December 3, 2014 House hearing, Honda, Ford, Chrysler, and Toyota had all agreed to NHTSA's demand for a nationwide recall, principally for driver side airbags. Days later, Mazda expanded the geographic scope of its recall. By December 23, 2014, BMW had also agreed to a nationwide recall.

169.    Having neglected the defect for over a decade, the 10 vehicle manufacturers met in December 2014 to "sort out a way to understand the technical issues involved." A few months later, in March 2015, Honda announced an advertising campaign to promote the recall—a step it could and should have taken a decade sooner. A few days later, Honda announced another 105,000 vehicles that needed to be recalled (Recall 15V153), consisting of vehicles that should have been part of the 2014 recalls.

170.    Frustrated by Takata's continual foot-dragging, NHTSA imposed a $14,000 per day fine that started on Friday, February 20, 2015, concluding that Takata had not been forthcoming with the information that it is legally obligated to supply, nor cooperative in aiding NHTSA's ongoing investigation. Days later, NHTSA demanded that Takata preserve all airbag inflators removed through the recall process as evidence for both NHTSA's investigation and private litigation cases.

171.    By May 2015, Takata had filed Defect Information Reports ("DIRs") admitting the defect and continued to add inflator models through additional DIRs in the coming years. Despite overwhelming evidence of the defect, Defendants did not issue recalls, warn consumers, or otherwise protect them from the risk, through, for example, systematic loaner vehicle programs.

172.    Additionally, in correspondence to consumers in December 2017

and January 2018, the Mercedes-Benz Defendants acknowledged that "the availability of replacement parts [was] taking longer than anticipated."

173.  In the meantime, the risk of injury remains very real, and is exacerbated by vehicle manufacturers' poor execution of the recalls, as discussed in the next section.

  a.  On June 25, 2014, Patricia Mincey was rendered quadriplegic due to a Takata airbag rupture while driving her 2001 Honda Civic in Jacksonville, Florida.

  b.  On July 22, 2014, Joshua Reliford suffered severe facial and brain injuries due to a Takata airbag rupture while driving his 2001 Honda Civic in McCraken County, Kentucky.

  c.  On July 28, 2014, Francisco Demarco died due to a Takata airbag rupture while riding in the passenger seat of a 2007 Honda Accord in Palm Beach County, Florida.

  d.  On October 4, 2014, Devon Rideout suffered permanent loss of vision due to an alleged Takata airbag rupture while riding passenger in a 2001 BMW 330i in Chesapeake City, Virginia.

  e.  On November 19, 2014, Racquel Hudson suffered extensive first and second degree burns due to a Takata airbag rupture while driving her 2004 Honda Odyssey in San Antonio, Texas.

  f.  On December 12, 2014, the driver airbag in a 2002 BMW 325

parked in the owner's driveway deployed with such energy that it melted and burned the dashboard and ceiling panel, created burn marks throughout the cabin, and shattered the front windshield.

g. On December 31, 2014, the Takata driver airbag in a 2008 Mazda 6 deployed following an accident, ejecting metal fragments that injured the driver's face.

h. On January 18, 2015, Carlos Solis was killed in an accident in Houston, Texas, and a ruptured Takata airbag was the suspected cause.

174. For more than 15 years, Takata knew there was a problem with the safety of its airbags, as there have been at least 24 deaths and 240 injuries linked to defective Takata airbags. As detailed above, the incidents date back to at least 2003, and involve vehicles made by Acura, BMW, Chevrolet, Honda, Mazda, Subaru, and Toyota.

175. The Mercedes-Benz Defendants knew of the Inflator Defect by virtue of these incidents and the investigations conducted by NHTSA, Takata, and the other vehicle manufacturers.

176. The Mercedes-Benz Defendants were on further notice due to unusual Takata airbag deployments that should have prompted further inquiry into the airbags' fitness for use. A review of publicly-available NHTSA complaints shows dozens of incidents of Takata airbags

inadvertently deploying in vehicles, an event that, on information and belief, could be tied to the unstable propellant. These complaints started as early as September 2005, and involve vehicles manufactured by Acura, BMW, Dodge, Ford, Mitsubishi, Pontiac, Subaru, and Toyota. Some of these incidents showed still further signs of the Inflator Defect, including airbags that deployed with such force that they caused the windshield to crack, break, or shatter, and others that caused unusual smoke and fire (or both). For example:

    a. Takata airbags inadvertently deployed and caused windshields to crack, shatter, or break in a 2004 Mitsubishi Lancer on November 23, 2006, a 2003 Toyota Corolla on May 3, 2010, a 2003 Toyota Matrix on August 17, 2010 (in addition to causing unusual smoke), and a 2003 Toyota Matrix on January 29, 2012 (in addition to damaging the dashboard).

    b. Takata airbags inadvertently deployed and caused unusual smoke and heat in a 2003 Acura MDX on January 29, 2012 (which caused the driver skin burns) and a 2003 Toyota Corolla on March 17, 2014.

## TOLLING OF THE STATUTE OF LIMITATIONS

177. Upon information and belief, Takata has known of the inflator defect in its airbags since at least the 1990s. The Mercedes-Benz Defendants

have known of the inflator defects in vehicles outfitted with Takata airbag safety systems since 2004. The Mercedes-Benz Defendants have concealed from or failed to notify Plaintiffs and the public of the full and complete nature of the airbag inflator defect.

178. Although the Mercedes-Benz Defendants have now acknowledged to safety regulators that Takata's airbags are defective, for years, the Mercedes-Benz Defendants did not fully investigate or disclose the seriousness of the issue and in fact downplayed the widespread prevalence of the problem.

179. Any applicable statute of limitation has therefore been tolled by the Mercedes-Benz Defendants' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

180. The Mercedes-Benz Defendants were and are under a continuous duty to disclose to Plaintiffs and the public the true character, quality, and nature of their vehicles. They actively concealed the true character, quality and nature of the vehicles and knowingly made misrepresentations about the quality, reliability, characteristics and performance of the vehicles. Plaintiffs reasonably relied upon the Mercedes-Benz Defendants knowing and affirmative misrepresentations and/or active concealment of these facts. Based on the foregoing, the Mercedes-Benz Defendants are estopped from relying on any statutes of limitation in defense of this action.

181. The causes of action alleged herein did not accrue until Plaintiffs discovered that the Mercedes Vehicle had the defective airbag—after the subject accident. Plaintiffs, however, had no realistic ability to discern that the Mercedes Vehicle was defective until – at the earliest – after the defective airbag exploded. Even then, Plaintiffs had no reason to discover her causes of action because of Defendants' active concealment of the true nature of the airbag inflator defect and untimely recall notice.

## **CONDITIONS PRECEDENT**

182. All conditions precedent have been satisfied or excused.

## **COUNT I—STRICT LIABILITY**
(Nermina Alimanovic against Mercedes-Benz USA, LLC)

183. Nermina re-alleges and incorporates Paragraphs 1 through 182 of this Complaint as if fully stated herein.

184. Defendant, Mercedes-Benz USA, LLC ("MBUSA") at all times material hereto, was engaged in the business of designing, manufacturing, assembling, testing, marketing, promoting, advertising, distributing and selling Mercedes-Benz brand vehicles such as the Mercedes Vehicle to the public.

185. MBUSA is liable under the theory of Strict Product Liability as set forth in the Restatement (Second) of Torts § 402A and Florida law. MBUSA was, at all times relevant to this action, the manufacturer of a

product that was unreasonably and dangerously defective in its design, manufacture, and warning.

186. MBUSA, as the maker of the Mercedes Vehicle with an incorporated Takata airbag safety system who placed such vehicle into the marketplace so as to be distributed and sold in a defective and unreasonably dangerous condition, is strictly liable for the physical harm caused by the Mercedes Vehicle's airbag safety system, when, upon deployment of its passenger's side frontal air bag, the inflator in same ruptured and exploded, causing metal fragments to strike Nermina causing injuries in this foreseeable accident which occurred on November 7, 2020.

187. MBUSA, in incorporating a Takata airbag safety system into the Mercedes Vehicle which it made and sold, which is not a component system that, once incorporated, is subject to any routine maintenance, adjustment or diagnostic review that would change its condition from how it was designed, manufactured and installed, would have expected the Takata airbag safety system in the Mercedes Vehicle to reach the user or consumer without substantial change in the condition in which it was sold.

188. In this instance, the Mercedes Vehicle, and its incorporated Takata airbag safety system, reached Nermina without substantial change, and, just as when it was originally made and sold by MBUSA, such vehicle and its airbag safety system remained a life threatening hazard. Further, the

Mercedes Vehicle and its incorporated Takata airbag safety system was not substantially changed from the time it was manufactured until the date of this accident on November 7, 2020.

189.   MBUSA placed the Mercedes Vehicle on the market with knowledge that it would be used without inspection for defects and dangers. MBUSA knew, or should have known, that ultimate users, operators, or passengers would not and could not properly inspect this product, including its airbag safety system, for defects and dangerous conditions, and that detection of such defects and dangers would be beyond the capabilities of such persons.

190.   The inherently and unreasonably defective and dangerous condition of the Mercedes Vehicle's Takata airbag system is a condition that was not readily apparent to Nermina, or similarly situated users, operators, consumers and owners, who could foreseeably be seriously injured or killed by said defective airbag safety system should it be deployed as intended to provide supplemental occupant protection in a foreseeable frontal crash like occurred here.

191.   MBUSA, having actual knowledge, failed to provide notice of the defective and unreasonably dangerous condition of the Mercedes Vehicle's Takata airbag system to Nermina.

192.   MBUSA has affirmatively concealed over the past decade the

defective and unreasonably dangerous condition of the Mercedes Vehicle's Takata airbag system from the public, NHTSA, and owners, including Plaintiffs, and, such ongoing and continuous conduct, actions and inactions as has been specifically pled in this Complaint over time has foreseeably contributed to and/or caused the general public, NHTSA and owners, like Plaintiffs, to be unaware of the dangers of exploding Takata airbags and/or lack an understanding or appreciation for the magnitude of the problem and potentially lethal harms of same.

193.   As a consequence, Nermina did not know of the dangerous condition in the Mercedes Vehicle at the time of the Incident. Additionally, Nermina did not know of the dangerous condition during the period of the use of the Mercedes Vehicle prior to the subject accident. Had Nermina been informed at any time prior to riding in the Mercedes Vehicle of the potentially lethal defect in the airbag system, she would not have used the Mercedes Vehicle, and, accordingly, she would not have been exposed to said defective and unreasonably dangerous condition. Further, had Nermina been informed at any time during the period of her use of the Mercedes Vehicle prior to the subject accident of the potentially lethal defect in the airbag system, she would not have been a passenger in the Mercedes Vehicle and she would not have been exposed to the defective and unreasonably dangerous condition as described above when she was in an accident on

November 7, 2020.

194. The Airbag Safety System in the Mercedes Vehicle was defective and unreasonably dangerous to ultimate users, operators, consumers and owners, including Nermina, when designed, manufactured, assembled, distributed and sold by MBUSA. The defects in the Airbag Safety System in the Mercedes Vehicle include, but are not limited to:

a. The Airbag Safety System in the Mercedes Vehicle failed to perform as safely as an ordinary consumer would expect when deployed as intended in a foreseeable frontal accident to provide the driver with supplemental occupant protection;

b. The Airbag Safety System in the Mercedes Vehicle had an unreasonably dangerous propensity to rupture upon inflation due to excessive internal pressure, resulting in metal fragments passing through the airbag cushion material into the occupant compartment striking vehicle passengers, like Nermina;

c. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous because of its design in that it failed to perform as safely as an ordinary consumer would expect when deployed as intended, in that the passenger's front airbag inflator produced excessive internal pressure upon deployment causing the inflator to rupture and explode, sending metal fragments through the airbag cushion material into the occupant compartment striking the vehicle's passenger, Nermina;

d. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous because of its design in that it failed to perform as safely as an ordinary consumer would expect when it deployed in a manner reasonably foreseeable to MBUSA, in that the passenger's front airbag inflator produced excessive internal pressure upon deployment causing the inflator to rupture sending metal fragments through the airbag cushion material into the occupant compartment striking the vehicle's passenger, Nermina;

e. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous because of its design in that the risk of danger in the design outweighed the benefits when deployed as intended, in that the passenger's front airbag inflator produced excessive internal pressure upon deployment causing the inflator to rupture sending metal fragments through the airbag cushion material into the occupant compartment striking the vehicle's passenger, Nermina;

f. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous and defective with an inflator having a propensity to rupture upon inflation sending metal fragments flying through the airbag cushion material because: it was not produced in accordance with available alternative designs that were safer, feasible, and technically practicable; it was not state of the art and was not designed and manufactured to the level of technical knowledge that existed when it was made; and, it was made in such a way that it posed a risk of danger to vehicle users, like Nermina, that outweighed the benefits of that airbag safety system as designed and manufactured;

g. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous as manufactured as it did not conform to its intended design and perform as safely as the intended design would have performed, in that the passenger's front airbag inflator produced excessive internal pressure upon deployment causing the inflator to rupture sending metal fragments through the airbag cushion material into the occupant compartment striking the vehicle's passenger, Nermina; and

h. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous and defective due to MBUSA's failure to provide adequate warnings of the risks addressed herein that were known or knowable to MBUSA in light of the generally recognized and prevailing best scientific and/or medical knowledge available at the time of manufacture and distribution, including the use of appropriate warning stickers, placards, or documentation to alert users regarding the hazardous conditions described herein.

195. At the time of the accident, the Mercedes Vehicle, including

specifically its airbag safety system, was substantially unchanged from its condition, as set forth above, when sold and distributed by MBUSA.

196. For the reasons set forth above, and as addressed in the preceding portions of this Complaint as have been specifically incorporated and re-alleged, the Mercedes Vehicle was unreasonably dangerous to foreseeable users, including Nermina, who was the passenger of the Mercedes Vehicle in an ordinary and foreseeable manner. At the time MBUSA released the Mercedes Vehicle with its airbag safety system into the stream of commerce, non-defective designs were economically and technologically feasible and the use of same on the Mercedes Vehicle would have been a safer alternative design which would have significantly reduced the risk of Nermina's injuries without substantially impairing the utility of the Mercedes Vehicle and its airbag safety system.

197. The defects described above directly and proximately caused the injuries sustained by Nermina in this foreseeable accident, in that they directly and in natural and continuous sequence produced or contributed substantially to Nermina's injuries.

198. Nermina suffered personal injuries including (a) bodily injury and any resulting pain and suffering, disability or physical impairment, disfigurement, mental anguish, inconveniences or loss of capacity for the enjoyment of life, experienced in the past or to be experienced in the future;

(b) the expense of hospitalization, medical and nursing care and treatment necessarily or reasonably obtained in the past or to be so obtained in the future; and (c) any earnings or working time lost in the past and any loss of ability to earn money in the future.

199. The conduct of MBUSA was not simply negligent, but amounted to intentional misconduct, gross negligence, recklessness, and/or willful and wanton conduct, particularly in light of (a) the protracted period of time over which the defects have existed, (b) the long held knowledge of the defects by MBUSA, (c) the repeated failure to take adequate steps to notify the public or federal regulators of the danger, and (d) the repeated efforts by MBUSA to minimize the seriousness and scope of the problem.

**WHEREFORE**, Plaintiff, Nermina Alimanovic, demands judgment against Defendant, Mercedes-Benz USA, LLC, for all injuries and damages she sustained due to the incident giving rise to this action, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages, non-economic damages, punitive damages, mental anguish, emotional distress, pain and suffering, lost wages, costs, interest, and for any such further relief as the Court deems appropriate.

## COUNT II—NEGLIGENCE
(Nermina Alimanovic against Mercedes-Benz USA, LLC)

200.   Nermina re-alleges and incorporates Paragraphs 1 through 182 of this Complaint as if fully stated herein.

201.   Defendant, Mercedes-Benz USA, LLC ("MBUSA") had a duty to properly and adequately design, manufacture, assemble, test, inspect, label, provide adequate warnings for, package, distribute, and sell the Mercedes Vehicle, including its incorporated airbag safety system, in a reasonably safe condition so as not to present a danger to members of the general public who reasonably and expectedly under ordinary circumstances would come into contact with the Mercedes Vehicle and its airbag safety system, including Nermina.

202.   MBUSA knew or in the exercise of due care should have known that the Mercedes Vehicle with its incorporated Takata airbag safety system would be used without inspection in an unreasonably dangerous condition and would create a foreseeable and unreasonable zone of risk of harm to users, including Nermina.

203.   MBUSA breached its duty by negligently designing, manufacturing, assembling, testing, inspecting, labeling, packaging, failing to warn, distributing, and selling the Mercedes Vehicle with its incorporated Airbag Safety System when it was not in a reasonably safe condition for foreseeable use, as follows:

   a. Failing to ensure the Airbag Safety System in the Mercedes

Vehicle would perform as safely as an ordinary consumer would expect when deployed as intended in a foreseeable frontal accident to provide the passenger with supplemental occupant protection;

b. Failing to ensure the Airbag Safety System in the Mercedes Vehicle was safe, and would not rupture, catch fire, or explode upon inflation due to excessive internal pressure, resulting in metal fragments passing through the airbag cushion material into the occupant compartment striking vehicle passengers, like Nermina;

c. Failing to ensure the Airbag Safety System to be incorporated into the Mercedes Vehicle as supplied by a third-party, namely Takata, would be designed, manufactured, tested, distributed and provided for purchase in a manner to ensure it was free of design and/or manufacturing defects, and/or would not otherwise be damaged or compromised during the distribution process before use;

d. Failing to ensure the Airbag Safety System in the Mercedes Vehicle was not unreasonably dangerous because of its design so that the passenger's front airbag inflator could produce excessive internal pressure upon deployment causing the inflator to rupture sending metal fragments through the airbag cushion material into the occupant compartment striking the vehicle's passenger, Nermina;

e. Failing to ensure the Airbag Safety System in the Mercedes Vehicle was not unreasonably dangerous and defective with an inflator having a propensity to rupture upon inflation sending metal fragments flying through the airbag cushion material because: it was not produced in accordance with available alternative designs that were safer, feasible, and technically practicable; it was not state of the art and was not designed and manufactured to the level of technical knowledge that existed when it was made; and, it was made in such a way that it posed a risk of danger to vehicle users, like Nermina, that outweighed the benefits of that airbag safety system as designed and manufactured;

f. Failing to ensure the Airbag Safety System in the Mercedes Vehicle was not unreasonably dangerous as manufactured so that the passenger's front airbag inflator could produce excessive internal pressure upon deployment causing the inflator to rupture sending metal fragments through the airbag cushion material into the occupant compartment striking the vehicle's passenger, Nermina;

g. Failing to ensure the Airbag Safety System as delivered for incorporation into the Mercedes Vehicle was not damaged or rendered unreasonably dangerous due to damage or compromise sustained during transport or shipping;

h. Failing to require and ensure verification of the use of reasonable testing and quality control checks on a continuing basis by Takata during the design, development, manufacture, distribution and final delivery/acceptance processes relative to the Airbag Safety System before its incorporation into the Mercedes Vehicle where it would then not be further susceptible or subject to further inspection before delivery to foreseeable users of the Mercedes Vehicle;

i. Failing to ensure the Airbag Safety System was safe for incorporation and use in the Mercedes Vehicle before being incorporated and used by undertaking reasonable steps, including the utilization of testing, quality control and other recognized measures on a continuing basis to ensure product quality for safe use;

j. Failing to ensure the defective Airbag Safety System in the Mercedes Vehicle was fixed, repaired, or made safe in a reasonable and timely manner pursuant to the recall(s) of the Mercedes Vehicle by MBUSA pursuant to the Safety Act;

k. Failing to ensure timely notification and completion of the repair of the Airbag Safety System in the Mercedes Vehicle upon voluntarily undertaking the duty to do so, including, specifically the initiation of MBUSA's safety improvement campaign(s); and

l. Failing to warn or adequately warn by using stickers, placards, or other proper documentation, or notice, to alert users regarding the

hazardous conditions and risks, as stated above, which a user would not reasonably expect to find in the product and which MBUSA had knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, with respect to the use and operation of the Mercedes Vehicle.

204. The negligence described above, inclusive of the conduct, actions and inactions as addressed in the preceding portions of this Complaint as have been specifically incorporated and re-alleged, directly and proximately caused the injuries of Nermina, in that it directly and in natural and continuous sequence, produced or contributed substantially to Nermina's injuries.

205. Nermina suffered personal injuries including (a) bodily injury and any resulting pain and suffering, disability or physical impairment, disfigurement, mental anguish, inconveniences or loss of capacity for the enjoyment of life, experienced in the past or to be experienced in the future; (b) the expense of hospitalization, medical and nursing care and treatment necessarily or reasonably obtained in the past or to be so obtained in the future; and (c) any earnings or working time lost in the past and any loss of ability to earn money in the future.

206. The conduct of MBUSA was not simply negligent, but amounted to intentional misconduct, gross negligence, recklessness, and/or willful and wanton conduct, particularly in light of (a) the protracted period of time over which the defects have existed, (b) the long held knowledge of the defects by

MBUSA, (c) the repeated failure to take adequate steps to notify the public or federal regulators of the danger, and (d) the repeated efforts by MBUSA to minimize the seriousness and scope of the problem.

**WHEREFORE**, Plaintiff, Nermina Alimanovic, demands judgment against Defendant, Mercedes-Benz USA, LLC, for all injuries and damages she sustained due to the incident giving rise to this action, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages, non-economic damages, mental anguish, emotional distress, pain and suffering, lost wages, costs, interest, and for any such further relief as the Court deems appropriate.

## COUNT III—NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
(Nermina Alimanovic against Mercedes-Benz USA, LLC)

207.  Nermina re-alleges and incorporates Paragraphs 1 through 182 of this Complaint as if fully stated herein.

208.  Defendant, Mercedes-Benz USA, LLC ("MBUSA") designed, manufactured, inspected, tested, marketed, advertised, distributed, and sold the Mercedes Vehicle and placed the Mercedes Vehicle into the stream of commerce.

209.  MBUSA knew or reasonably foresaw that Elvir, as a foreseeable user/driver, and Nermina, as a foreseeable bystander/passenger, would use or come into contact with the Mercedes Vehicle.

210. MBUSA owed a duty to Nermina and Elvir to properly design, manufacture, assemble, test, inspect, distribute, and sell the Mercedes Vehicle in a reasonably safe condition and without defect so as not to present a danger to members of the general public who would reasonably and foreseeably use or come into contact with the Mercedes Vehicle, including Nermina and Elvir.

211. MBUSA owed a duty to Nermina and Elvir to provide adequate warnings and instruction about the dangers associated with using the Mercedes Vehicle and how to protect against these dangers.

212. MBUSA breached the duties it owed to Nermina and Elvir by designing, manufacturing, inspecting, testing, distributing, and selling the Mercedes Vehicle in a defective and unreasonably dangerous condition and without adequate warnings or instructions.

213. MBUSA knew or reasonably should have known that Elvir, as a foreseeable user/driver, and Nermina, as a foreseeable bystander/passenger, would suffer injuries and damages due to the Mercedes Vehicle's defective and unreasonably dangerous condition.

214. At no time did MBUSA take action to remedy the Mercedes Vehicle's defective and unreasonably dangerous condition or warn consumers about its negligent design, manufacture, and warning with respect to the Mercedes Vehicle, despite MBUSA's ability to do so.

215.    As a direct and proximate result of MBUSA's negligent acts and omissions, Nermina suffered severe emotional distress and psychological trauma.

216.    Nermina's severe emotional distress and psychological trauma caused physical injury to Nermina within a short time after the incident giving rise to this lawsuit.

217.    The conduct of MBUSA was not simply negligent, but amounted to intentional misconduct, gross negligence, recklessness, and/or willful and wanton conduct, particularly in light of (a) the protracted period of time over which the defects have existed, (b) the long held knowledge of the defects by MBUSA, (c) the repeated failure to take adequate steps to notify the public or federal regulators of the danger, and (d) the repeated efforts by MBUSA to minimize the seriousness and scope of the problem.

**WHEREFORE**, Plaintiff, Nermina Alimanovic, demands judgment against Defendant, Mercedes-Benz USA, LLC, for all injuries and damages she sustained due to the incident giving rise to this action, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages, non-economic damages, punitive damages, mental anguish, emotional distress, pain and suffering, lost wages, costs, interest, and for any such further relief as the Court deems appropriate.

## COUNT IV—STRICT LIABILITY

(Nermina Alimanovic against Mercedes-Benz Research & Development North
America, Inc.)

218.    Nermina re-alleges and incorporates Paragraphs 1 through 182
of this Complaint as if fully stated herein.

219.    Defendant, Mercedes-Benz Research & Development North
America, Inc. ("MBRDNA") at all times material hereto, was engaged in the
business of designing, manufacturing, assembling, testing, marketing,
promoting, advertising, distributing and selling Mercedes-Benz brand
vehicles such as the Mercedes Vehicle to the public.

220.    MBRDNA is liable under the theory of Strict Product Liability as
set forth in the Restatement (Second) of Torts § 402A and Florida law.
MBRDNA was, at all times relevant to this action, the manufacturer of a
product that was unreasonably and dangerously defective in its design,
manufacture, and warning.

221.    MBRDNA, as the maker of the Mercedes Vehicle with an
incorporated Takata airbag safety system who placed such vehicle into the
marketplace so as to be distributed and sold in a defective and unreasonably
dangerous condition, is strictly liable for the physical harm caused by the
Mercedes Vehicle's airbag safety system, when, upon deployment of its
passenger's side frontal air bag, the inflator in same ruptured and exploded,
causing metal fragments to strike Nermina causing injuries in this

foreseeable accident which occurred on November 7, 2020.

222.   MBRDNA, in incorporating a Takata airbag safety system into the Mercedes Vehicle which it made and sold, which is not a component system that, once incorporated, is subject to any routine maintenance, adjustment or diagnostic review that would change its condition from how it was designed, manufactured and installed, would have expected the Takata airbag safety system in the Mercedes Vehicle to reach the user or consumer without substantial change in the condition in which it was sold.

223.   In this instance, the Mercedes Vehicle, and its incorporated Takata airbag safety system, reached Nermina without substantial change, and, just as when it was originally made and sold by MBRDNA, such vehicle and its airbag safety system remained a life threatening hazard. Further, the Mercedes Vehicle and its incorporated Takata airbag safety system was not substantially changed from the time it was manufactured until the date of this accident on November 7, 2020.

224.   MBRDNA placed the Mercedes Vehicle on the market with knowledge that it would be used without inspection for defects and dangers. MBRDNA knew, or should have known, that ultimate users, operators, or passengers would not and could not properly inspect this product, including its airbag safety system, for defects and dangerous conditions, and that detection of such defects and dangers would be beyond the capabilities of

such persons.

225. The inherently and unreasonably defective and dangerous condition of the Mercedes Vehicle's Takata airbag system is a condition that was not readily apparent to Nermina, or similarly situated users, operators, consumers and owners, who could foreseeably be seriously injured or killed by said defective airbag safety system should it be deployed as intended to provide supplemental occupant protection in a foreseeable frontal crash like occurred here.

226. MBRDNA, having actual knowledge, failed to provide notice of the defective and unreasonably dangerous condition of the Mercedes Vehicle's Takata airbag system to Nermina.

227. MBRDNA has affirmatively concealed over the past decade the defective and unreasonably dangerous condition of the Mercedes Vehicle's Takata airbag system from the public, NHTSA, and owners, including Plaintiffs, and, such ongoing and continuous conduct, actions and inactions as has been specifically pled in this Complaint over time has foreseeably contributed to and/or caused the general public, NHTSA and owners, like Plaintiffs, to be unaware of the dangers of exploding Takata airbags and/or lack an understanding or appreciation for the magnitude of the problem and potentially lethal harms of same.

228. As a consequence, Nermina did not know of the dangerous

condition in the Mercedes Vehicle at the time of the Incident. Additionally, Nermina did not know of the dangerous condition during the period of the use of the Mercedes Vehicle prior to the subject accident. Had Nermina been informed at any time prior to riding in the Mercedes Vehicle of the potentially lethal defect in the airbag system, she would not have used the Mercedes Vehicle, and, accordingly, she would not have been exposed to said defective and unreasonably dangerous condition. Further, had Nermina been informed at any time during the period of her use of the Mercedes Vehicle prior to the subject accident of the potentially lethal defect in the airbag system, she would not have been a passenger in the Mercedes Vehicle and she would not have been exposed to the defective and unreasonably dangerous condition as described above when she was in an accident on November 7, 2020.

229.   The Airbag Safety System in the Mercedes Vehicle was defective and unreasonably dangerous to ultimate users, operators, consumers and owners, including Nermina, when designed, manufactured, assembled, distributed and sold by MBRDNA. The defects in the Airbag Safety System in the Mercedes Vehicle include, but are not limited to:

    a. The Airbag Safety System in the Mercedes Vehicle failed to perform as safely as an ordinary consumer would expect when deployed as intended in a foreseeable frontal accident to provide the passenger with supplemental occupant protection;

b. The Airbag Safety System in the Mercedes Vehicle had an unreasonably dangerous propensity to rupture upon inflation due to excessive internal pressure, resulting in metal fragments passing through the airbag cushion material into the occupant compartment striking vehicle passengers, like Nermina;

c. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous because of its design in that it failed to perform as safely as an ordinary consumer would expect when deployed as intended, in that the passenger's front airbag inflator produced excessive internal pressure upon deployment causing the inflator to rupture and explode, sending metal fragments through the airbag cushion material into the occupant compartment striking the vehicle's passenger, Nermina;

d. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous because of its design in that it failed to perform as safely as an ordinary consumer would expect when it deployed in a manner reasonably foreseeable to MBRDNA, in that the passenger's front airbag inflator produced excessive internal pressure upon deployment causing the inflator to rupture sending metal fragments through the airbag cushion material into the occupant compartment striking the vehicle's passenger, Nermina;

e. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous because of its design in that the risk of danger in the design outweighed the benefits when deployed as intended, in that the passenger's front airbag inflator produced excessive internal pressure upon deployment causing the inflator to rupture sending metal fragments through the airbag cushion material into the occupant compartment striking the vehicle's passenger, Nermina;

f. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous and defective with an inflator having a propensity to rupture upon inflation sending metal fragments flying through the airbag cushion material because: it was not produced in accordance with available alternative designs that were safer, feasible, and technically practicable; it was not state of the art and was not designed and manufactured to the level of

technical knowledge that existed when it was made; and, it was made in such a way that it posed a risk of danger to vehicle users, like Nermina, that outweighed the benefits of that airbag safety system as designed and manufactured;

g. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous as manufactured as it did not conform to its intended design and perform as safely as the intended design would have performed, in that the passenger's front airbag inflator produced excessive internal pressure upon deployment causing the inflator to rupture sending metal fragments through the airbag cushion material into the occupant compartment striking the vehicle's passenger, Nermina; and

h. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous and defective due to MBRDNA's failure to provide adequate warnings of the risks addressed herein that were known or knowable to MBRDNA in light of the generally recognized and prevailing best scientific and/or medical knowledge available at the time of manufacture and distribution, including the use of appropriate warning stickers, placards, or documentation to alert users regarding the hazardous conditions described herein.

230. At the time of the accident, the Mercedes Vehicle, including specifically its airbag safety system, was substantially unchanged from its condition, as set forth above, when sold and distributed by MBRDNA.

231. For the reasons set forth above, and as addressed in the preceding portions of this Complaint as have been specifically incorporated and re-alleged, the Mercedes Vehicle was unreasonably dangerous to foreseeable users, including Nermina, who was the passenger of the Mercedes Vehicle in an ordinary and foreseeable manner. At the time MBRDNA released the Mercedes Vehicle with its airbag safety system into the stream

of commerce, non-defective designs were economically and technologically feasible and the use of same on the Mercedes Vehicle would have been a safer alternative design which would have significantly reduced the risk of Nermina's injuries without substantially impairing the utility of the Mercedes Vehicle and its airbag safety system.

232.   The defects described above directly and proximately caused the injuries sustained by Nermina in this foreseeable accident, in that they directly and in natural and continuous sequence produced or contributed substantially to Nermina's injuries.

233.   Nermina suffered personal injuries including (a) bodily injury and any resulting pain and suffering, disability or physical impairment, disfigurement, mental anguish, inconveniences or loss of capacity for the enjoyment of life, experienced in the past or to be experienced in the future; (b) the expense of hospitalization, medical and nursing care and treatment necessarily or reasonably obtained in the past or to be so obtained in the future; and (c) any earnings or working time lost in the past and any loss of ability to earn money in the future.

234.   The conduct of MBRDNA was not simply negligent, but amounted to intentional misconduct, gross negligence, recklessness, and/or willful and wanton conduct, particularly in light of (a) the protracted period of time over which the defects have existed, (b) the long held knowledge of the

defects by MBRDNA, (c) the repeated failure to take adequate steps to notify the public or federal regulators of the danger, and (d) the repeated efforts by MBRDNA to minimize the seriousness and scope of the problem.

**WHEREFORE**, Plaintiff, Nermina Alimanovic, demands judgment against Defendant, Mercedes-Benz Research & Development North America, Inc., for all injuries and damages she sustained due to the incident giving rise to this action, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages, non-economic damages, punitive damages, mental anguish, emotional distress, pain and suffering, lost wages, costs, interest, and for any such further relief as the Court deems appropriate.

## COUNT V—NEGLIGENCE
(Nermina Alimanovic against Mercedes-Benz Research & Development North America, Inc.)

235.    Nermina re-alleges and incorporates Paragraphs 1 through 182 of this Complaint as if fully stated herein.

236.    MBRDNA had a duty to properly and adequately design, manufacture, assemble, test, inspect, label, provide adequate warnings for, package, distribute, and sell the Mercedes Vehicle, including its incorporated airbag safety system, in a reasonably safe condition so as not to present a danger to members of the general public who reasonably and expectedly under

ordinary circumstances would come into contact with the Mercedes Vehicle and its airbag safety system, including Nermina.

237. MBRDNA knew or in the exercise of due care should have known that the Mercedes Vehicle with its incorporated Takata airbag safety system would be used without inspection in an unreasonably dangerous condition and would create a foreseeable and unreasonable zone of risk of harm to users, including Nermina.

238. MBRDNA breached its duty by negligently designing, manufacturing, assembling, testing, inspecting, labeling, packaging, failing to warn, distributing, and selling the Mercedes Vehicle with its incorporated Airbag Safety System when it was not in a reasonably safe condition for foreseeable use, as follows:

    a. Failing to ensure the Airbag Safety System in the Mercedes Vehicle would perform as safely as an ordinary consumer would expect when deployed as intended in a foreseeable frontal accident to provide the passenger with supplemental occupant protection;

    b. Failing to ensure the Airbag Safety System in the Mercedes Vehicle was safe, and would not rupture, catch fire, or explode upon inflation due to excessive internal pressure, resulting in metal fragments passing through the airbag cushion material into the occupant compartment striking vehicle passengers, like Nermina;

    c. Failing to ensure the Airbag Safety System to be incorporated into the Mercedes Vehicle as supplied by a third-party, namely Takata, would be designed, manufactured, tested, distributed and provided for purchase in a manner to ensure it was free of

design and/or manufacturing defects, and/or would not otherwise be damaged or compromised during the distribution process before use;

d. Failing to ensure the Airbag Safety System in the Mercedes Vehicle was not unreasonably dangerous because of its design so that the passenger's front airbag inflator could produce excessive internal pressure upon deployment causing the inflator to rupture sending metal fragments through the airbag cushion material into the occupant compartment striking the vehicle's passenger, Nermina;

e. Failing to ensure the Airbag Safety System in the Mercedes Vehicle was not unreasonably dangerous and defective with an inflator having a propensity to rupture upon inflation sending metal fragments flying through the airbag cushion material because: it was not produced in accordance with available alternative designs that were safer, feasible, and technically practicable; it was not state of the art and was not designed and manufactured to the level of technical knowledge that existed when it was made; and, it was made in such a way that it posed a risk of danger to vehicle users, like Nermina, that outweighed the benefits of that airbag safety system as designed and manufactured;

f. Failing to ensure the Airbag Safety System in the Mercedes Vehicle was not unreasonably dangerous as manufactured so that the passenger's front airbag inflator could produce excessive internal pressure upon deployment causing the inflator to rupture sending metal fragments through the airbag cushion material into the occupant compartment striking the vehicle's passenger, Nermina;

g. Failing to ensure the Airbag Safety System as delivered for incorporation into the Mercedes Vehicle was not damaged or rendered unreasonably dangerous due to damage or compromise sustained during transport or shipping;

h. Failing to require and ensure verification of the use of reasonable testing and quality control checks on a continuing basis by Takata during the design, development, manufacture,

distribution and final delivery/acceptance processes relative to the Airbag Safety System before its incorporation into the Mercedes Vehicle where it would then not be further susceptible or subject to further inspection before delivery to foreseeable users of the Mercedes Vehicle;

i. Failing to ensure the Airbag Safety System was safe for incorporation and use in the Mercedes Vehicle before being incorporated and used by undertaking reasonable steps, including the utilization of testing, quality control and other recognized measures on a continuing basis to ensure product quality for safe use;

j. Failing to ensure the defective Airbag Safety System in the Mercedes Vehicle was fixed, repaired, or made safe in a reasonable and timely manner pursuant to the recall(s) of the Mercedes Vehicle by MBRDNA pursuant to the Safety Act;

k. Failing to ensure timely notification and completion of the repair of the Airbag Safety System in the Mercedes Vehicle upon voluntarily undertaking the duty to do so, including, specifically the initiation of MBRDNA's safety improvement campaign(s); and

l. Failing to warn or adequately warn by using stickers, placards, or other proper documentation, or notice, to alert users regarding the hazardous conditions and risks, as stated above, which a user would not reasonably expect to find in the product and which MBRDNA had knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, with respect to the use and operation of the Mercedes Vehicle.

239. The negligence described above, inclusive of the conduct, actions and inactions as addressed in the preceding portions of this Complaint as have been specifically incorporated and re-alleged, directly and proximately caused the injuries of Nermina, in that it directly and in natural and continuous sequence, produced or contributed substantially to Nermina's

injuries.

240.  Nermina suffered personal injuries including (a) bodily injury and any resulting pain and suffering, disability or physical impairment, disfigurement, mental anguish, inconveniences or loss of capacity for the enjoyment of life, experienced in the past or to be experienced in the future; (b) the expense of hospitalization, medical and nursing care and treatment necessarily or reasonably obtained in the past or to be so obtained in the future; and (c) any earnings or working time lost in the past and any loss of ability to earn money in the future.

241.  The conduct of MBRDNA was not simply negligent, but amounted to intentional misconduct, gross negligence, recklessness, and/or willful and wanton conduct, particularly in light of (a) the protracted period of time over which the defects have existed, (b) the long held knowledge of the defects by MBRDNA, (c) the repeated failure to take adequate steps to notify the public or federal regulators of the danger, and (d) the repeated efforts by MBRDNA to minimize the seriousness and scope of the problem.

**WHEREFORE**, Plaintiff, Nermina Alimanovic, demands judgment against Defendant, Mercedes-Benz Research & Development North America, Inc., for all injuries and damages she sustained due to the incident giving rise to this action, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages, non-

economic damages, punitive damages, mental anguish, emotional distress, pain and suffering, lost wages, costs, interest, and for any such further relief as the Court deems appropriate.

## COUNT VI—NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
(Nermina Alimanovic against Mercedes-Benz Research & Development North America, Inc.)

242.   Nermina re-alleges and incorporates Paragraphs 1 through 182 of this Complaint as if fully stated herein.

243.   MBRDNA designed, manufactured, inspected, tested, marketed, advertised, distributed, and sold the Mercedes Vehicle and placed the Mercedes Vehicle into the stream of commerce.

244.   MBRDNA knew or reasonably foresaw that Elvir, as a foreseeable user/driver, and Nermina, as a foreseeable bystander/passenger, would use or come into contact with the Mercedes Vehicle.

245.   MBRDNA owed a duty to Nermina and Elvir to properly design, manufacture, assemble, test, inspect, distribute, and sell the Mercedes Vehicle in a reasonably safe condition and without defect so as not to present a danger to members of the general public who would reasonably and foreseeably use or come into contact with the Mercedes Vehicle, including Nermina and Elvir.

246.    MBRDNA owed a duty to Nermina and Elvir to provide adequate warnings and instruction about the dangers associated with using the Mercedes Vehicle and how to protect against these dangers.

247.    MBRDNA breached the duties it owed to Nermina and Elvir by designing, manufacturing, inspecting, testing, distributing, and selling the Mercedes Vehicle in a defective and unreasonably dangerous condition and without adequate warnings or instructions.

248.    MBRDNA knew or reasonably should have known that Elvir, as a foreseeable user/driver, and Nermina, as a foreseeable bystander/passenger, would suffer injuries and damages due to the Mercedes Vehicle's defective and unreasonably dangerous condition.

249.    At no time did MBRDNA take action to remedy the Mercedes Vehicle's defective and unreasonably dangerous condition or warn consumers about its negligent design, manufacture, and warning with respect to the Mercedes Vehicle, despite MBRDNA's ability to do so.

250.    As a direct and proximate result of MBRDNA's negligent acts and omissions, Nermina suffered severe emotional distress and psychological trauma.

251.    Nermina's severe emotional distress and psychological trauma caused physical injury to Nermina within a short time after the incident giving rise to this lawsuit.

252. The conduct of MBRDNA was not simply negligent, but amounted to intentional misconduct, gross negligence, recklessness, and/or willful and wanton conduct, particularly in light of (a) the protracted period of time over which the defects have existed, (b) the long held knowledge of the defects by MBRDNA, (c) the repeated failure to take adequate steps to notify the public or federal regulators of the danger, and (d) the repeated efforts by MBRDNA to minimize the seriousness and scope of the problem.

**WHEREFORE**, Plaintiff, Nermina Alimanovic, demands judgment against Defendant, Mercedes-Benz Research & Development North America, Inc., for all injuries and damages she sustained due to the incident giving rise to this action, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages, non-economic damages, punitive damages, mental anguish, emotional distress, pain and suffering, lost wages, costs, interest, and for any such further relief as the Court deems appropriate.

## <u>COUNT VII—STRICT LIABILITY</u>
(Nermina Alimanovic against Daimler North America Corporation)

253. Nermina re-alleges and incorporates Paragraphs 1 through 182 of this Complaint as if fully stated herein.

254. Defendant, Daimler North America Corporation ("DNAC") at all times material hereto, was engaged in the business of designing,

manufacturing, assembling, testing, marketing, promoting, advertising, distributing and selling Mercedes-Benz brand vehicles such as the Mercedes Vehicle to the public.

255. DNAC is liable under the theory of Strict Product Liability as set forth in the Restatement (Second) of Torts § 402A and Florida law. DNAC was, at all times relevant to this action, the manufacturer of a product that was unreasonably and dangerously defective in its design, manufacture, and warning.

256. DNAC, as the maker of the Mercedes Vehicle with an incorporated Takata airbag safety system who placed such vehicle into the marketplace so as to be distributed and sold in a defective and unreasonably dangerous condition, is strictly liable for the physical harm caused by the Mercedes Vehicle's airbag safety system, when, upon deployment of its passenger's side frontal air bag, the inflator in same ruptured and exploded, causing metal fragments to strike Nermina causing injuries in this foreseeable accident which occurred on November 7, 2020.

257. DNAC, in incorporating a Takata airbag safety system into the Mercedes Vehicle which it made and sold, which is not a component system that, once incorporated, is subject to any routine maintenance, adjustment or diagnostic review that would change its condition from how it was designed, manufactured and installed, would have expected the Takata airbag safety

system in the Mercedes Vehicle to reach the user or consumer without substantial change in the condition in which it was sold.

258.   In this instance, the Mercedes Vehicle, and its incorporated Takata airbag safety system, reached Nermina without substantial change, and, just as when it was originally made and sold by DNAC, such vehicle and its airbag safety system remained a life threatening hazard. Further, the Mercedes Vehicle and its incorporated Takata airbag safety system was not substantially changed from the time it was manufactured until the date of this accident on November 7, 2020.

259.   DNAC placed the Mercedes Vehicle on the market with knowledge that it would be used without inspection for defects and dangers. DNAC knew, or should have known, that ultimate users, operators, or passengers would not and could not properly inspect this product, including its airbag safety system, for defects and dangerous conditions, and that detection of such defects and dangers would be beyond the capabilities of such persons.

260.   The inherently and unreasonably defective and dangerous condition of the Mercedes Vehicle's Takata airbag system is a condition that was not readily apparent to Nermina, or similarly situated users, operators, consumers and owners, who could foreseeably be seriously injured or killed by said defective airbag safety system should it be deployed as intended

to provide supplemental occupant protection in a foreseeable frontal crash like occurred here.

261. DNAC, having actual knowledge, failed to provide notice of the defective and unreasonably dangerous condition of the Mercedes Vehicle's Takata airbag system to Nermina.

262. DNAC has affirmatively concealed over the past decade the defective and unreasonably dangerous condition of the Mercedes Vehicle's Takata airbag system from the public, NHTSA, and owners, including Plaintiffs, and, such ongoing and continuous conduct, actions and inactions as has been specifically pled in this Complaint over time has foreseeably contributed to and/or caused the general public, NHTSA and owners, like Plaintiffs, to be unaware of the dangers of exploding Takata airbags and/or lack an understanding or appreciation for the magnitude of the problem and potentially lethal harms of same.

263. As a consequence, Nermina did not know of the dangerous condition in the Mercedes Vehicle at the time of the Incident. Additionally, Nermina did not know of the dangerous condition during the period of the use of the Mercedes Vehicle prior to the subject accident. Had Nermina been informed at any time prior to riding in the Mercedes Vehicle of the potentially lethal defect in the airbag system, she would not have used the Mercedes Vehicle, and, accordingly, she would not have been exposed to said

defective and unreasonably dangerous condition. Further, had Nermina been informed at any time during the period of her use of the Mercedes Vehicle prior to the subject accident of the potentially lethal defect in the airbag system, she would not have been a passenger in the Mercedes Vehicle and she would not have been exposed to the defective and unreasonably dangerous condition as described above when she was in an accident on November 7, 2020.

264. The Airbag Safety System in the Mercedes Vehicle was defective and unreasonably dangerous to ultimate users, operators, consumers and owners, including Nermina, when designed, manufactured, assembled, distributed and sold by DNAC. The defects in the Airbag Safety System in the Mercedes Vehicle include, but are not limited to:

    a. The Airbag Safety System in the Mercedes Vehicle failed to perform as safely as an ordinary consumer would expect when deployed as intended in a foreseeable frontal accident to provide the passenger with supplemental occupant protection;

    b. The Airbag Safety System in the Mercedes Vehicle had an unreasonably dangerous propensity to rupture upon inflation due to excessive internal pressure, resulting in metal fragments passing through the airbag cushion material into the occupant compartment striking vehicle passengers, like Nermina;

    c. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous because of its design in that it failed to perform as safely as an ordinary consumer would expect when deployed as intended, in that the passenger's front airbag inflator produced excessive internal pressure upon deployment causing the inflator to rupture and explode, sending metal fragments

through the airbag cushion material into the occupant compartment striking the vehicle's passenger, Nermina;

d.  The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous because of its design in that it failed to perform as safely as an ordinary consumer would expect when it deployed in a manner reasonably foreseeable to DNAC, in that the passenger's front airbag inflator produced excessive internal pressure upon deployment causing the inflator to rupture sending metal fragments through the airbag cushion material into the occupant compartment striking the vehicle's passenger, Nermina;

e.  The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous because of its design in that the risk of danger in the design outweighed the benefits when deployed as intended, in that the passenger's front airbag inflator produced excessive internal pressure upon deployment causing the inflator to rupture sending metal fragments through the airbag cushion material into the occupant compartment striking the vehicle's passenger, Nermina;

f.  The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous and defective with an inflator having a propensity to rupture upon inflation sending metal fragments flying through the airbag cushion material because: it was not produced in accordance with available alternative designs that were safer, feasible, and technically practicable; it was not state of the art and was not designed and manufactured to the level of technical knowledge that existed when it was made; and, it was made in such a way that it posed a risk of danger to vehicle users, like Nermina, that outweighed the benefits of that airbag safety system as designed and manufactured;

g.  The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous as manufactured as it did not conform to its intended design and perform as safely as the intended design would have performed, in that the passenger's front airbag inflator produced excessive internal pressure upon deployment causing the inflator to rupture sending metal fragments through the airbag cushion material into the occupant compartment

striking the vehicle's passenger, Nermina; and

h. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous and defective due to DNAC's failure to provide adequate warnings of the risks addressed herein that were known or knowable to DNAC in light of the generally recognized and prevailing best scientific and/or medical knowledge available at the time of manufacture and distribution, including the use of appropriate warning stickers, placards, or documentation to alert users regarding the hazardous conditions described herein.

265. At the time of the accident, the Mercedes Vehicle, including specifically its airbag safety system, was substantially unchanged from its condition, as set forth above, when sold and distributed by DNAC.

266. For the reasons set forth above, and as addressed in the preceding portions of this Complaint as have been specifically incorporated and re-alleged, the Mercedes Vehicle was unreasonably dangerous to foreseeable users, including Nermina, who was the passenger of the Mercedes Vehicle in an ordinary and foreseeable manner. At the time DNAC released the Mercedes Vehicle with its airbag safety system into the stream of commerce, non-defective designs were economically and technologically feasible and the use of same on the Mercedes Vehicle would have been a safer alternative design which would have significantly reduced the risk of Nermina's injuries without substantially impairing the utility of the Mercedes Vehicle and its airbag safety system.

267. The defects described above directly and proximately caused the

injuries sustained by Nermina in this foreseeable accident, in that they directly and in natural and continuous sequence produced or contributed substantially to Nermina's injuries.

268. Nermina suffered personal injuries including (a) bodily injury and any resulting pain and suffering, disability or physical impairment, disfigurement, mental anguish, inconveniences or loss of capacity for the enjoyment of life, experienced in the past or to be experienced in the future; (b) the expense of hospitalization, medical and nursing care and treatment necessarily or reasonably obtained in the past or to be so obtained in the future; and (c) any earnings or working time lost in the past and any loss of ability to earn money in the future.

269. The conduct of DNAC was not simply negligent, but amounted to intentional misconduct, gross negligence, recklessness, and/or willful and wanton conduct, particularly in light of (a) the protracted period of time over which the defects have existed, (b) the long held knowledge of the defects by DNAC, (c) the repeated failure to take adequate steps to notify the public or federal regulators of the danger, and (d) the repeated efforts by DNAC to minimize the seriousness and scope of the problem.

**WHEREFORE**, Plaintiff, Nermina Alimanovic, demands judgment against Defendant, Daimler North America Corporation, for all injuries and damages she sustained due to the incident giving rise to this action, whether

already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages, non-economic damages, punitive damages, mental anguish, emotional distress, pain and suffering, lost wages, costs, interest, and for any such further relief as the Court deems appropriate.

### COUNT VIII—NEGLIGENCE
(Nermina Alimanovic against Daimler North America Corporation)

270. Nermina re-alleges and incorporates Paragraphs 1 through 182 of this Complaint as if fully stated herein.

271. DNAC had a duty to properly and adequately design, manufacture, assemble, test, inspect, label, provide adequate warnings for, package, distribute, and sell the Mercedes Vehicle, including its incorporated airbag safety system, in a reasonably safe condition so as not to present a danger to members of the general public who reasonably and expectedly under ordinary circumstances would come into contact with the Mercedes Vehicle and its airbag safety system, including Nermina.

272. DNAC knew or in the exercise of due care should have known that the Mercedes Vehicle with its incorporated Takata airbag safety system would be used without inspection in an unreasonably dangerous condition and would create a foreseeable and unreasonable zone of risk of harm to users, including Nermina.

273. DNAC breached its duty by negligently designing, manufacturing,

assembling, testing, inspecting, labeling, packaging, failing to warn, distributing, and selling the Mercedes Vehicle with its incorporated Airbag Safety System when it was not in a reasonably safe condition for foreseeable use, as follows:

    a. Failing to ensure the Airbag Safety System in the Mercedes Vehicle would perform as safely as an ordinary consumer would expect when deployed as intended in a foreseeable frontal accident to provide the passenger with supplemental occupant protection;

    b. Failing to ensure the Airbag Safety System in the Mercedes Vehicle was safe, and would not rupture, catch fire, or explode upon inflation due to excessive internal pressure, resulting in metal fragments passing through the airbag cushion material into the occupant compartment striking vehicle passengers, like Nermina;

    c. Failing to ensure the Airbag Safety System to be incorporated into the Mercedes Vehicle as supplied by a third-party, namely Takata, would be designed, manufactured, tested, distributed and provided for purchase in a manner to ensure it was free of design and/or manufacturing defects, and/or would not otherwise be damaged or compromised during the distribution process before use;

    d. Failing to ensure the Airbag Safety System in the Mercedes Vehicle was not unreasonably dangerous because of its design so that the passenger's front airbag inflator could produce excessive internal pressure upon deployment causing the inflator to rupture sending metal fragments through the airbag cushion material into the occupant compartment striking the vehicle's passenger, Nermina;

    e. Failing to ensure the Airbag Safety System in the Mercedes Vehicle was not unreasonably dangerous and defective with an inflator having a propensity to rupture upon inflation sending metal fragments flying through the airbag cushion material

because: it was not produced in accordance with available alternative designs that were safer, feasible, and technically practicable; it was not state of the art and was not designed and manufactured to the level of technical knowledge that existed when it was made; and, it was made in such a way that it posed a risk of danger to vehicle users, like Nermina, that outweighed the benefits of that airbag safety system as designed and manufactured;

f.  Failing to ensure the Airbag Safety System in the Mercedes Vehicle was not unreasonably dangerous as manufactured so that the passenger's front airbag inflator could produce excessive internal pressure upon deployment causing the inflator to rupture sending metal fragments through the airbag cushion material into the occupant compartment striking the vehicle's passenger, Nermina;

g.  Failing to ensure the Airbag Safety System as delivered for incorporation into the Mercedes Vehicle was not damaged or rendered unreasonably dangerous due to damage or compromise sustained during transport or shipping;

h.  Failing to require and ensure verification of the use of reasonable testing and quality control checks on a continuing basis by Takata during the design, development, manufacture, distribution and final delivery/acceptance processes relative to the Airbag Safety System before its incorporation into the Mercedes Vehicle where it would then not be further susceptible or subject to further inspection before delivery to foreseeable users of the Mercedes Vehicle;

i.  Failing to ensure the Airbag Safety System was safe for incorporation and use in the Mercedes Vehicle before being incorporated and used by undertaking reasonable steps, including the utilization of testing, quality control and other recognized measures on a continuing basis to ensure product quality for safe use;

j.  Failing to ensure the defective Airbag Safety System in the Mercedes Vehicle was fixed, repaired, or made safe in a reasonable and timely manner pursuant to the recall(s) of the

Mercedes Vehicle by DNAC pursuant to the Safety Act;

k. Failing to ensure timely notification and completion of the repair of the Airbag Safety System in the Mercedes Vehicle upon voluntarily undertaking the duty to do so, including, specifically the initiation of DNAC's safety improvement campaign(s); and

l. Failing to warn or adequately warn by using stickers, placards, or other proper documentation, or notice, to alert users regarding the hazardous conditions and risks, as stated above, which a user would not reasonably expect to find in the product and which DNAC had knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, with respect to the use and operation of the Mercedes Vehicle.

274. The negligence described above, inclusive of the conduct, actions and inactions as addressed in the preceding portions of this Complaint as have been specifically incorporated and re-alleged, directly and proximately caused the injuries of Nermina, in that it directly and in natural and continuous sequence, produced or contributed substantially to Nermina's injuries.

275. Nermina suffered personal injuries including (a) bodily injury and any resulting pain and suffering, disability or physical impairment, disfigurement, mental anguish, inconveniences or loss of capacity for the enjoyment of life, experienced in the past or to be experienced in the future; (b) the expense of hospitalization, medical and nursing care and treatment necessarily or reasonably obtained in the past or to be so obtained in the future; and (c) any earnings or working time lost in the past and any loss of

ability to earn money in the future.

276.    The conduct of DNAC was not simply negligent, but amounted to intentional misconduct, gross negligence, recklessness, and/or willful and wanton conduct, particularly in light of (a) the protracted period of time over which the defects have existed, (b) the long held knowledge of the defects by DNAC, (c) the repeated failure to take adequate steps to notify the public or federal regulators of the danger, and (d) the repeated efforts by DNAC to minimize the seriousness and scope of the problem.

**WHEREFORE**, Plaintiff, Nermina Alimanovic, demands judgment against Defendant, Daimler North America Corporation, for all injuries and damages she sustained due to the incident giving rise to this action, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages, non-economic damages, punitive damages, mental anguish, emotional distress, pain and suffering, lost wages, costs, interest, and for any such further relief as the Court deems appropriate.

## COUNT IX—NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
(Nermina Alimanovic against Daimler North America Corporation)

277.    Nermina re-alleges and incorporates Paragraphs 1 through 182 of this Complaint as if fully stated herein.

278. DNAC designed, manufactured, inspected, tested, marketed, advertised, distributed, and sold the Mercedes Vehicle and placed the Mercedes Vehicle into the stream of commerce.

279. DNAC knew or reasonably foresaw that Elvir, as a foreseeable user/driver, and Nermina, as a foreseeable bystander/passenger, would use or come into contact with the Mercedes Vehicle.

280. DNAC owed a duty to Nermina and Elvir to properly design, manufacture, assemble, test, inspect, distribute, and sell the Mercedes Vehicle in a reasonably safe condition and without defect so as not to present a danger to members of the general public who would reasonably and foreseeably use or come into contact with the Mercedes Vehicle, including Nermina and Elvir.

281. DNAC owed a duty to Nermina and Elvir to provide adequate warnings and instruction about the dangers associated with using the Mercedes Vehicle and how to protect against these dangers.

282. DNAC breached the duties it owed to Nermina and Elvir by designing, manufacturing, inspecting, testing, distributing, and selling the Mercedes Vehicle in a defective and unreasonably dangerous condition and without adequate warnings or instructions.

283. DNAC knew or reasonably should have known that Elvir, as a foreseeable user/driver, and Nermina, as a foreseeable bystander/passenger,

would suffer injuries and damages due to the Mercedes Vehicle's defective and unreasonably dangerous condition.

284. At no time did DNAC take action to remedy the Mercedes Vehicle's defective and unreasonably dangerous condition or warn consumers about its negligent design, manufacture, and warning with respect to the Mercedes Vehicle, despite DNAC's ability to do so.

285. As a direct and proximate result of DNAC's negligent acts and omissions, Nermina suffered severe emotional distress and psychological trauma.

286. Nermina's severe emotional distress and psychological trauma caused physical injury to Nermina within a short time after the incident giving rise to this lawsuit.

287. The conduct of DNAC was not simply negligent, but amounted to intentional misconduct, gross negligence, recklessness, and/or willful and wanton conduct, particularly in light of (a) the protracted period of time over which the defects have existed, (b) the long held knowledge of the defects by DNAC, (c) the repeated failure to take adequate steps to notify the public or federal regulators of the danger, and (d) the repeated efforts by DNAC to minimize the seriousness and scope of the problem.

**WHEREFORE**, Plaintiff, Nermina Alimanovic, demands judgment against Defendant, Daimler North America Corporation, for all injuries and

damages she sustained due to the incident giving rise to this action, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages, non-economic damages, punitive damages, mental anguish, emotional distress, pain and suffering, lost wages, costs, interest, and for any such further relief as the Court deems appropriate.

## COUNT X—STRICT LIABILITY
(Nermina Alimanovic against Daimler AG)

288. Nermina re-alleges and incorporates Paragraphs 1 through 182 of this Complaint as if fully stated herein.

289. Defendant, Daimler AG at all times material hereto, was engaged in the business of designing, manufacturing, assembling, testing, marketing, promoting, advertising, distributing and selling Mercedes-Benz brand vehicles such as the Mercedes Vehicle to the public.

290. Daimler AG is liable under the theory of Strict Product Liability as set forth in the Restatement (Second) of Torts § 402A and Florida law. Daimler AG was, at all times relevant to this action, the manufacturer of a product that was unreasonably and dangerously defective in its design, manufacture, and warning.

291. Daimler AG, as the maker of the Mercedes Vehicle with an incorporated Takata airbag safety system who placed such vehicle into the marketplace so as to be distributed and sold in a defective and unreasonably

dangerous condition, is strictly liable for the physical harm caused by the Mercedes Vehicle's airbag safety system, when, upon deployment of its passenger's side frontal air bag, the inflator in same ruptured and exploded, causing metal fragments to strike Nermina causing injuries in this foreseeable accident which occurred on November 7, 2020.

292. Daimler AG, in incorporating a Takata airbag safety system into the Mercedes Vehicle which it made and sold, which is not a component system that, once incorporated, is subject to any routine maintenance, adjustment or diagnostic review that would change its condition from how it was designed, manufactured and installed, would have expected the Takata airbag safety system in the Mercedes Vehicle to reach the user or consumer without substantial change in the condition in which it was sold.

293. In this instance, the Mercedes Vehicle, and its incorporated Takata airbag safety system, reached Nermina without substantial change, and, just as when it was originally made and sold by Daimler AG, such vehicle and its airbag safety system remained a life threatening hazard. Further, the Mercedes Vehicle and its incorporated Takata airbag safety system was not substantially changed from the time it was manufactured until the date of this accident on November 7, 2020.

294. Daimler AG placed the Mercedes Vehicle on the market with knowledge that it would be used without inspection for defects and dangers.

Daimler AG knew, or should have known, that ultimate users, operators, or passengers would not and could not properly inspect this product, including its airbag safety system, for defects and dangerous conditions, and that detection of such defects and dangers would be beyond the capabilities of such persons.

295. The inherently and unreasonably defective and dangerous condition of the Mercedes Vehicle's Takata airbag system is a condition that was not readily apparent to Nermina, or similarly situated users, operators, consumers and owners, who could foreseeably be seriously injured or killed by said defective airbag safety system should it be deployed as intended to provide supplemental occupant protection in a foreseeable frontal crash like occurred here.

296. Daimler AG, having actual knowledge, failed to provide notice of the defective and unreasonably dangerous condition of the Mercedes Vehicle's Takata airbag system to Nermina.

297. Daimler AG has affirmatively concealed over the past decade the defective and unreasonably dangerous condition of the Mercedes Vehicle's Takata airbag system from the public, NHTSA, and owners, including Plaintiffs, and, such ongoing and continuous conduct, actions and inactions as has been specifically pled in this Complaint over time has foreseeably contributed to and/or caused the general public, NHTSA and owners, like

Plaintiffs, to be unaware of the dangers of exploding Takata airbags and/or lack an understanding or appreciation for the magnitude of the problem and potentially lethal harms of same.

298. As a consequence, Nermina did not know of the dangerous condition in the Mercedes Vehicle at the time of the Incident. Additionally, Nermina did not know of the dangerous condition during the period of the use of the Mercedes Vehicle prior to the subject accident. Had Nermina been informed at any time prior to riding in the Mercedes Vehicle of the potentially lethal defect in the airbag system, she would not have used the Mercedes Vehicle, and, accordingly, she would not have been exposed to said defective and unreasonably dangerous condition. Further, had Nermina been informed at any time during the period of her use of the Mercedes Vehicle prior to the subject accident of the potentially lethal defect in the airbag system, she would not have been a passenger in the Mercedes Vehicle and she would not have been exposed to the defective and unreasonably dangerous condition as described above when she was in an accident on November 7, 2020.

299. The Airbag Safety System in the Mercedes Vehicle was defective and unreasonably dangerous to ultimate users, operators, consumers and owners, including Nermina, when designed, manufactured, assembled, distributed and sold by Daimler AG. The defects in the Airbag Safety System

in the Mercedes Vehicle include, but are not limited to:

    a. The Airbag Safety System in the Mercedes Vehicle failed to perform as safely as an ordinary consumer would expect when deployed as intended in a foreseeable frontal accident to provide the passenger with supplemental occupant protection;

    b. The Airbag Safety System in the Mercedes Vehicle had an unreasonably dangerous propensity to rupture upon inflation due to excessive internal pressure, resulting in metal fragments passing through the airbag cushion material into the occupant compartment striking vehicle passengers, like Nermina;

    c. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous because of its design in that it failed to perform as safely as an ordinary consumer would expect when deployed as intended, in that the passenger's front airbag inflator produced excessive internal pressure upon deployment causing the inflator to rupture and explode, sending metal fragments through the airbag cushion material into the occupant compartment striking the vehicle's passenger, Nermina;

    d. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous because of its design in that it failed to perform as safely as an ordinary consumer would expect when it deployed in a manner reasonably foreseeable to Daimler AG, in that the passenger's front airbag inflator produced excessive internal pressure upon deployment causing the inflator to rupture sending metal fragments through the airbag cushion material into the occupant compartment striking the vehicle's passenger, Nermina;

    e. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous because of its design in that the risk of danger in the design outweighed the benefits when deployed as intended, in that the passenger's front airbag inflator produced excessive internal pressure upon deployment causing the inflator to rupture sending metal fragments through the airbag cushion material into the occupant compartment striking the vehicle's passenger, Nermina;

f. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous and defective with an inflator having a propensity to rupture upon inflation sending metal fragments flying through the airbag cushion material because: it was not produced in accordance with available alternative designs that were safer, feasible, and technically practicable; it was not state of the art and was not designed and manufactured to the level of technical knowledge that existed when it was made; and, it was made in such a way that it posed a risk of danger to vehicle users, like Nermina, that outweighed the benefits of that airbag safety system as designed and manufactured;

g. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous as manufactured as it did not conform to its intended design and perform as safely as the intended design would have performed, in that the passenger's front airbag inflator produced excessive internal pressure upon deployment causing the inflator to rupture sending metal fragments through the airbag cushion material into the occupant compartment striking the vehicle's passenger, Nermina; and

h. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous and defective due to Daimler AG's failure to provide adequate warnings of the risks addressed herein that were known or knowable to Daimler AG in light of the generally recognized and prevailing best scientific and/or medical knowledge available at the time of manufacture and distribution, including the use of appropriate warning stickers, placards, or documentation to alert users regarding the hazardous conditions described herein.

300. At the time of the accident, the Mercedes Vehicle, including specifically its airbag safety system, was substantially unchanged from its condition, as set forth above, when sold and distributed by Daimler AG.

301. For the reasons set forth above, and as addressed in the preceding portions of this Complaint as have been specifically incorporated

and re-alleged, the Mercedes Vehicle was unreasonably dangerous to foreseeable users, including Nermina, who was the passenger of the Mercedes Vehicle in an ordinary and foreseeable manner. At the time Daimler AG released the Mercedes Vehicle with its airbag safety system into the stream of commerce, non-defective designs were economically and technologically feasible and the use of same on the Mercedes Vehicle would have been a safer alternative design which would have significantly reduced the risk of Nermina's injuries without substantially impairing the utility of the Mercedes Vehicle and its airbag safety system.

302.   The defects described above directly and proximately caused the injuries sustained by Nermina in this foreseeable accident, in that they directly and in natural and continuous sequence produced or contributed substantially to Nermina's injuries.

303.   Nermina suffered personal injuries including (a) bodily injury and any resulting pain and suffering, disability or physical impairment, disfigurement, mental anguish, inconveniences or loss of capacity for the enjoyment of life, experienced in the past or to be experienced in the future; (b) the expense of hospitalization, medical and nursing care and treatment necessarily or reasonably obtained in the past or to be so obtained in the future; and (c) any earnings or working time lost in the past and any loss of ability to earn money in the future.

304. The conduct of Daimler AG was not simply negligent, but amounted to intentional misconduct, gross negligence, recklessness, and/or willful and wanton conduct, particularly in light of (a) the protracted period of time over which the defects have existed, (b) the long held knowledge of the defects by Daimler AG, (c) the repeated failure to take adequate steps to notify the public or federal regulators of the danger, and (d) the repeated efforts by Daimler AG to minimize the seriousness and scope of the problem.

**WHEREFORE**, Plaintiff, Nermina Alimanovic, demands judgment against Defendant, Daimler AG, for all injuries and damages she sustained due to the incident giving rise to this action, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages, non-economic damages, punitive damages, mental anguish, emotional distress, pain and suffering, lost wages, costs, interest, and for any such further relief as the Court deems appropriate.

## COUNT XI—NEGLIGENCE
(Nermina Alimanovic against Daimler AG)

305. Nermina re-alleges and incorporates Paragraphs 1 through 182 of this Complaint as if fully stated herein.

306. Daimler AG had a duty to properly and adequately design, manufacture, assemble, test, inspect, label, provide adequate warnings for, package, distribute, and sell the Mercedes Vehicle, including its incorporated

airbag safety system, in a reasonably safe condition so as not to present a danger to members of the general public who reasonably and expectedly under ordinary circumstances would come into contact with the Mercedes Vehicle and its airbag safety system, including Nermina.

307.   Daimler AG knew or in the exercise of due care should have known that the Mercedes Vehicle with its incorporated Takata airbag safety system would be used without inspection in an unreasonably dangerous condition and would create a foreseeable and unreasonable zone of risk of harm to users, including Nermina.

308.   Daimler AG breached its duty by negligently designing, manufacturing, assembling, testing, inspecting, labeling, packaging, failing to warn, distributing, and selling the Mercedes Vehicle with its incorporated Airbag Safety System when it was not in a reasonably safe condition for foreseeable use, as follows:

    a.  Failing to ensure the Airbag Safety System in the Mercedes Vehicle would perform as safely as an ordinary consumer would expect when deployed as intended in a foreseeable frontal accident to provide the passenger with supplemental occupant protection;

    b.  Failing to ensure the Airbag Safety System in the Mercedes Vehicle was safe, and would not rupture, catch fire, or explode upon inflation due to excessive internal pressure, resulting in metal fragments passing through the airbag cushion material into the occupant compartment striking vehicle passengers, like Nermina;

c.   Failing to ensure the Airbag Safety System to be incorporated into the Mercedes Vehicle as supplied by a third-party, namely Takata, would be designed, manufactured, tested, distributed and provided for purchase in a manner to ensure it was free of design and/or manufacturing defects, and/or would not otherwise be damaged or compromised during the distribution process before use;

d.   Failing to ensure the Airbag Safety System in the Mercedes Vehicle was not unreasonably dangerous because of its design so that the passenger's front airbag inflator could produce excessive internal pressure upon deployment causing the inflator to rupture sending metal fragments through the airbag cushion material into the occupant compartment striking the vehicle's passenger, Nermina;

e.   Failing to ensure the Airbag Safety System in the Mercedes Vehicle was not unreasonably dangerous and defective with an inflator having a propensity to rupture upon inflation sending metal fragments flying through the airbag cushion material because: it was not produced in accordance with available alternative designs that were safer, feasible, and technically practicable; it was not state of the art and was not designed and manufactured to the level of technical knowledge that existed when it was made; and, it was made in such a way that it posed a risk of danger to vehicle users, like Nermina, that outweighed the benefits of that airbag safety system as designed and manufactured;

f.   Failing to ensure the Airbag Safety System in the Mercedes Vehicle was not unreasonably dangerous as manufactured so that the passenger's front airbag inflator could produce excessive internal pressure upon deployment causing the inflator to rupture sending metal fragments through the airbag cushion material into the occupant compartment striking the vehicle's passenger, Nermina;

g.   Failing to ensure the Airbag Safety System as delivered for incorporation into the Mercedes Vehicle was not damaged or rendered unreasonably dangerous due to damage or compromise sustained during transport or shipping;

h. Failing to require and ensure verification of the use of reasonable testing and quality control checks on a continuing basis by Takata during the design, development, manufacture, distribution and final delivery/acceptance processes relative to the Airbag Safety System before its incorporation into the Mercedes Vehicle where it would then not be further susceptible or subject to further inspection before delivery to foreseeable users of the Mercedes Vehicle;

i. Failing to ensure the Airbag Safety System was safe for incorporation and use in the Mercedes Vehicle before being incorporated and used by undertaking reasonable steps, including the utilization of testing, quality control and other recognized measures on a continuing basis to ensure product quality for safe use;

j. Failing to ensure the defective Airbag Safety System in the Mercedes Vehicle was fixed, repaired, or made safe in a reasonable and timely manner pursuant to the recall(s) of the Mercedes Vehicle by Daimler AG pursuant to the Safety Act;

k. Failing to ensure timely notification and completion of the repair of the Airbag Safety System in the Mercedes Vehicle upon voluntarily undertaking the duty to do so, including, specifically the initiation of Daimler AG's safety improvement campaign(s); and

l. Failing to warn or adequately warn by using stickers, placards, or other proper documentation, or notice, to alert users regarding the hazardous conditions and risks, as stated above, which a user would not reasonably expect to find in the product and which Daimler AG had knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, with respect to the use and operation of the Mercedes Vehicle.

309. The negligence described above, inclusive of the conduct, actions and inactions as addressed in the preceding portions of this Complaint as have been specifically incorporated and re-alleged, directly and proximately

caused the injuries of Nermina, in that it directly and in natural and continuous sequence, produced or contributed substantially to Nermina's injuries.

310. Nermina suffered personal injuries including (a) bodily injury and any resulting pain and suffering, disability or physical impairment, disfigurement, mental anguish, inconveniences or loss of capacity for the enjoyment of life, experienced in the past or to be experienced in the future; (b) the expense of hospitalization, medical and nursing care and treatment necessarily or reasonably obtained in the past or to be so obtained in the future; and (c) any earnings or working time lost in the past and any loss of ability to earn money in the future.

311. The conduct of Daimler AG was not simply negligent, but amounted to intentional misconduct, gross negligence, recklessness, and/or willful and wanton conduct, particularly in light of (a) the protracted period of time over which the defects have existed, (b) the long held knowledge of the defects by Daimler AG, (c) the repeated failure to take adequate steps to notify the public or federal regulators of the danger, and (d) the repeated efforts by Daimler AG to minimize the seriousness and scope of the problem.

**WHEREFORE**, Plaintiff, Nermina Alimanovic, demands judgment against Defendant, Daimler AG, for all injuries and damages she sustained due to the incident giving rise to this action, whether already incurred or to be

incurred in the future, including all actual damages, consequential damages, economic damages, non-economic damages, punitive damages, mental anguish, emotional distress, pain and suffering, lost wages, costs, interest, and for any such further relief as the Court deems appropriate.

## COUNT XII—NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Nermina Alimanovic against Daimler AG)

312. Nermina re-alleges and incorporates Paragraphs 1 through 182 of this Complaint as if fully stated herein.

313. Daimler AG designed, manufactured, inspected, tested, marketed, advertised, distributed, and sold the Mercedes Vehicle and placed the Mercedes Vehicle into the stream of commerce.

314. Daimler AG knew or reasonably foresaw that Elvir, as a foreseeable user/driver, and Nermina, as a foreseeable bystander/passenger, would use or come into contact with the Mercedes Vehicle.

315. Daimler AG owed a duty to Nermina and Elvir to properly design, manufacture, assemble, test, inspect, distribute, and sell the Mercedes Vehicle in a reasonably safe condition and without defect so as not to present a danger to members of the general public who would reasonably and foreseeably use or come into contact with the Mercedes Vehicle, including Nermina and Elvir.

316. Daimler AG owed a duty to Nermina and Elvir to provide adequate warnings and instruction about the dangers associated with using the Mercedes Vehicle and how to protect against these dangers.

317. Daimler AG breached the duties it owed to Nermina and Elvir by designing, manufacturing, inspecting, testing, distributing, and selling the Mercedes Vehicle in a defective and unreasonably dangerous condition and without adequate warnings or instructions.

318. Daimler AG knew or reasonably should have known that Elvir, as a foreseeable user/driver, and Nermina, as a foreseeable bystander/passenger, would suffer injuries and damages due to the Mercedes Vehicle's defective and unreasonably dangerous condition.

319. At no time did Daimler AG take action to remedy the Mercedes Vehicle's defective and unreasonably dangerous condition or warn consumers about its negligent design, manufacture, and warning with respect to the Mercedes Vehicle, despite Daimler AG's ability to do so.

320. As a direct and proximate result of Daimler AG's negligent acts and omissions, Nermina suffered severe emotional distress and psychological trauma.

321. Nermina's severe emotional distress and psychological trauma caused physical injury to Nermina within a short time after the incident giving rise to this lawsuit.

322. The conduct of Daimler AG was not simply negligent, but amounted to intentional misconduct, gross negligence, recklessness, and/or willful and wanton conduct, particularly in light of (a) the protracted period of time over which the defects have existed, (b) the long held knowledge of the defects by Daimler AG, (c) the repeated failure to take adequate steps to notify the public or federal regulators of the danger, and (d) the repeated efforts by Daimler AG to minimize the seriousness and scope of the problem.

**WHEREFORE**, Plaintiff, Nermina Alimanovic, demands judgment against Defendant, Daimler AG, for all injuries and damages she sustained due to the incident giving rise to this action, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages, non-economic damages, punitive damages, mental anguish, emotional distress, pain and suffering, lost wages, costs, interest, and for any such further relief as the Court deems appropriate.

## COUNT XIII—STRICT LIABILITY
(Elvir Islamovic against Mercedes-Benz USA, LLC)

323. Elvir re-alleges and incorporates Paragraphs 1 through 182 of this Complaint as if fully stated herein.

324. Defendant, Mercedes-Benz USA, LLC ("MBUSA") at all times material hereto, was engaged in the business of designing, manufacturing, assembling, testing, marketing, promoting, advertising, distributing and

selling Mercedes-Benz brand vehicles such as the Mercedes Vehicle to the public.

325.   MBUSA is liable under the theory of Strict Product Liability as set forth in the Restatement (Second) of Torts § 402A and Florida law. MBUSA was, at all times relevant to this action, the manufacturer of a product that was unreasonably and dangerously defective in its design, manufacture, and warning.

326.   MBUSA, as the maker of the Mercedes Vehicle with an incorporated Takata airbag safety system who placed such vehicle into the marketplace so as to be distributed and sold in a defective and unreasonably dangerous condition, is strictly liable for the physical harm caused by the Mercedes Vehicle's airbag safety system, when, upon deployment of its passenger's side frontal air bag, the inflator in same ruptured and exploded causing Elvir injuries in this foreseeable accident which occurred on November 7, 2020.

327.   MBUSA, in incorporating a Takata airbag safety system into the Mercedes Vehicle which it made and sold, which is not a component system that, once incorporated, is subject to any routine maintenance, adjustment or diagnostic review that would change its condition from how it was designed, manufactured and installed, would have expected the Takata airbag safety system in the Mercedes Vehicle to reach the user or consumer without

substantial change in the condition in which it was sold.

328.   In this instance, the Mercedes Vehicle, and its incorporated Takata airbag safety system, reached Elvir without substantial change, and, just as when it was originally made and sold by MBUSA, such vehicle and its airbag safety system remained a life threatening hazard. Further, the Mercedes Vehicle and its incorporated Takata airbag safety system was not substantially changed from the time it was manufactured until the date of this accident on November 7, 2020.

329.   MBUSA placed the Mercedes Vehicle on the market with knowledge that it would be used without inspection for defects and dangers. MBUSA knew, or should have known, that ultimate users, operators, or passengers would not and could not properly inspect this product, including its airbag safety system, for defects and dangerous conditions, and that detection of such defects and dangers would be beyond the capabilities of such persons.

330.   The inherently and unreasonably defective and dangerous condition of the Mercedes Vehicle's Takata airbag system is a condition that was not readily apparent to Elvir, or similarly situated users, operators, consumers and owners, who could foreseeably be seriously injured or killed by said defective airbag safety system should it be deployed as intended to provide supplemental occupant protection in a foreseeable frontal crash

like occurred here.

331.   MBUSA, having actual knowledge, failed to provide notice of the defective and unreasonably dangerous condition of the Mercedes Vehicle's Takata airbag system to Elvir.

332.   MBUSA has affirmatively concealed over the past decade the defective and unreasonably dangerous condition of the Mercedes Vehicle's Takata airbag system from the public, NHTSA, and owners, including Plaintiffs, and, such ongoing and continuous conduct, actions and inactions as has been specifically pled in this Complaint over time has foreseeably contributed to and/or caused the general public, NHTSA and owners, like Plaintiffs, to be unaware of the dangers of exploding Takata airbags and/or lack an understanding or appreciation for the magnitude of the problem and potentially lethal harms of same.

333.   As a consequence, Elvir did not know of the dangerous condition in the Mercedes Vehicle at the time of the Incident. Additionally, Elvir did not know of the dangerous condition during the period of the use of the Mercedes Vehicle prior to the subject accident. Had Elvir been informed at any time prior to riding in the Mercedes Vehicle of the potentially lethal defect in the airbag system, he would not have used the Mercedes Vehicle, and, accordingly, he would not have been exposed to said defective and unreasonably dangerous condition. Further, had Elvir been informed at any

time during the period of his use of the Mercedes Vehicle prior to the subject accident of the potentially lethal defect in the airbag system, he would not have been a driver in the Mercedes Vehicle and he would not have been exposed to the defective and unreasonably dangerous condition as described above when he was in an accident on November 7, 2020.

334. The Airbag Safety System in the Mercedes Vehicle was defective and unreasonably dangerous to ultimate users, operators, consumers and owners, including Elvir, when designed, manufactured, assembled, distributed and sold by MBUSA. The defects in the Airbag Safety System in the Mercedes Vehicle include, but are not limited to:

    a. The Airbag Safety System in the Mercedes Vehicle failed to perform as safely as an ordinary consumer would expect when deployed as intended in a foreseeable frontal accident to provide the driver with supplemental occupant protection;

    b. The Airbag Safety System in the Mercedes Vehicle had an unreasonably dangerous propensity to rupture upon inflation due to excessive internal pressure, resulting in injuries to occupants, like Elvir;

    c. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous because of its design in that it failed to perform as safely as an ordinary consumer would expect when deployed as intended, in that the passenger's front airbag inflator produced excessive internal pressure upon deployment causing the inflator to rupture and explode;

    d. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous because of its design in that it failed to perform as safely as an ordinary consumer would expect when it deployed in a manner reasonably foreseeable to MBUSA, in that

the passenger's front airbag inflator produced excessive internal pressure upon deployment causing the inflator to rupture;

e. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous because of its design in that the risk of danger in the design outweighed the benefits when deployed as intended, in that the passenger's front airbag inflator produced excessive internal pressure upon deployment causing the inflator to rupture;

f. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous and defective with an inflator having a propensity to rupture upon inflation sending metal fragments flying through the airbag cushion material because: it was not produced in accordance with available alternative designs that were safer, feasible, and technically practicable; it was not state of the art and was not designed and manufactured to the level of technical knowledge that existed when it was made; and, it was made in such a way that it posed a risk of danger to vehicle users, like Elvir, that outweighed the benefits of that airbag safety system as designed and manufactured;

g. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous as manufactured as it did not conform to its intended design and perform as safely as the intended design would have performed, in that the passenger's front airbag inflator produced excessive internal pressure upon deployment causing the inflator to rupture; and

h. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous and defective due to MBUSA's failure to provide adequate warnings of the risks addressed herein that were known or knowable to MBUSA in light of the generally recognized and prevailing best scientific and/or medical knowledge available at the time of manufacture and distribution, including the use of appropriate warning stickers, placards, or documentation to alert users regarding the hazardous conditions described herein.

335. At the time of the accident, the Mercedes Vehicle, including specifically its airbag safety system, was substantially unchanged from its

condition, as set forth above, when sold and distributed by MBUSA.

336.  For the reasons set forth above, and as addressed in the preceding portions of this Complaint as have been specifically incorporated and re-alleged, the Mercedes Vehicle was unreasonably dangerous to foreseeable users, including Elvir, who was driving the Mercedes Vehicle in an ordinary and foreseeable manner. At the time MBUSA released the Mercedes Vehicle with its airbag safety system into the stream of commerce, non-defective designs were economically and technologically feasible and the use of same on the Mercedes Vehicle would have been a safer alternative design which would have significantly reduced the risk of Elvir's injuries without substantially impairing the utility of the Mercedes Vehicle and its airbag safety system.

337.  The defects described above directly and proximately caused the injuries sustained by Elvir in this foreseeable accident, in that they directly and in natural and continuous sequence produced or contributed substantially to Elvir's injuries.

338.  Elvir suffered personal injuries including (a) bodily injury and any resulting pain and suffering, disability or physical impairment, disfigurement, mental anguish, inconveniences or loss of capacity for the enjoyment of life, experienced in the past or to be experienced in the future; (b) the expense of hospitalization, medical and nursing care and treatment

necessarily or reasonably obtained in the past or to be so obtained in the future; and (c) any earnings or working time lost in the past and any loss of ability to earn money in the future.

339. The conduct of MBUSA was not simply negligent, but amounted to intentional misconduct, gross negligence, recklessness, and/or willful and wanton conduct, particularly in light of (a) the protracted period of time over which the defects have existed, (b) the long held knowledge of the defects by MBUSA, (c) the repeated failure to take adequate steps to notify the public or federal regulators of the danger, and (d) the repeated efforts by MBUSA to minimize the seriousness and scope of the problem.

**WHEREFORE**, Plaintiff, Elvir Islamovic, demands judgment against Defendant, Mercedes-Benz USA, LLC, for all injuries and damages he sustained due to the incident giving rise to this action, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages, non-economic damages, punitive damages, mental anguish, emotional distress, pain and suffering, lost wages, costs, interest, and for any such further relief as the Court deems appropriate.

## COUNT XIV—NEGLIGENCE
### (Elvir Islamovic against Mercedes-Benz USA, LLC)

340. Elvir re-alleges and incorporates Paragraphs 1 through 182 of this Complaint as if fully stated herein.

341. Defendant, Mercedes-Benz USA, LLC ("MBUSA") had a duty to properly and adequately design, manufacture, assemble, test, inspect, label, provide adequate warnings for, package, distribute, and sell the Mercedes Vehicle, including its incorporated airbag safety system, in a reasonably safe condition so as not to present a danger to members of the general public who reasonably and expectedly under ordinary circumstances would come into contact with the Mercedes Vehicle and its airbag safety system, including Elvir.

342. MBUSA knew or in the exercise of due care should have known that the Mercedes Vehicle with its incorporated Takata airbag safety system would be used without inspection in an unreasonably dangerous condition and would create a foreseeable and unreasonable zone of risk of harm to users, including Elvir.

343. MBUSA breached its duty by negligently designing, manufacturing, assembling, testing, inspecting, labeling, packaging, failing to warn, distributing, and selling the Mercedes Vehicle with its incorporated Airbag Safety System when it was not in a reasonably safe condition for foreseeable use, as follows:

    a. Failing to ensure the Airbag Safety System in the Mercedes Vehicle would perform as safely as an ordinary consumer would expect when deployed as intended in a foreseeable frontal accident to provide the driver with supplemental occupant protection;

    b. Failing to ensure the Airbag Safety System in the Mercedes

Vehicle was safe, and would not rupture, catch fire, or explode upon inflation due to excessive internal pressure;

c. Failing to ensure the Airbag Safety System to be incorporated into the Mercedes Vehicle as supplied by a third-party, namely Takata, would be designed, manufactured, tested, distributed and provided for purchase in a manner to ensure it was free of design and/or manufacturing defects, and/or would not otherwise be damaged or compromised during the distribution process before use;

d. Failing to ensure the Airbag Safety System in the Mercedes Vehicle was not unreasonably dangerous because of its design so that the passenger's front airbag inflator could produce excessive internal pressure upon deployment causing the inflator to rupture;

e. Failing to ensure the Airbag Safety System in the Mercedes Vehicle was not unreasonably dangerous and defective with an inflator having a propensity to rupture upon inflation sending metal fragments flying through the airbag cushion material because: it was not produced in accordance with available alternative designs that were safer, feasible, and technically practicable; it was not state of the art and was not designed and manufactured to the level of technical knowledge that existed when it was made; and, it was made in such a way that it posed a risk of danger to vehicle users, like Elvir, that outweighed the benefits of that airbag safety system as designed and manufactured;

f. Failing to ensure the Airbag Safety System in the Mercedes Vehicle was not unreasonably dangerous as manufactured so that the passenger's front airbag inflator could produce excessive internal pressure upon deployment causing the inflator to rupture;

g. Failing to ensure the Airbag Safety System as delivered for incorporation into the Mercedes Vehicle was not damaged or rendered unreasonably dangerous due to damage or compromise sustained during transport or shipping;

h. Failing to require and ensure verification of the use of reasonable testing and quality control checks on a continuing basis by Takata during the design, development, manufacture, distribution and final delivery/acceptance processes relative to the Airbag Safety System before its incorporation into the Mercedes Vehicle where it would then not be further susceptible or subject to further inspection before delivery to foreseeable users of the Mercedes Vehicle;

i. Failing to ensure the Airbag Safety System was safe for incorporation and use in the Mercedes Vehicle before being incorporated and used by undertaking reasonable steps, including the utilization of testing, quality control and other recognized measures on a continuing basis to ensure product quality for safe use;

j. Failing to ensure the defective Airbag Safety System in the Mercedes Vehicle was fixed, repaired, or made safe in a reasonable and timely manner pursuant to the recall(s) of the Mercedes Vehicle by MBUSA pursuant to the Safety Act;

k. Failing to ensure timely notification and completion of the repair of the Airbag Safety System in the Mercedes Vehicle upon voluntarily undertaking the duty to do so, including, specifically the initiation of MBUSA's safety improvement campaign(s); and

l. Failing to warn or adequately warn by using stickers, placards, or other proper documentation, or notice, to alert users regarding the hazardous conditions and risks, as stated above, which a user would not reasonably expect to find in the product and which MBUSA had knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, with respect to the use and operation of the Mercedes Vehicle.

344. The negligence described above, inclusive of the conduct, actions and inactions as addressed in the preceding portions of this Complaint as have been specifically incorporated and re-alleged, directly and proximately caused the injuries of Elvir, in that it directly and in natural and continuous

sequence, produced or contributed substantially to Elvir's injuries.

345.   Elvir suffered personal injuries including (a) bodily injury and any resulting pain and suffering, disability or physical impairment, disfigurement, mental anguish, inconveniences or loss of capacity for the enjoyment of life, experienced in the past or to be experienced in the future; (b) the expense of hospitalization, medical and nursing care and treatment necessarily or reasonably obtained in the past or to be so obtained in the future; and (c) any earnings or working time lost in the past and any loss of ability to earn money in the future.

346.   The conduct of MBUSA was not simply negligent, but amounted to intentional misconduct, gross negligence, recklessness, and/or willful and wanton conduct, particularly in light of (a) the protracted period of time over which the defects have existed, (b) the long held knowledge of the defects by MBUSA, (c) the repeated failure to take adequate steps to notify the public or federal regulators of the danger, and (d) the repeated efforts by MBUSA to minimize the seriousness and scope of the problem.

**WHEREFORE**, Plaintiff, Elvir Islamovic, demands judgment against Defendant, Mercedes-Benz USA, LLC, for all injuries and damages he sustained due to the incident giving rise to this action, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages, non-economic damages, punitive

damages, mental anguish, emotional distress, pain and suffering, lost wages, costs, interest, and for any such further relief as the Court deems appropriate.

## COUNT XV—NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Elvir Islamovic against Mercedes-Benz USA, LLC)

347.    Elvir re-alleges and incorporates Paragraphs 1 through 182 of this Complaint as if fully stated herein.

348.    Defendant, Mercedes-Benz USA, LLC ("MBUSA") designed, manufactured, inspected, tested, marketed, advertised, distributed, and sold the Mercedes Vehicle and placed the Mercedes Vehicle into the stream of commerce.

349.    MBUSA knew or reasonably foresaw that Elvir, as a foreseeable user/driver, and Nermina, as a foreseeable bystander/passenger, would use or come into contact with the Mercedes Vehicle.

350.    MBUSA owed a duty to Nermina and Elvir to properly design, manufacture, assemble, test, inspect, distribute, and sell the Mercedes Vehicle in a reasonably safe condition and without defect so as not to present a danger to members of the general public who would reasonably and foreseeably use or come into contact with the Mercedes Vehicle, including Nermina and Elvir.

351.   MBUSA owed a duty to Nermina and Elvir to provide adequate warnings and instruction about the dangers associated with using the Mercedes Vehicle and how to protect against these dangers.

352.   MBUSA breached the duties it owed to Nermina and Elvir by designing, manufacturing, inspecting, testing, distributing, and selling the Mercedes Vehicle in a defective and unreasonably dangerous condition and without adequate warnings or instructions.

353.   MBUSA knew or reasonably should have known that Elvir, as a foreseeable user/driver, and Nermina, as a foreseeable bystander/passenger, would suffer injuries and damages due to the Mercedes Vehicle's defective and unreasonably dangerous condition.

354.   At no time did MBUSA take action to remedy the Mercedes Vehicle's defective and unreasonably dangerous condition or warn consumers about its negligent design, manufacture, and warning with respect to the Mercedes Vehicle, despite MBUSA's ability to do so.

355.   As a direct and proximate result of MBUSA's negligent acts and omissions, Elvir suffered severe emotional distress and psychological trauma.

356.   Elvir's severe emotional distress and psychological trauma caused physical injury to Elvir within a short time after the incident giving rise to this lawsuit.

357.    The conduct of MBUSA was not simply negligent, but amounted to intentional misconduct, gross negligence, recklessness, and/or willful and wanton conduct, particularly in light of (a) the protracted period of time over which the defects have existed, (b) the long held knowledge of the defects by MBUSA, (c) the repeated failure to take adequate steps to notify the public or federal regulators of the danger, and (d) the repeated efforts by MBUSA to minimize the seriousness and scope of the problem.

**WHEREFORE**, Plaintiff, Elvir Islamovic, demands judgment against Defendant, Mercedes-Benz USA, LLC, for all injuries and damages he sustained due to the incident giving rise to this action, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages, non-economic damages, punitive damages, mental anguish, emotional distress, pain and suffering, lost wages, costs, interest, and for any such further relief as the Court deems appropriate.

## COUNT XVI—STRICT LIABILITY
(Elvir Islamovic against Mercedes-Benz Research & Development North America, Inc.)

358.    Elvir re-alleges and incorporates Paragraphs 1 through 182 of this Complaint as if fully stated herein.

359.    Defendant, Mercedes-Benz Research & Development North America, Inc. ("MBRDNA") at all times material hereto, was engaged in the business of designing, manufacturing, assembling, testing, marketing,

promoting, advertising, distributing and selling Mercedes-Benz brand vehicles such as the Mercedes Vehicle to the public.

360.   MBRDNA is liable under the theory of Strict Product Liability as set forth in the Restatement (Second) of Torts § 402A and Florida law. MBUSA was, at all times relevant to this action, the manufacturer of a product that was unreasonably and dangerously defective in its design, manufacture, and warning.

361.   MBRDNA, as the maker of the Mercedes Vehicle with an incorporated Takata airbag safety system who placed such vehicle into the marketplace so as to be distributed and sold in a defective and unreasonably dangerous condition, is strictly liable for the physical harm caused by the Mercedes Vehicle's airbag safety system, when, upon deployment of its passenger's side frontal air bag, the inflator in same ruptured and exploded, causing metal fragments to strike Elvir causing injuries in this foreseeable accident which occurred on November 7, 2020.

362.   MBRDNA, in incorporating a Takata airbag safety system into the Mercedes Vehicle which it made and sold, which is not a component system that, once incorporated, is subject to any routine maintenance, adjustment or diagnostic review that would change its condition from how it was designed, manufactured and installed, would have expected the Takata airbag safety system in the Mercedes Vehicle to reach the user or consumer

without substantial change in the condition in which it was sold.

363. In this instance, the Mercedes Vehicle, and its incorporated Takata airbag safety system, reached Elvir without substantial change, and, just as when it was originally made and sold by MBRDNA, such vehicle and its airbag safety system remained a life threatening hazard. Further, the Mercedes Vehicle and its incorporated Takata airbag safety system was not substantially changed from the time it was manufactured until the date of this accident on November 7, 2020.

364. MBRDNA placed the Mercedes Vehicle on the market with knowledge that it would be used without inspection for defects and dangers. MBRDNA knew, or should have known, that ultimate users, operators, or passengers would not and could not properly inspect this product, including its airbag safety system, for defects and dangerous conditions, and that detection of such defects and dangers would be beyond the capabilities of such persons.

365. The inherently and unreasonably defective and dangerous condition of the Mercedes Vehicle's Takata airbag system is a condition that was not readily apparent to Elvir, or similarly situated users, operators, consumers and owners, who could foreseeably be seriously injured or killed by said defective airbag safety system should it be deployed as intended to provide supplemental occupant protection in a foreseeable frontal crash

like occurred here.

366.   MBRDNA, having actual knowledge, failed to provide notice of the defective and unreasonably dangerous condition of the Mercedes Vehicle's Takata airbag system to Elvir.

367.   MBRDNA has affirmatively concealed over the past decade the defective and unreasonably dangerous condition of the Mercedes Vehicle's Takata airbag system from the public, NHTSA, and owners, including Plaintiffs, and, such ongoing and continuous conduct, actions and inactions as has been specifically pled in this Complaint over time has foreseeably contributed to and/or caused the general public, NHTSA and owners, like Plaintiffs, to be unaware of the dangers of exploding Takata airbags and/or lack an understanding or appreciation for the magnitude of the problem and potentially lethal harms of same.

368.   As a consequence, Elvir did not know of the dangerous condition in the Mercedes Vehicle at the time of the Incident. Additionally, Elvir did not know of the dangerous condition during the period of the use of the Mercedes Vehicle prior to the subject accident. Had Elvir been informed at any time prior to riding in the Mercedes Vehicle of the potentially lethal defect in the airbag system, he would not have used the Mercedes Vehicle, and, accordingly, he would not have been exposed to said defective and unreasonably dangerous condition. Further, had Elvir been informed at any

time during the period of his use of the Mercedes Vehicle prior to the subject accident of the potentially lethal defect in the airbag system, he would not have been a driver in the Mercedes Vehicle and he would not have been exposed to the defective and unreasonably dangerous condition as described above when he was in an accident on November 7, 2020.

369. The Airbag Safety System in the Mercedes Vehicle was defective and unreasonably dangerous to ultimate users, operators, consumers and owners, including Elvir, when designed, manufactured, assembled, distributed and sold by MBRDNA. The defects in the Airbag Safety System in the Mercedes Vehicle include, but are not limited to:

    a. The Airbag Safety System in the Mercedes Vehicle failed to perform as safely as an ordinary consumer would expect when deployed as intended in a foreseeable frontal accident to provide the driver with supplemental occupant protection;

    b. The Airbag Safety System in the Mercedes Vehicle had an unreasonably dangerous propensity to rupture upon inflation due to excessive internal pressure;

    c. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous because of its design in that it failed to perform as safely as an ordinary consumer would expect when deployed as intended, in that the passenger's front airbag inflator produced excessive internal pressure upon deployment causing the inflator to rupture and explode;

    d. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous because of its design in that it failed to perform as safely as an ordinary consumer would expect when it deployed in a manner reasonably foreseeable to MBRDNA, in that the passenger's front airbag inflator produced excessive

internal pressure upon deployment causing the inflator to rupture and explode;

e. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous because of its design in that the risk of danger in the design outweighed the benefits when deployed as intended, in that the passenger's front airbag inflator produced excessive internal pressure upon deployment causing the inflator to rupture and explode;

f. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous and defective with an inflator having a propensity to rupture upon inflation sending metal fragments flying through the airbag cushion material because: it was not produced in accordance with available alternative designs that were safer, feasible, and technically practicable; it was not state of the art and was not designed and manufactured to the level of technical knowledge that existed when it was made; and, it was made in such a way that it posed a risk of danger to vehicle users, like Elvir, that outweighed the benefits of that airbag safety system as designed and manufactured;

g. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous as manufactured as it did not conform to its intended design and perform as safely as the intended design would have performed, in that the passenger's front airbag inflator produced excessive internal pressure upon deployment causing the inflator to rupture and explode; and

h. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous and defective due to MBRDNA's failure to provide adequate warnings of the risks addressed herein that were known or knowable to MBRDNA in light of the generally recognized and prevailing best scientific and/or medical knowledge available at the time of manufacture and distribution, including the use of appropriate warning stickers, placards, or documentation to alert users regarding the hazardous conditions described herein.

370. At the time of the accident, the Mercedes Vehicle, including

specifically its airbag safety system, was substantially unchanged from its condition, as set forth above, when sold and distributed by MBRDNA.

371. For the reasons set forth above, and as addressed in the preceding portions of this Complaint as have been specifically incorporated and re-alleged, the Mercedes Vehicle was unreasonably dangerous to foreseeable users, including Elvir, who was driving the Mercedes Vehicle in an ordinary and foreseeable manner. At the time MBRDNA released the Mercedes Vehicle with its airbag safety system into the stream of commerce, non-defective designs were economically and technologically feasible and the use of same on the Mercedes Vehicle would have been a safer alternative design which would have significantly reduced the risk of Elvir's injuries without substantially impairing the utility of the Mercedes Vehicle and its airbag safety system.

372. The defects described above directly and proximately caused the injuries sustained by Elvir in this foreseeable accident, in that they directly and in natural and continuous sequence produced or contributed substantially to Elvir's injuries.

373. Elvir suffered personal injuries including (a) bodily injury and any resulting pain and suffering, disability or physical impairment, disfigurement, mental anguish, inconveniences or loss of capacity for the enjoyment of life, experienced in the past or to be experienced in the future;

(b) the expense of hospitalization, medical and nursing care and treatment necessarily or reasonably obtained in the past or to be so obtained in the future; and (c) any earnings or working time lost in the past and any loss of ability to earn money in the future.

374. The conduct of MBRDNA was not simply negligent, but amounted to intentional misconduct, gross negligence, recklessness, and/or willful and wanton conduct, particularly in light of (a) the protracted period of time over which the defects have existed, (b) the long held knowledge of the defects by MBRDNA, (c) the repeated failure to take adequate steps to notify the public or federal regulators of the danger, and (d) the repeated efforts by MBRDNA to minimize the seriousness and scope of the problem.

**WHEREFORE**, Plaintiff, Elvir Islamovic, demands judgment against Defendant, Mercedes-Benz Research & Development North America, Inc., for all injuries and damages he sustained due to the incident giving rise to this action, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages, non-economic damages, punitive damages, mental anguish, emotional distress, pain and suffering, lost wages, costs, interest, and for any such further relief as the Court deems appropriate.

## COUNT XVII—NEGLIGENCE
(Elvir Islamovic against Mercedes-Benz Research & Development North America, Inc.)

375.  Elvir re-alleges and incorporates Paragraphs 1 through 182 of this Complaint as if fully stated herein.

376.  MBRDNA had a duty to properly and adequately design, manufacture, assemble, test, inspect, label, provide adequate warnings for, package, distribute, and sell the Mercedes Vehicle, including its incorporated airbag safety system, in a reasonably safe condition so as not to present a danger to members of the general public who reasonably and expectedly under ordinary circumstances would come into contact with the Mercedes Vehicle and its airbag safety system, including Elvir.

377.  MBRDNA knew or in the exercise of due care should have known that the Mercedes Vehicle with its incorporated Takata airbag safety system would be used without inspection in an unreasonably dangerous condition and would create a foreseeable and unreasonable zone of risk of harm to users, including Elvir.

378.  MBRDNA breached its duty by negligently designing, manufacturing, assembling, testing, inspecting, labeling, packaging, failing to warn, distributing, and selling the Mercedes Vehicle with its incorporated Airbag Safety System when it was not in a reasonably safe condition for foreseeable use, as follows:

    a. Failing to ensure the Airbag Safety System in the Mercedes Vehicle would perform as safely as an ordinary consumer would

expect when deployed as intended in a foreseeable frontal accident to provide the driver with supplemental occupant protection;

b.  Failing to ensure the Airbag Safety System in the Mercedes Vehicle was safe, and would not rupture, catch fire, or explode upon inflation due to excessive internal pressure;

c.  Failing to ensure the Airbag Safety System to be incorporated into the Mercedes Vehicle as supplied by a third-party, namely Takata, would be designed, manufactured, tested, distributed and provided for purchase in a manner to ensure it was free of design and/or manufacturing defects, and/or would not otherwise be damaged or compromised during the distribution process before use;

d.  Failing to ensure the Airbag Safety System in the Mercedes Vehicle was not unreasonably dangerous because of its design so that the passenger's front airbag inflator could produce excessive internal pressure upon deployment causing the inflator to rupture and explode;

e.  Failing to ensure the Airbag Safety System in the Mercedes Vehicle was not unreasonably dangerous and defective with an inflator having a propensity to rupture upon inflation sending metal fragments flying through the airbag cushion material because: it was not produced in accordance with available alternative designs that were safer, feasible, and technically practicable; it was not state of the art and was not designed and manufactured to the level of technical knowledge that existed when it was made; and, it was made in such a way that it posed a risk of danger to vehicle users, like Elvir, that outweighed the benefits of that airbag safety system as designed and manufactured;

f.  Failing to ensure the Airbag Safety System in the Mercedes Vehicle was not unreasonably dangerous as manufactured so that the passenger's front airbag inflator could produce excessive internal pressure upon deployment causing the inflator to rupture and explode;

g. Failing to ensure the Airbag Safety System as delivered for incorporation into the Mercedes Vehicle was not damaged or rendered unreasonably dangerous due to damage or compromise sustained during transport or shipping;

h. Failing to require and ensure verification of the use of reasonable testing and quality control checks on a continuing basis by Takata during the design, development, manufacture, distribution and final delivery/acceptance processes relative to the Airbag Safety System before its incorporation into the Mercedes Vehicle where it would then not be further susceptible or subject to further inspection before delivery to foreseeable users of the Mercedes Vehicle;

i. Failing to ensure the Airbag Safety System was safe for incorporation and use in the Mercedes Vehicle before being incorporated and used by undertaking reasonable steps, including the utilization of testing, quality control and other recognized measures on a continuing basis to ensure product quality for safe use;

j. Failing to ensure the defective Airbag Safety System in the Mercedes Vehicle was fixed, repaired, or made safe in a reasonable and timely manner pursuant to the recall(s) of the Mercedes Vehicle by MBRDNA pursuant to the Safety Act;

k. Failing to ensure timely notification and completion of the repair of the Airbag Safety System in the Mercedes Vehicle upon voluntarily undertaking the duty to do so, including, specifically the initiation of MBRDNA's safety improvement campaign(s); and

l. Failing to warn or adequately warn by using stickers, placards, or other proper documentation, or notice, to alert users regarding the hazardous conditions and risks, as stated above, which a user would not reasonably expect to find in the product and which MBRDNA had knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, with respect to the use and operation of the Mercedes Vehicle.

379. The negligence described above, inclusive of the conduct, actions

and inactions as addressed in the preceding portions of this Complaint as have been specifically incorporated and re-alleged, directly and proximately caused the injuries of Elvir, in that it directly and in natural and continuous sequence, produced or contributed substantially to Elvir's injuries.

380. Elvir suffered personal injuries including (a) bodily injury and any resulting pain and suffering, disability or physical impairment, disfigurement, mental anguish, inconveniences or loss of capacity for the enjoyment of life, experienced in the past or to be experienced in the future; (b) the expense of hospitalization, medical and nursing care and treatment necessarily or reasonably obtained in the past or to be so obtained in the future; and (c) any earnings or working time lost in the past and any loss of ability to earn money in the future.

381. The conduct of MBRDNA was not simply negligent, but amounted to intentional misconduct, gross negligence, recklessness, and/or willful and wanton conduct, particularly in light of (a) the protracted period of time over which the defects have existed, (b) the long held knowledge of the defects by MBRDNA, (c) the repeated failure to take adequate steps to notify the public or federal regulators of the danger, and (d) the repeated efforts by MBRDNA to minimize the seriousness and scope of the problem.

**WHEREFORE**, Plaintiff, Elvir Islamovic, demands judgment against Defendant, Mercedes-Benz Research & Development North America, Inc., for

all injuries and damages he sustained due to the incident giving rise to this action, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages, non-economic damages, punitive damages, mental anguish, emotional distress, pain and suffering, lost wages, costs, interest, and for any such further relief as the Court deems appropriate.

### COUNT XVIII—NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
(Elvir Islamovic against Mercedes-Benz Research & Development North America, Inc.)

382.    Elvir re-alleges and incorporates Paragraphs 1 through 182 of this Complaint as if fully stated herein.

383.    MBRDNA designed, manufactured, inspected, tested, marketed, advertised, distributed, and sold the Mercedes Vehicle and placed the Mercedes Vehicle into the stream of commerce.

384.    MBRDNA knew or reasonably foresaw that Elvir, as a foreseeable user/driver, and Nermina, as a foreseeable bystander/passenger, would use or come into contact with the Mercedes Vehicle.

385.    MBRDNA owed a duty to Nermina and Elvir to properly design, manufacture, assemble, test, inspect, distribute, and sell the Mercedes Vehicle in a reasonably safe condition and without defect so as not to present a danger to members of the general public who would reasonably and

foreseeably use or come into contact with the Mercedes Vehicle, including Nermina and Elvir.

386. MBRDNA owed a duty to Nermina and Elvir to provide adequate warnings and instruction about the dangers associated with using the Mercedes Vehicle and how to protect against these dangers.

387. MBRDNA breached the duties it owed to Nermina and Elvir by designing, manufacturing, inspecting, testing, distributing, and selling the Mercedes Vehicle in a defective and unreasonably dangerous condition and without adequate warnings or instructions.

388. MBRDNA knew or reasonably should have known that Elvir, as a foreseeable user/driver, and Nermina, as a foreseeable bystander/passenger, would suffer injuries and damages due to the Mercedes Vehicle's defective and unreasonably dangerous condition.

389. At no time did MBRDNA take action to remedy the Mercedes Vehicle's defective and unreasonably dangerous condition or warn consumers about its negligent design, manufacture, and warning with respect to the Mercedes Vehicle, despite MBRDNA's ability to do so.

390. As a direct and proximate result of MBRDNA's negligent acts and omissions, Elvir suffered severe emotional distress and psychological trauma.

391.  Elvir's severe emotional distress and psychological trauma caused physical injury to Elvir within a short time after the incident giving rise to this lawsuit.

392.  The conduct of MBRDNA was not simply negligent, but amounted to intentional misconduct, gross negligence, recklessness, and/or willful and wanton conduct, particularly in light of (a) the protracted period of time over which the defects have existed, (b) the long held knowledge of the defects by MBRDNA, (c) the repeated failure to take adequate steps to notify the public or federal regulators of the danger, and (d) the repeated efforts by MBRDNA to minimize the seriousness and scope of the problem.

**WHEREFORE**, Plaintiff, Elvir Islamovic, demands judgment against Defendant, Mercedes-Benz Research & Development North America, Inc., for all injuries and damages he sustained due to the incident giving rise to this action, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages, non-economic damages, punitive damages, mental anguish, emotional distress, pain and suffering, lost wages, costs, interest, and for any such further relief as the Court deems appropriate.

## COUNT XIX—STRICT LIABILITY
(Elvir Islamovic against Daimler North America Corporation)

393.  Elvir re-alleges and incorporates Paragraphs 1 through 182 of this Complaint as if fully stated herein.

394.  Defendant, Daimler North America Corporation ("DNAC") at all times material hereto, was engaged in the business of designing, manufacturing, assembling, testing, marketing, promoting, advertising, distributing and selling Mercedes-Benz brand vehicles such as the Mercedes Vehicle to the public.

395.  DNAC is liable under the theory of Strict Product Liability as set forth in the Restatement (Second) of Torts § 402A and Florida law. DNAC was, at all times relevant to this action, the manufacturer of a product that was unreasonably and dangerously defective in its design, manufacture, and warning.

396.  DNAC, as the maker of the Mercedes Vehicle with an incorporated Takata airbag safety system who placed such vehicle into the marketplace so as to be distributed and sold in a defective and unreasonably dangerous condition, is strictly liable for the physical harm caused by the Mercedes Vehicle's airbag safety system, when, upon deployment of its passenger's side frontal air bag, the inflator in same ruptured and exploded.

397.  DNAC, in incorporating a Takata airbag safety system into the Mercedes Vehicle which it made and sold, which is not a component system that, once incorporated, is subject to any routine maintenance, adjustment or

diagnostic review that would change its condition from how it was designed, manufactured and installed, would have expected the Takata airbag safety system in the Mercedes Vehicle to reach the user or consumer without substantial change in the condition in which it was sold.

398. In this instance, the Mercedes Vehicle, and its incorporated Takata airbag safety system, reached Elvir without substantial change, and, just as when it was originally made and sold by DNAC, such vehicle and its airbag safety system remained a life threatening hazard. Further, the Mercedes Vehicle and its incorporated Takata airbag safety system was not substantially changed from the time it was manufactured until the date of this accident on November 7, 2020.

399. DNAC placed the Mercedes Vehicle on the market with knowledge that it would be used without inspection for defects and dangers. DNAC knew, or should have known, that ultimate users, operators, or passengers would not and could not properly inspect this product, including its airbag safety system, for defects and dangerous conditions, and that detection of such defects and dangers would be beyond the capabilities of such persons.

400. The inherently and unreasonably defective and dangerous condition of the Mercedes Vehicle's Takata airbag system is a condition that was not readily apparent to Elvir, or similarly situated users, operators,

consumers and owners, who could foreseeably be seriously injured or killed by said defective airbag safety system should it be deployed as intended to provide supplemental occupant protection in a foreseeable frontal crash like occurred here.

401.  DNAC, having actual knowledge, failed to provide notice of the defective and unreasonably dangerous condition of the Mercedes Vehicle's Takata airbag system to Elvir.

402.  DNAC has affirmatively concealed over the past decade the defective and unreasonably dangerous condition of the Mercedes Vehicle's Takata airbag system from the public, NHTSA, and owners, including Plaintiffs, and, such ongoing and continuous conduct, actions and inactions as has been specifically pled in this Complaint over time has foreseeably contributed to and/or caused the general public, NHTSA and owners, like Plaintiffs, to be unaware of the dangers of exploding Takata airbags and/or lack an understanding or appreciation for the magnitude of the problem and potentially lethal harms of same.

403.  As a consequence, Elvir did not know of the dangerous condition in the Mercedes Vehicle at the time of the Incident. Additionally, Elvir did not know of the dangerous condition during the period of the use of the Mercedes Vehicle prior to the subject accident. Had Elvir been informed at any time prior to riding in the Mercedes Vehicle of the potentially lethal

defect in the airbag system, he would not have used the Mercedes Vehicle, and, accordingly, he would not have been exposed to said defective and unreasonably dangerous condition. Further, had Elvir been informed at any time during the period of his use of the Mercedes Vehicle prior to the subject accident of the potentially lethal defect in the airbag system, he would not have been a driver in the Mercedes Vehicle and he would not have been exposed to the defective and unreasonably dangerous condition as described above when he was in an accident on November 7, 2020.

404. The Airbag Safety System in the Mercedes Vehicle was defective and unreasonably dangerous to ultimate users, operators, consumers and owners, including Elvir, when designed, manufactured, assembled, distributed and sold by DNAC. The defects in the Airbag Safety System in the Mercedes Vehicle include, but are not limited to:

    a. The Airbag Safety System in the Mercedes Vehicle failed to perform as safely as an ordinary consumer would expect when deployed as intended in a foreseeable frontal accident to provide the driver with supplemental occupant protection;

    b. The Airbag Safety System in the Mercedes Vehicle had an unreasonably dangerous propensity to rupture upon inflation due to excessive internal pressure;

    c. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous because of its design in that it failed to perform as safely as an ordinary consumer would expect when deployed as intended, in that the passenger's front airbag inflator produced excessive internal pressure upon deployment causing the inflator to rupture and explode;

d. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous because of its design in that it failed to perform as safely as an ordinary consumer would expect when it deployed in a manner reasonably foreseeable to DNAC, in that the passenger's front airbag inflator produced excessive internal pressure upon deployment causing the inflator to rupture and explode;

e. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous because of its design in that the risk of danger in the design outweighed the benefits when deployed as intended, in that the passenger's front airbag inflator produced excessive internal pressure upon deployment causing the inflator to rupture and explode;

f. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous and defective with an inflator having a propensity to rupture upon inflation sending metal fragments flying through the airbag cushion material because: it was not produced in accordance with available alternative designs that were safer, feasible, and technically practicable; it was not state of the art and was not designed and manufactured to the level of technical knowledge that existed when it was made; and, it was made in such a way that it posed a risk of danger to vehicle users, like Elvir, that outweighed the benefits of that airbag safety system as designed and manufactured;

g. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous as manufactured as it did not conform to its intended design and perform as safely as the intended design would have performed, in that the passenger's front airbag inflator produced excessive internal pressure upon deployment causing the inflator to rupture and explode; and

h. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous and defective due to DNAC's failure to provide adequate warnings of the risks addressed herein that were known or knowable to DNAC in light of the generally recognized and prevailing best scientific and/or medical knowledge available at the time of manufacture and distribution, including the use of

appropriate warning stickers, placards, or documentation to alert users regarding the hazardous conditions described herein.

405. At the time of the accident, the Mercedes Vehicle, including specifically its airbag safety system, was substantially unchanged from its condition, as set forth above, when sold and distributed by DNAC.

406. For the reasons set forth above, and as addressed in the preceding portions of this Complaint as have been specifically incorporated and re-alleged, the Mercedes Vehicle was unreasonably dangerous to foreseeable users, including Elvir, who was driving the Mercedes Vehicle in an ordinary and foreseeable manner. At the time DNAC released the Mercedes Vehicle with its airbag safety system into the stream of commerce, non-defective designs were economically and technologically feasible and the use of same on the Mercedes Vehicle would have been a safer alternative design which would have significantly reduced the risk of Elvir's injuries without substantially impairing the utility of the Mercedes Vehicle and its airbag safety system.

407. The defects described above directly and proximately caused the injuries sustained by Elvir in this foreseeable accident, in that they directly and in natural and continuous sequence produced or contributed substantially to Elvir's injuries.

408. Elvir suffered personal injuries including (a) bodily injury and

any resulting pain and suffering, disability or physical impairment, disfigurement, mental anguish, inconveniences or loss of capacity for the enjoyment of life, experienced in the past or to be experienced in the future; (b) the expense of hospitalization, medical and nursing care and treatment necessarily or reasonably obtained in the past or to be so obtained in the future; and (c) any earnings or working time lost in the past and any loss of ability to earn money in the future.

409. The conduct of DNAC was not simply negligent, but amounted to intentional misconduct, gross negligence, recklessness, and/or willful and wanton conduct, particularly in light of (a) the protracted period of time over which the defects have existed, (b) the long held knowledge of the defects by DNAC, (c) the repeated failure to take adequate steps to notify the public or federal regulators of the danger, and (d) the repeated efforts by DNAC to minimize the seriousness and scope of the problem.

**WHEREFORE**, Plaintiff, Elvir Islamovic, demands judgment against Defendant, Daimler North America Corporation, for all injuries and damages he sustained due to the incident giving rise to this action, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages, non-economic damages, punitive damages, mental anguish, emotional distress, pain and suffering, lost wages, costs, interest, and for any such further relief as the Court deems appropriate.

## COUNT XX—NEGLIGENCE

### (Elvir Islamovic against Daimler North America Corporation)

410.    Elvir re-alleges and incorporates Paragraphs 1 through 182 of this Complaint as if fully stated herein.

411.    DNAC had a duty to properly and adequately design, manufacture, assemble, test, inspect, label, provide adequate warnings for, package, distribute, and sell the Mercedes Vehicle, including its incorporated airbag safety system, in a reasonably safe condition so as not to present a danger to members of the general public who reasonably and expectedly under ordinary circumstances would come into contact with the Mercedes Vehicle and its airbag safety system, including Elvir.

412.    DNAC knew or in the exercise of due care should have known that the Mercedes Vehicle with its incorporated Takata airbag safety system would be used without inspection in an unreasonably dangerous condition and would create a foreseeable and unreasonable zone of risk of harm to users, including Elvir.

413.    DNAC breached its duty by negligently designing, manufacturing, assembling, testing, inspecting, labeling, packaging, failing to warn, distributing, and selling the Mercedes Vehicle with its incorporated Airbag Safety System when it was not in a reasonably safe condition for foreseeable use, as follows:

a. Failing to ensure the Airbag Safety System in the Mercedes Vehicle would perform as safely as an ordinary consumer would expect when deployed as intended in a foreseeable frontal accident to provide the driver with supplemental occupant protection;

b. Failing to ensure the Airbag Safety System in the Mercedes Vehicle was safe, and would not rupture, catch fire, or explode upon inflation due to excessive internal pressure;

c. Failing to ensure the Airbag Safety System to be incorporated into the Mercedes Vehicle as supplied by a third-party, namely Takata, would be designed, manufactured, tested, distributed and provided for purchase in a manner to ensure it was free of design and/or manufacturing defects, and/or would not otherwise be damaged or compromised during the distribution process before use;

d. Failing to ensure the Airbag Safety System in the Mercedes Vehicle was not unreasonably dangerous because of its design so that the passenger's front airbag inflator could produce excessive internal pressure upon deployment causing the inflator to rupture and explode;

e. Failing to ensure the Airbag Safety System in the Mercedes Vehicle was not unreasonably dangerous and defective with an inflator having a propensity to rupture upon inflation sending metal fragments flying through the airbag cushion material because: it was not produced in accordance with available alternative designs that were safer, feasible, and technically practicable; it was not state of the art and was not designed and manufactured to the level of technical knowledge that existed when it was made; and, it was made in such a way that it posed a risk of danger to vehicle users, like Elvir, that outweighed the benefits of that airbag safety system as designed and manufactured;

f. Failing to ensure the Airbag Safety System in the Mercedes Vehicle was not unreasonably dangerous as manufactured so that the passenger's front airbag inflator could produce excessive internal pressure upon deployment causing the inflator to

rupture and explode;

g. Failing to ensure the Airbag Safety System as delivered for incorporation into the Mercedes Vehicle was not damaged or rendered unreasonably dangerous due to damage or compromise sustained during transport or shipping;

h. Failing to require and ensure verification of the use of reasonable testing and quality control checks on a continuing basis by Takata during the design, development, manufacture, distribution and final delivery/acceptance processes relative to the Airbag Safety System before its incorporation into the Mercedes Vehicle where it would then not be further susceptible or subject to further inspection before delivery to foreseeable users of the Mercedes Vehicle;

i. Failing to ensure the Airbag Safety System was safe for incorporation and use in the Mercedes Vehicle before being incorporated and used by undertaking reasonable steps, including the utilization of testing, quality control and other recognized measures on a continuing basis to ensure product quality for safe use;

j. Failing to ensure the defective Airbag Safety System in the Mercedes Vehicle was fixed, repaired, or made safe in a reasonable and timely manner pursuant to the recall(s) of the Mercedes Vehicle by DNAC pursuant to the Safety Act;

k. Failing to ensure timely notification and completion of the repair of the Airbag Safety System in the Mercedes Vehicle upon voluntarily undertaking the duty to do so, including, specifically the initiation of DNAC's safety improvement campaign(s); and

l. Failing to warn or adequately warn by using stickers, placards, or other proper documentation, or notice, to alert users regarding the hazardous conditions and risks, as stated above, which a user would not reasonably expect to find in the product and which DNAC had knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, with respect to the use and operation of the Mercedes Vehicle.

414. The negligence described above, inclusive of the conduct, actions and inactions as addressed in the preceding portions of this Complaint as have been specifically incorporated and re-alleged, directly and proximately caused the injuries of Elvir, in that it directly and in natural and continuous sequence, produced or contributed substantially to Elvir's injuries.

415. Elvir suffered personal injuries including (a) bodily injury and any resulting pain and suffering, disability or physical impairment, disfigurement, mental anguish, inconveniences or loss of capacity for the enjoyment of life, experienced in the past or to be experienced in the future; (b) the expense of hospitalization, medical and nursing care and treatment necessarily or reasonably obtained in the past or to be so obtained in the future; and (c) any earnings or working time lost in the past and any loss of ability to earn money in the future.

416. The conduct of DNAC was not simply negligent, but amounted to intentional misconduct, gross negligence, recklessness, and/or willful and wanton conduct, particularly in light of (a) the protracted period of time over which the defects have existed, (b) the long held knowledge of the defects by DNAC, (c) the repeated failure to take adequate steps to notify the public or federal regulators of the danger, and (d) the repeated efforts by DNAC to minimize the seriousness and scope of the problem.

**WHEREFORE**, Plaintiff, Elvir Islamovic, demands judgment against Defendant, Daimler North America Corporation, for all injuries and damages he sustained due to the incident giving rise to this action, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages, non-economic damages, punitive damages, mental anguish, emotional distress, pain and suffering, lost wages, costs, interest, and for any such further relief as the Court deems appropriate.

## COUNT XXI—NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
(Elvir Islamovic against Daimler North America Corporation)

417.   Elvir re-alleges and incorporates Paragraphs 1 through 182 of this Complaint as if fully stated herein.

418.   DNAC designed, manufactured, inspected, tested, marketed, advertised, distributed, and sold the Mercedes Vehicle and placed the Mercedes Vehicle into the stream of commerce.

419.   DNAC knew or reasonably foresaw that Elvir, as a foreseeable user/driver, and Nermina, as a foreseeable bystander/passenger, would use or come into contact with the Mercedes Vehicle.

420.   DNAC owed a duty to Nermina and Elvir to properly design, manufacture, assemble, test, inspect, distribute, and sell the Mercedes Vehicle in a reasonably safe condition and without defect so as not to present a danger to members of the general public who would reasonably and

foreseeably use or come into contact with the Mercedes Vehicle, including Nermina and Elvir.

421. DNAC owed a duty to Nermina and Elvir to provide adequate warnings and instruction about the dangers associated with using the Mercedes Vehicle and how to protect against these dangers.

422. DNAC breached the duties it owed to Nermina and Elvir by designing, manufacturing, inspecting, testing, distributing, and selling the Mercedes Vehicle in a defective and unreasonably dangerous condition and without adequate warnings or instructions.

423. DNAC knew or reasonably should have known that Elvir, as a foreseeable user/driver, and Nermina, as a foreseeable bystander/passenger, would suffer injuries and damages due to the Mercedes Vehicle's defective and unreasonably dangerous condition.

424. At no time did DNAC take action to remedy the Mercedes Vehicle's defective and unreasonably dangerous condition or warn consumers about its negligent design, manufacture, and warning with respect to the Mercedes Vehicle, despite DNAC's ability to do so.

425. As a direct and proximate result of DNAC's negligent acts and omissions, Elvir suffered severe emotional distress and psychological trauma.

426. Elvir's severe emotional distress and psychological trauma caused physical injury to Elvir within a short time after the incident giving rise to this lawsuit.

427. The conduct of DNAC was not simply negligent, but amounted to intentional misconduct, gross negligence, recklessness, and/or willful and wanton conduct, particularly in light of (a) the protracted period of time over which the defects have existed, (b) the long held knowledge of the defects by DNAC, (c) the repeated failure to take adequate steps to notify the public or federal regulators of the danger, and (d) the repeated efforts by DNAC to minimize the seriousness and scope of the problem.

**WHEREFORE**, Plaintiff, Elvir Islamovic, demands judgment against Defendant, Daimler North America Corporation, for all injuries and damages he sustained due to the incident giving rise to this action, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages, non-economic damages, punitive damages, mental anguish, emotional distress, pain and suffering, lost wages, costs, interest, and for any such further relief as the Court deems appropriate.

## COUNT XXII—STRICT LIABILITY
(Elvir Islamovic against Daimler AG)

428. Elvir re-alleges and incorporates Paragraphs 1 through 182 of this Complaint as if fully stated herein.

429.    Defendant, Daimler AG at all times material hereto, was engaged in the business of designing, manufacturing, assembling, testing, marketing, promoting, advertising, distributing and selling Mercedes-Benz brand vehicles such as the Mercedes Vehicle to the public.

430.    Daimler AG is liable under the theory of Strict Product Liability as set forth in the Restatement (Second) of Torts § 402A and Florida law. Daimler AG was, at all times relevant to this action, the manufacturer of a product that was unreasonably and dangerously defective in its design, manufacture, and warning.

431.    Daimler AG, as the maker of the Mercedes Vehicle with an incorporated Takata airbag safety system who placed such vehicle into the marketplace so as to be distributed and sold in a defective and unreasonably dangerous condition, is strictly liable for the physical harm caused by the Mercedes Vehicle's airbag safety system, when, upon deployment of its passenger's side frontal air bag, the inflator in same ruptured and exploded.

432.    Daimler AG, in incorporating a Takata airbag safety system into the Mercedes Vehicle which it made and sold, which is not a component system that, once incorporated, is subject to any routine maintenance, adjustment or diagnostic review that would change its condition from how it was designed, manufactured and installed, would have expected the Takata airbag safety system in the Mercedes Vehicle to reach the user or consumer

without substantial change in the condition in which it was sold.

433. In this instance, the Mercedes Vehicle, and its incorporated Takata airbag safety system, reached Elvir without substantial change, and, just as when it was originally made and sold by Daimler AG, such vehicle and its airbag safety system remained a life threatening hazard. Further, the Mercedes Vehicle and its incorporated Takata airbag safety system was not substantially changed from the time it was manufactured until the date of this accident on November 7, 2020.

434. Daimler AG placed the Mercedes Vehicle on the market with knowledge that it would be used without inspection for defects and dangers. Daimler AG knew, or should have known, that ultimate users, operators, or passengers would not and could not properly inspect this product, including its airbag safety system, for defects and dangerous conditions, and that detection of such defects and dangers would be beyond the capabilities of such persons.

435. The inherently and unreasonably defective and dangerous condition of the Mercedes Vehicle's Takata airbag system is a condition that was not readily apparent to Elvir, or similarly situated users, operators, consumers and owners, who could foreseeably be seriously injured or killed by said defective airbag safety system should it be deployed as intended to provide supplemental occupant protection in a foreseeable frontal crash

like occurred here.

436.    Daimler AG, having actual knowledge, failed to provide notice of the defective and unreasonably dangerous condition of the Mercedes Vehicle's Takata airbag system to Elvir.

437.    Daimler AG has affirmatively concealed over the past decade the defective and unreasonably dangerous condition of the Mercedes Vehicle's Takata airbag system from the public, NHTSA, and owners, including Plaintiffs, and, such ongoing and continuous conduct, actions and inactions as has been specifically pled in this Complaint over time has foreseeably contributed to and/or caused the general public, NHTSA and owners, like Plaintiffs, to be unaware of the dangers of exploding Takata airbags and/or lack an understanding or appreciation for the magnitude of the problem and potentially lethal harms of same.

438.    As a consequence, Elvir did not know of the dangerous condition in the Mercedes Vehicle at the time of the Incident. Additionally, Elvir did not know of the dangerous condition during the period of the use of the Mercedes Vehicle prior to the subject accident. Had Elvir been informed at any time prior to riding in the Mercedes Vehicle of the potentially lethal defect in the airbag system, he would not have used the Mercedes Vehicle, and, accordingly, he would not have been exposed to said defective and unreasonably dangerous condition. Further, had Elvir been informed at any

time during the period of his use of the Mercedes Vehicle prior to the subject accident of the potentially lethal defect in the airbag system, he would not have been a driver in the Mercedes Vehicle and he would not have been exposed to the defective and unreasonably dangerous condition as described above when he was in an accident on November 7, 2020.

439. The Airbag Safety System in the Mercedes Vehicle was defective and unreasonably dangerous to ultimate users, operators, consumers and owners, including Elvir, when designed, manufactured, assembled, distributed and sold by Daimler AG. The defects in the Airbag Safety System in the Mercedes Vehicle include, but are not limited to:

    a. The Airbag Safety System in the Mercedes Vehicle failed to perform as safely as an ordinary consumer would expect when deployed as intended in a foreseeable frontal accident to provide the driver with supplemental occupant protection;

    b. The Airbag Safety System in the Mercedes Vehicle had an unreasonably dangerous propensity to rupture upon inflation due to excessive internal pressure;

    c. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous because of its design in that it failed to perform as safely as an ordinary consumer would expect when deployed as intended, in that the passenger's front airbag inflator produced excessive internal pressure upon deployment causing the inflator to rupture and explode;

    d. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous because of its design in that it failed to perform as safely as an ordinary consumer would expect when it deployed in a manner reasonably foreseeable to Daimler AG, in that the passenger's front airbag inflator produced excessive

internal pressure upon deployment causing the inflator to rupture and explode;

e. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous because of its design in that the risk of danger in the design outweighed the benefits when deployed as intended, in that the passenger's front airbag inflator produced excessive internal pressure upon deployment causing the inflator to rupture and explode;

f. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous and defective with an inflator having a propensity to rupture upon inflation sending metal fragments flying through the airbag cushion material because: it was not produced in accordance with available alternative designs that were safer, feasible, and technically practicable; it was not state of the art and was not designed and manufactured to the level of technical knowledge that existed when it was made; and, it was made in such a way that it posed a risk of danger to vehicle users, like Elvir, that outweighed the benefits of that airbag safety system as designed and manufactured;

g. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous as manufactured as it did not conform to its intended design and perform as safely as the intended design would have performed, in that the passenger's front airbag inflator produced excessive internal pressure upon deployment causing the inflator to rupture and explode; and

h. The Airbag Safety System in the Mercedes Vehicle was unreasonably dangerous and defective due to Daimler AG's failure to provide adequate warnings of the risks addressed herein that were known or knowable to Daimler AG in light of the generally recognized and prevailing best scientific and/or medical knowledge available at the time of manufacture and distribution, including the use of appropriate warning stickers, placards, or documentation to alert users regarding the hazardous conditions described herein.

440. At the time of the accident, the Mercedes Vehicle, including

specifically its airbag safety system, was substantially unchanged from its condition, as set forth above, when sold and distributed by Daimler AG.

441. For the reasons set forth above, and as addressed in the preceding portions of this Complaint as have been specifically incorporated and re-alleged, the Mercedes Vehicle was unreasonably dangerous to foreseeable users, including Elvir, who was driving the Mercedes Vehicle in an ordinary and foreseeable manner. At the time Daimler AG released the Mercedes Vehicle with its airbag safety system into the stream of commerce, non-defective designs were economically and technologically feasible and the use of same on the Mercedes Vehicle would have been a safer alternative design which would have significantly reduced the risk of Elvir's injuries without substantially impairing the utility of the Mercedes Vehicle and its airbag safety system.

442. The defects described above directly and proximately caused the injuries sustained by Elvir in this foreseeable accident, in that they directly and in natural and continuous sequence produced or contributed substantially to Elvir's injuries.

443. Elvir suffered personal injuries including (a) bodily injury and any resulting pain and suffering, disability or physical impairment, disfigurement, mental anguish, inconveniences or loss of capacity for the enjoyment of life, experienced in the past or to be experienced in the future;

(b) the expense of hospitalization, medical and nursing care and treatment necessarily or reasonably obtained in the past or to be so obtained in the future; and (c) any earnings or working time lost in the past and any loss of ability to earn money in the future.

444. The conduct of Daimler AG was not simply negligent, but amounted to intentional misconduct, gross negligence, recklessness, and/or willful and wanton conduct, particularly in light of (a) the protracted period of time over which the defects have existed, (b) the long held knowledge of the defects by Daimler AG, (c) the repeated failure to take adequate steps to notify the public or federal regulators of the danger, and (d) the repeated efforts by Daimler AG to minimize the seriousness and scope of the problem.

**WHEREFORE**, Plaintiff, Elvir Islamovic, demands judgment against Defendant, Daimler AG, for all injuries and damages he sustained due to the incident giving rise to this action, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages, non-economic damages, punitive damages, mental anguish, emotional distress, pain and suffering, lost wages, costs, interest, and for any such further relief as the Court deems appropriate.

## COUNT XXIII—NEGLIGENCE
(Elvir Islamovic against Daimler AG)

445.   Elvir re-alleges and incorporates Paragraphs 1 through 182 of this Complaint as if fully stated herein.

446.   Daimler AG had a duty to properly and adequately design, manufacture, assemble, test, inspect, label, provide adequate warnings for, package, distribute, and sell the Mercedes Vehicle, including its incorporated airbag safety system, in a reasonably safe condition so as not to present a danger to members of the general public who reasonably and expectedly under ordinary circumstances would come into contact with the Mercedes Vehicle and its airbag safety system, including Elvir.

447.   Daimler AG knew or in the exercise of due care should have known that the Mercedes Vehicle with its incorporated Takata airbag safety system would be used without inspection in an unreasonably dangerous condition and would create a foreseeable and unreasonable zone of risk of harm to users, including Elvir.

448.   Daimler AG breached its duty by negligently designing, manufacturing, assembling, testing, inspecting, labeling, packaging, failing to warn, distributing, and selling the Mercedes Vehicle with its incorporated Airbag Safety System when it was not in a reasonably safe condition for foreseeable use, as follows:

   a. Failing to ensure the Airbag Safety System in the Mercedes Vehicle would perform as safely as an ordinary consumer would expect when deployed as intended in a foreseeable frontal

accident to provide the driver with supplemental occupant protection;

b. Failing to ensure the Airbag Safety System in the Mercedes Vehicle was safe, and would not rupture, catch fire, or explode upon inflation due to excessive internal pressure;

c. Failing to ensure the Airbag Safety System to be incorporated into the Mercedes Vehicle as supplied by a third-party, namely Takata, would be designed, manufactured, tested, distributed and provided for purchase in a manner to ensure it was free of design and/or manufacturing defects, and/or would not otherwise be damaged or compromised during the distribution process before use;

d. Failing to ensure the Airbag Safety System in the Mercedes Vehicle was not unreasonably dangerous because of its design so that the passenger's front airbag inflator could produce excessive internal pressure upon deployment causing the inflator to rupture and explode;

e. Failing to ensure the Airbag Safety System in the Mercedes Vehicle was not unreasonably dangerous and defective with an inflator having a propensity to rupture upon inflation sending metal fragments flying through the airbag cushion material because: it was not produced in accordance with available alternative designs that were safer, feasible, and technically practicable; it was not state of the art and was not designed and manufactured to the level of technical knowledge that existed when it was made; and, it was made in such a way that it posed a risk of danger to vehicle users, like Elvir, that outweighed the benefits of that airbag safety system as designed and manufactured;

f. Failing to ensure the Airbag Safety System in the Mercedes Vehicle was not unreasonably dangerous as manufactured so that the passenger's front airbag inflator could produce excessive internal pressure upon deployment causing the inflator to rupture and explode;

g. Failing to ensure the Airbag Safety System as delivered for

incorporation into the Mercedes Vehicle was not damaged or rendered unreasonably dangerous due to damage or compromise sustained during transport or shipping;

h. Failing to require and ensure verification of the use of reasonable testing and quality control checks on a continuing basis by Takata during the design, development, manufacture, distribution and final delivery/acceptance processes relative to the Airbag Safety System before its incorporation into the Mercedes Vehicle where it would then not be further susceptible or subject to further inspection before delivery to foreseeable users of the Mercedes Vehicle;

i. Failing to ensure the Airbag Safety System was safe for incorporation and use in the Mercedes Vehicle before being incorporated and used by undertaking reasonable steps, including the utilization of testing, quality control and other recognized measures on a continuing basis to ensure product quality for safe use;

j. Failing to ensure the defective Airbag Safety System in the Mercedes Vehicle was fixed, repaired, or made safe in a reasonable and timely manner pursuant to the recall(s) of the Mercedes Vehicle by Daimler AG pursuant to the Safety Act;

k. Failing to ensure timely notification and completion of the repair of the Airbag Safety System in the Mercedes Vehicle upon voluntarily undertaking the duty to do so, including, specifically the initiation of Daimler AG's safety improvement campaign(s); and

l. Failing to warn or adequately warn by using stickers, placards, or other proper documentation, or notice, to alert users regarding the hazardous conditions and risks, as stated above, which a user would not reasonably expect to find in the product and which Daimler AG had knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, with respect to the use and operation of the Mercedes Vehicle.

449. The negligence described above, inclusive of the conduct, actions

and inactions as addressed in the preceding portions of this Complaint as have been specifically incorporated and re-alleged, directly and proximately caused the injuries of Elvir, in that it directly and in natural and continuous sequence, produced or contributed substantially to Elvir's injuries.

450.    Elvir suffered personal injuries including (a) bodily injury and any resulting pain and suffering, disability or physical impairment, disfigurement, mental anguish, inconveniences or loss of capacity for the enjoyment of life, experienced in the past or to be experienced in the future; (b) the expense of hospitalization, medical and nursing care and treatment necessarily or reasonably obtained in the past or to be so obtained in the future; and (c) any earnings or working time lost in the past and any loss of ability to earn money in the future.

451.    The conduct of Daimler AG was not simply negligent, but amounted to intentional misconduct, gross negligence, recklessness, and/or willful and wanton conduct, particularly in light of (a) the protracted period of time over which the defects have existed, (b) the long held knowledge of the defects by Daimler AG, (c) the repeated failure to take adequate steps to notify the public or federal regulators of the danger, and (d) the repeated efforts by Daimler AG to minimize the seriousness and scope of the problem.

**WHEREFORE**, Plaintiff, Elvir Islamovic, demands judgment against Defendant, Daimler AG, for all injuries and damages he sustained due to the

incident giving rise to this action, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages, non-economic damages, punitive damages, mental anguish, emotional distress, pain and suffering, lost wages, costs, interest, and for any such further relief as the Court deems appropriate.

## COUNT XXIV—NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
(Elvir Islamovic against Daimler AG)

452.   Elvir re-alleges and incorporates Paragraphs 1 through 182 of this Complaint as if fully stated herein.

453.   Daimler AG designed, manufactured, inspected, tested, marketed, advertised, distributed, and sold the Mercedes Vehicle and placed the Mercedes Vehicle into the stream of commerce.

454.   Daimler AG knew or reasonably foresaw that Elvir, as a foreseeable user/driver, and Nermina, as a foreseeable bystander/passenger, would use or come into contact with the Mercedes Vehicle.

455.   Daimler AG owed a duty to Nermina and Elvir to properly design, manufacture, assemble, test, inspect, distribute, and sell the Mercedes Vehicle in a reasonably safe condition and without defect so as not to present a danger to members of the general public who would reasonably and foreseeably use or come into contact with the Mercedes Vehicle, including Nermina and Elvir.

456.   Daimler AG owed a duty to Nermina and Elvir to provide adequate warnings and instruction about the dangers associated with using the Mercedes Vehicle and how to protect against these dangers.

457.   Daimler AG breached the duties it owed to Nermina and Elvir by designing, manufacturing, inspecting, testing, distributing, and selling the Mercedes Vehicle in a defective and unreasonably dangerous condition and without adequate warnings or instructions.

458.   Daimler AG knew or reasonably should have known that Elvir, as a foreseeable user/driver, and Nermina, as a foreseeable bystander/passenger, would suffer injuries and damages due to the Mercedes Vehicle's defective and unreasonably dangerous condition.

459.   At no time did Daimler AG take action to remedy the Mercedes Vehicle's defective and unreasonably dangerous condition or warn consumers about its negligent design, manufacture, and warning with respect to the Mercedes Vehicle, despite Daimler AG's ability to do so.

460.   As a direct and proximate result of Daimler AG's negligent acts and omissions, Elvir suffered severe emotional distress and psychological trauma.

461.   Elvir's severe emotional distress and psychological trauma caused physical injury to Elvir within a short time after the incident giving rise to this lawsuit.

462. The conduct of Daimler AG was not simply negligent, but amounted to intentional misconduct, gross negligence, recklessness, and/or willful and wanton conduct, particularly in light of (a) the protracted period of time over which the defects have existed, (b) the long held knowledge of the defects by Daimler AG, (c) the repeated failure to take adequate steps to notify the public or federal regulators of the danger, and (d) the repeated efforts by Daimler AG to minimize the seriousness and scope of the problem.

**WHEREFORE**, Plaintiff, Elvir Islamovic, demands judgment against Defendant, Daimler AG, for all injuries and damages he sustained due to the incident giving rise to this action, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages, non-economic damages, punitive damages, mental anguish, emotional distress, pain and suffering, lost wages, costs, interest, and for any such further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs, Nermina Alimanovic and Elvir Islamovic, demand a jury trial on all issues so triable.

## CONCLUSION

**WHEREFORE**, Plaintiffs, Nermina Alimanovic and Elvir Islamovic, demand judgment against Defendants, Mercedes-Benz USA, LLC, Mercedes-Benz Research and Development North America, Inc., Daimler North

America Corporation, and Daimler AG, for all injuries and damages they sustained due to the incident giving rise to this action, whether already incurred or to be incurred in the future, including all actual damages, consequential damages, economic damages, non-economic damages, punitive damages, mental anguish, emotional distress, pain and suffering, lost wages, costs, interest, and for any such further relief as the Court deems appropriate.

Dated: March 9, 2021                    Respectfully submitted,


*/s/ Andrew Parker Felix, Esq.*
**ANDREW PARKER FELIX, ESQ.**
Florida Bar No.: 0685607
**STEVEN E. NAUMAN, ESQ.**
Florida Bar No.: 106126
**BRANDEN WEBER, ESQ.**
Florida Bar No.: 124283
**JOSHUA R. JACOBSON, ESQ.**
Florida Bar No.: 1002264
**Morgan & Morgan, P.A.**
20 North Orange Avenue, Suite 1600
Orlando, FL 32801
Telephone: (407) 244-3209
Email: andrew@forthepeople.com
Secondary Email:
kdimeglio@forthepeople.com
Secondary Email:
snauman@forthepeople.com
Secondary Email:
bweber@forthepeople.com
Secondary Email:
jjacobson@forthepeople.com
*Counsel for Plaintiffs*